### UNITED STATES BANKRUPTCY COURT

### SOUTHERN DISTRICT OF ALABAMA

### MOBILE

| | | |
|---|---|---|
| IN RE: | * | |
| | * | |
| MARK JOSEPH BRANNAN and | * | LEAD CASE NO. |
| KELLY ANN BRANNAN, | * | 02-16647 |
| | * | |
| DEBTORS. | * | Chapter 13 |
| | * | |
| * * * * * * * * * * * | * | |
| | * | |
| MARK JOSEPH BRANNAN and | * | ADVERSARY NO. |
| KELLY ANN BRANNAN, | * | 04-01037 |
| | * | |
| Plaintiffs. | * | |
| | * | |
| v. | * | Mobile, Alabama |
| | * | October 20, 2011 |
| WELLS FARGO HOME MORTGAGE, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| * * * * * * * * * * * | * | |

Transcript of the proceedings taken in the above captioned matter on **Thursday, October 20, 2011,** the Honorable Margaret A. Mahoney United States Bankruptcy Judge, presiding.


TRANSCRIPTIONIST:  Sherryl Robinson
                   3704 Chadwood Drive
                   Harvey, Louisiana 70058
                   (504) 348-3704


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

      Cunningham, Bounds, LLC
      BY:  STEVE OLEN, ESQ.
      BY:  STEVEN L. NICHOLAS, ESQ.
      1601 Dauphin Street
      Post Office Box 66705
      Mobile, Alabama 36660


      Cabaniss, Johnston, Gardner, Dumas & O'Neal, LLP
      BY:  IAN D. ROSENTHAL, ESQ.
      BY:  BENJAMEN T. ROWE, ESQ.
      Riverview Plaza
      63 Royal Street, Suite 700
      Post Office Box 2906
      Mobile, Alabama 36652

          Representing Kelly Ann Brannan


      Hand Arendall, LLC
      BY:  HENRY A. CALLAWAY, III, ESQ.
      BY:  RODNEY R. CATE, ESQ.
      BY:  JENNIFER S. MORGAN, ESQ.
      RSA Tower
      11 North Water Street, Suite 30200
      Post Office Box 123
      Mobile, Alabama 36601

          Representing the Defendant Wells Fargo


      Stephens, Millirons, Harrison & Gammons, PC
      BY:  JOSHUA B. WHITE, ESQ.
      2430 L and North Drive, SW
      Huntsville, Alabama 35801


      Burke, Warren, MacKay & Serritella, PC
      BY:  DANIELLE J. SZUKALA, ESQ.
      330 North Wabash Avenue, 22nd Floor
      Chicago, Illinois 60611

          Representing JP Morgan Chase Bank, N.A.

APPEARANCES (Cont'd.):

Burr & Forman, LLP
By:  STEPHEN J. BUMGARNER, ESQ.
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203

        Representing Citimortgage, Inc.

# I N D E X

| PLAINTIFF'S EXHIBITS: | Marked | Received |
|---|---|---|
| P-1  (not specified)<br>thru<br>P-2A | 12 | 12 |
| P-2B (not specified) | 135 | 136 |
| P-3  (not specified) | 135 | 138 |
| P-4  (not specified)<br>thru<br>P-11 | 12 | 12 |
| P-15 (not specified)<br>thru<br>P-16 | 12 | 12 |
| P-17 (not specified)<br>thru<br>P-31 | 135 | 138 |
| P-32 (not specified) | 12 | 12 |
| P-33 (not specified) | 135 | 138 |
| P-34 (not specified)<br>thru<br>P-184 | 12 | 12 |
| 17 Deposition Excerpts | 19 | 24 |

## I N D E X
### (Continued)

| DEFENDANT'S EXHIBITS: | Marked | Received |
|---|---|---|
| D-1  (not specified)<br>thru<br>D-93 | 12 | 12 |
|    3 Deposition Excerpts | 19 | 24 |

| | Page |
|---|---|
| AFTERNOON PROCEEDINGS: | 141 |

1                    **P R O C E E D I N G S**

2                 (Thursday, October 20, 2011)

3                  (Call to Order of the Court)

4                    *    *    *    *    *

5                **CLASS CERTIFICATION HEARING**

6                    *    *    *    *    *

7          THE COURT:  Good morning.

8     (All Counsel respond, "Good morning, Your Honor.")

9          THE COURT:  Please be seated.

10         All right.  We're here on *Brannan v. Wells Fargo Home*

11    *Mortgage*, the Class Certification Hearing.

12         Let's note appearances first for the record.  We'll

13    start with the Plaintiffs and go to the Defendants.

14         MR. OLEN:  Steve Olen for Plaintiff Kelly Brannan,

15    who is now Kelly Zayas.

16         THE COURT:  Okay, all right.

17         MR. ROSENTHAL:  Ian Rosenthal for Plaintiff Kelly

18    Brannan.

19         MR. NICHOLAS:  Steve Nicholas for the Plaintiff.

20         MR. ROWE:  Ben Rowe for the Plaintiff.

21         THE COURT:  All right, Defense Counsel.

22         MR. CALLAWAY:  Henry Callaway for the Defendant Wells

23    Fargo.

24         MR. CATE:  Rod Cate for Defendant Wells Fargo.

25         MS. MORGAN:  Jennifer Morgan for Defendant Wells

1  Fargo.

2          THE COURT:  All right.  And anybody else who wants

3  their appearance noted for any reason?

4          MS. SZUKALA:  Your Honor, Danielle Szukala on behalf

5  of JP Morgan Chase Bank.

6          THE COURT:  All right.

7          MS. SZUKALA:  I filed --

8          THE COURT:  I don't think we've -- have we met

9  before?

10         MS. SZUKALA:  It's been a few years ago on a

11  discovery matter, Your Honor.

12         THE COURT:  I was going to say it is nice to put a

13  face to a voice on the phone, all right.

14         Yes, go ahead.

15         MR. WHITE:  Joshua White for Chase also, Your Honor.

16         THE COURT:  The same there, it's nice to put a face

17  to your voice.

18         Yes?

19         MR. BUMGARNER:  Good morning Your Honor, Stephen

20  Bumgarner.

21         THE COURT:  Yes.

22         MR. BUMGARNER:  For Citimortgage and in Katherine

23  Tate v. Citimortgage, a matter pending before Your Honor.

24         THE COURT:  All right.  All right, are there -- well,

25  I know there are at least some preliminary matters.  I have the

1  exhibit list and then the Defendant Wells Fargo filed an

2  objection to some of the Plaintiff's exhibits.  Do we want to

3  deal with that now, or what do we want?  How do you folks want

4  to proceed?

5       MR. CALLAWAY:  I'll be glad to walk through them, to

6  see what we can go through.

7       THE COURT:  Have you and the Plaintiff's Counsel --

8  is there any resolution of any of these?  Have you discussed

9  this at all?

10      MR. OLEN:  We've discussed it, Your Honor.

11      THE COURT:  Okay.

12      MR. OLEN:  In terms of Mr. Callaway has conceptually

13  explained what his issue is.

14      THE COURT:  Okay, all right.  Well let's -- do you

15  think that's the first thing we ought to start with?

16      MR. OLEN:  We think that you ought to hear the

17  summary of what the testimony is.

18      THE COURT:  Okay.

19      MR. OLEN:  Because that will give you some context,

20  or otherwise, we're going to start talking about a good bit of

21  what the evidence is, to explain to you --

22      THE COURT:  That's true.

23      MR. OLEN:  -- why we think these affidavits are

24  relevant.

25      THE COURT:  Mr. Callaway.

```
 1              MR. CALLAWAY:  Well --

 2              MR. OLEN:  Now, some we don't have a problem with,

 3   like the (inaudible).  I told you that.

 4              MR. CALLAWAY:  Okay.

 5              MR. OLEN:  You can go ahead and offer that.

 6              MR. CALLAWAY:  He --

 7              THE COURT:  And so, tell me which one.  Let me just

 8   -- let's knock out the ones then that we can.

 9              MR. OLEN:  Yes, Your Honor.

10              MR. CALLAWAY:  Twelve and fourteen.

11              THE COURT:  Okay.  So, you're not offering 12 and 14?

12              MR. OLEN:  Correct.

13              THE COURT:  Okay.  And I will not receive those at

14   any point.

15              And Ms. Brooks, you will make a note of that.

16              THE CLERK:  Yes, ma'am.

17              MR. CALLAWAY:  And 2B, I just didn't understand what

18   it was.

19              THE COURT:  I saw that.

20              MR. CALLAWAY:  I was not --

21              THE COURT:  And then the more, I guess, substantive

22   issue is the ones on three, 17 through 31 and 33, right?  Oh,

23   and how about 14 is a newspaper article?  Is that one?

24              MR. CALLAWAY:  He's agreed to withdraw that.

25              THE COURT:  Okay.  Is that one being withdrawn?  I
```

1    didn't hear that.

2              MR. CALLAWAY:  Number 13, I'm not sure what that is.

3    It's some New York form pleading.

4              THE COURT:  Oh, okay.  I did Number 13 instead of

5    Number 14, all right.

6              MR. OLEN:  That's fine.  We won't offer Numbers 12,

7    13 or 14.

8              THE COURT:  Okay.

9              MR. OLEN:  That's no problem.

10              THE COURT:  All right.  And then as to the others,

11    your point Mr. Olen is that you need to sort of tell me where

12    these exhibits might fit into the scheme of things, if you

13    will, and then we can go to that issue.

14              MR. OLEN:  We --

15              THE COURT:  Okay, that works?

16              MR. CALLAWAY:  That's fine with me, Your Honor.

17              THE COURT:  All right.  I just don't want to forget,

18    somebody needs to remember to bring that up again before we're

19    done.

20              MR. CALLAWAY:  All right.

21              THE COURT:  So we'll face that one.

22              MR. CALLAWAY:  And let me clarify the record on a

23    couple of things.  Both the Plaintiff and Defendant have added

24    a couple of exhibits at the last minute.

25              THE COURT:  Okay.

1          MR. CALLAWAY:  And there's not any objections to

2   either one.

3          THE COURT:  Okay.

4          MR. CALLAWAY:  All right.

5          THE COURT:  And so, other than these --

6          MR. OLEN:  That's correct.

7          THE COURT:  -- ones we're going to talk about later,

8   just in whole, the Plaintiff has Exhibits 1 through what?  What

9   number did you -- you added -- I got your amended list and that

10  ends with --

11         MR. CALLAWAY:  Number 184, I believe.

12         THE COURT:  Number 182 on the list that was filed, so

13  it's Number 184 now?

14         MR. OLEN:  We just added two.

15         THE COURT:  Okay.

16         MR. OLEN:  Our servers were down --

17         THE COURT:  Okay.

18         MR. OLEN:  -- as of last night.

19         THE COURT:  Okay.

20         MR. OLEN:  And our secretary will file them --

21         THE COURT:  And I didn't look this morning.  I have

22  to --

23         MR. OLEN:  No, no, no, it wouldn't have been filed

24  yet.

25         THE COURT:  Okay.  And the Defendant's are Numbers 1

1   through?

2           MR. CALLAWAY:  Number 1 through 93.

3           THE COURT:  Okay, all right.  And so, other than the

4   ones I will talk about with you folks later, all of Numbers 1

5   through 184 of the Plaintiff's and Defendant's Numbers 1

6   through 93; all of Defendant's Number 1 through 93 are

7   received.

8           Plaintiff's Number 1 through 184 are received, other

9   than the ones we're going to talk about, and we'll come back

10  to.  All right, just for the record.

11          MR. CALLAWAY:  Which would be Numbers 2B, 3, 17 to 31

12  and 33?

13          THE COURT:  That's it.  That's it, the ones that are

14  on your objection, your written objection, other than -- and

15  then, I am not receiving -- I need to say that -- Numbers 12,

16  13 or 14.

17          MR. CALLAWAY:  Your Honor, we might need to stipulate

18  on the record as to what a few of these exhibits are.

19          THE COURT:  That's fine.

20          MR. OLEN:  Okay.

21          THE COURT:  Tell me.

22          MR. CALLAWAY:  I can refer you to --

23          THE COURT:  You're going to look at the Plaintiff's

24  exhibits?

25          MR. CALLAWAY:  We're looking at the Plaintiff's

1  exhibits first.

2          THE COURT:  Okay.  I do not have those up here.

3  They're voluminous enough, but I've got -- no, wait, here.

4  I've got the list so, all right.

5          MR. CALLAWAY:  All right.  Plaintiff's Exhibit 140 is

6  denominated as "Chart listing affidavits filed by Wells Fargo

7  in the Southern District of Alabama which have defects that can

8  be found by examining the affidavits themselves."

9          THE COURT:  Okay.

10         MR. CALLAWAY:  "The chart does not include any issues

11 identified by Wells Fargo's witnesses in their depositions nor

12 the bankruptcy files produced by Wells Fargo."

13         THE COURT:  Okay.

14         MR. CALLAWAY:  That's the Plaintiff's summary.  I

15 don't have any problem with that admission as a summary of

16 voluminous records.  I would note though that the Plaintiff has

17 comments on there which really take it outside the rule as

18 being a pure summary.

19         But with that caveat, that the Plaintiff's comments

20 are --

21         THE COURT:  Are simply their argument?

22         MR. CALLAWAY:  Their argument.

23         THE COURT:  All right.

24         MR. CALLAWAY:  Now, we got a spreadsheet version of

25 theirs and turned it into our own exhibit, which is Defendant's

1 | Exhibit 93, which is --

2 |        THE COURT: Similar?

3 |        MR. CALLAWAY: -- the Plaintiff's spreadsheet.

4 |        THE COURT: Okay.

5 |        MR. CALLAWAY: We didn't have time to do them all,

6 | but we did the comments on the ones that were marked as

7 | exhibits.

8 |        THE COURT: Okay.

9 |        MR. CALLAWAY: I've got --

10 |        THE COURT: And I have not had a chance to look at

11 | those yet, but that's terrific from my perspective.

12 |        MR. CALLAWAY: I've got a bigger copy of it that I

13 | would like to give to the Court that I've given to Mr. Olen.

14 |        THE COURT: Okay, and I am cross referencing them on

15 | each of -- are these the original exhibits?

16 |        THE CLERK: Yes.

17 |        THE COURT: Okay.

18 |        THE CLERK: Those are the ones that they gave me for

19 | you.

20 |        THE COURT: Well, I just made a note on it. Okay,

21 | I'll remember not to do that.

22 |        MR. CALLAWAY: If I could give this to Your Honor; I

23 | gave it to Mr. Olen. It's just the larger version of --

24 |        THE COURT: Okay.

25 |        MR. CALLAWAY: -- Defendant's Exhibit 93.

1              THE COURT:  Thank you.

2              MR. CALLAWAY:  Because we're going to be referring to

3    it in a little bit.

4              THE COURT:  I appreciate it.

5              MR. CALLAWAY:  And I took their spreadsheet, I added

6    columns on the left adding the trial exhibit numbers.

7              THE COURT:  Okay.

8              MR. CALLAWAY:  And then I put Defendant's comments on

9    the ones --

10             THE COURT:  You did.

11             MR. CALLAWAY:  -- that they listed as exhibits.

12             THE COURT:  That's helpful.

13             MR. CALLAWAY:  And then some deposition references,

14   although I will not represent that the deposition references

15   are exhaustive.  They were mainly for my own purposes, but I

16   left them in there.

17             THE COURT:  Okay.  All right, I appreciate that.

18             MR. CALLAWAY:  So, I think it goes in again as a

19   summary with the caveat that both Plaintiff's and Defendant's

20   comments are not themselves evidence.

21             THE COURT:  No, I am -- you are both correct.  You

22   are correct and I know we had this discussion the other day.

23   The comments are argument as to what each of you see that

24   affidavit may represent.

25             MR. CALLAWAY:  Thank you.

1          THE COURT:  Okay.

2          MR. CALLAWAY:  And one other minor thing is

3  Defendant's Exhibit 31 is a cut-down version of the Plaintiff's

4  exhibit that we just discussed.  And that was what was produced

5  by the Plaintiff in response to my discovery request for a list

6  of the allegedly improper affidavits filed in the Southern

7  District and what was wrong with them.  That was a discovery

8  response.

9          THE COURT:  Okay.

10          MR. CALLAWAY:  So, it's --

11          THE COURT:  So, this is a --

12          MR. CALLAWAY:  I want to clarify in the record what

13  that is.

14          THE COURT:  Okay.

15          MR. CALLAWAY:  It was produced by the Plaintiff's.

16  It's almost -- it's perhaps outmoded now, because we've now

17  expanded upon that, that list, but that's what Defendant's

18  Exhibit 31 is, because it's not self-explanatory as to what

19  that is.

20          THE COURT:  Okay.  I see that.  It's sort of a prior

21  140.

22          MR. CALLAWAY:  It was a discovery response --

23          THE COURT:  Yes.

24          MR. CALLAWAY:  -- that the Plaintiff's have now

25  expanded upon.

1          THE COURT:  Okay.

2          MR. CALLAWAY:  And the Defendant's have expanded

3   upon, as well.

4          THE COURT:  All right.

5          MR. CALLAWAY:  That's all I have, Your Honor.

6          THE COURT:  Anything you wanted to comment on or say

7   before we move forward?

8          MR. OLEN:  No, Your Honor.

9          THE COURT:  Okay.  I think we talked about this but

10   my view is we go to the testimony now versus going into any

11   legal argument.  We're going to save that for the end.  There's

12   no sense doing it twice.  I prefer to get the evidence in, and

13   then go to the legal argument.

14          So, that being said, I would go to Mr. Olen,

15   Mr. Nicholas and Mr. Rosenthal and ask how you want to proceed

16   now?

17          MR. OLEN:  Your Honor, what we propose to do, given

18   how voluminous the testimony and the evidence is, is to provide

19   you with a comprehensive summary.

20          THE COURT:  All right.

21          MR. OLEN:  There are 17 depositions that have been

22   excerpted by the Plaintiff and offered into evidence, and I

23   guess as a formality, we would ask you to accept into evidence

24   the deposition excerpts that have been offered by both sides of

25   this to make sense.

1          THE COURT:  And their part of -- and I thought I had

2    said it, but if I didn't, I'm glad you said it.  Plaintiff's 1

3    through 181 are received, other than going back -- well, or

4    those separate than that.

5          MR. OLEN:  I am talking about the deposition

6    excerpts.

7          THE COURT:  Oh, the deposition excerpts?

8          MR. OLEN:  Yes.

9          THE COURT:  Okay.  Those are separate and apart --

10         MR. OLEN:  Yes.

11         THE COURT:  -- from these, okay.

12         Any issue with that?

13         MR. CALLAWAY:  No, Your Honor.  And actually, we've

14    got --

15         THE COURT:  I wasn't listening.

16         MR. CALLAWAY:  -- we've got some more to add to it.

17         Have you already given those to the Court?

18         MR. OLEN:  We have not given them to her.

19         THE COURT:  Okay.

20         MR. OLEN:  We've got them here to leave with the

21    Court.

22         THE COURT:  Okay.  I was thinking they were in the --

23         MR. OLEN:  And I was saying all of them, including

24    yours.

25         THE COURT:  Okay.  So, that includes both the

1  Plaintiff's and Defendant's excerpts that are to come to me?

2       MR. OLEN:  Yes, Your Honor.

3       THE COURT:  Okay.

4       MR. OLEN:  And I'll just take a second to tell you

5  what we've done.

6       THE COURT:  Okay.

7       MR. OLEN:  Plaintiffs have offered seventeen

8  depositions, excepted.  Defendants have offered --

9       Three?

10      MR. CALLAWAY:  Three, I believe.

11      MR. OLEN:  The Plaintiff's selections are in yellow

12 and the Defendant's excerpts are in blue.  The Plaintiffs have

13 submitted theirs numerically in the chronological order in

14 which the depositions were taken, and would submit to you that

15 it will be -- that they will make much more sense if you read

16 them in the order in which they are submitted.

17      THE COURT:  Okay.

18      MR. OLEN:  Because some of them sort of --

19      THE COURT:  Follow on.

20      MR. OLEN:  -- follow up on things from --

21      THE COURT:  Okay.

22      MR. OLEN:  -- immediately previous or some previous

23 deposition.

24      In addition, for the Court's convenience as we

25 discussed at the pretrial conference; virtually every exhibit,

1   whether affidavit or other document referenced in the excerpted

2   testimony --

3           THE COURT:  Okay.

4           MR. OLEN:  -- is provided, in order, at the back.

5           THE COURT:  Right.

6           MR. OLEN:  And behind number tabs that run from one

7   up to some three hundred and something.

8           THE COURT:  Uh-huh.

9           MR. OLEN:  Some of them are duplicative of affidavits

10  offered into evidence, already accepted into evidence, but we

11  thought it would help Your Honor that if you're reading the

12  deposition of --

13          THE COURT:  It will.

14          MR. OLEN:  -- the first witness, Kim Miller, you can

15  see what's being referred to.

16          THE COURT:  And I appreciate that the Plaintiffs did

17  that and the Defendants did that.  It's going to make my life a

18  lot easier and I can take books with me rather than have to

19  worry about whether I needed boxes I didn't take with me if I

20  do any of this at home.  So, I really, really appreciate it,

21  and thank you.

22          MR. OLEN:  And if it's done correctly, and we think

23  it is, you'll have an index at the back --

24          THE COURT:  Right.

25          MR. OLEN:  -- of each deposition that tells you what

1  the list is, so -- because otherwise, the exhibit numbers

2  referenced in the testimony are no longer viable.

3          THE COURT:  Yes.

4          MR. OLEN:  That was a failure on our part.

5          THE COURT:  Okay, yes.  All right, thank you.  All

6  right, I understand how you've done that.  And so, at this

7  point the seventeen depositions offered by the Plaintiff and

8  the three other depositions offered by the Defendants; can

9  those be received as to both sides?

10         MR. CALLAWAY:  That's --

11         MR. OLEN:  Yes, Your Honor.

12         THE COURT:  I assume you didn't go to all that work

13 for me to not receive them, so okay.

14         MR. CALLAWAY:  Well, let me mention a couple of

15 things.  One; I haven't seen theirs with the exhibits, so I

16 didn't realize they had done a separate set of exhibits behind

17 the depositions.  I need to -- and I need to do that to mine.

18 I don't -- there are not a whole lot, but I just have -- I kept

19 the same exhibit numbers all the way through, so the deposition

20 exhibit numbers are the same as the trial exhibit numbers.

21         THE COURT:  It would help me if you can supplement

22 those and Mr. Olen doesn't have a problem with that.

23         MR. OLEN:  That's fine.

24         MR. CALLAWAY:  Yes.

25         THE COURT:  That would help me and if you can do that

1  within the next couple of days.

2          MR. CALLAWAY:  I certainly can.

3          THE COURT:  And with what I have to read, that won't

4  be a problem probably, you know, in terms of waiting a couple

5  of days for you to get that to me, if you could.

6          Well, with that and with that supplementation, can I

7  receive the seventeen depositions and the three depositions?

8          MR. CALLAWAY:  Well, let me make you aware of a

9  problem in it.

10          THE COURT:  Okay.

11          MR. CALLAWAY:  But I don't know how -- I don't know

12  if it can be overcome at this point.  The whole first week's

13  worth of depositions which include the first four or five

14  depositions were taken before the Court ruled that the class --

15  that any potential class in this case would not be outside this

16  district.

17          So, almost all of the deposition testimony and all of

18  the exhibits are about New Jersey, California, other --

19          THE COURT:  And that is part of your issue in that

20  objection --

21          MR. CALLAWAY:  Yes.

22          THE COURT:  -- to some of the other exhibits, right?

23          MR. CALLAWAY:  I will acknowledge that it's difficult

24  to un-ring the bell at this point, or to unwind it.  So, I

25  guess my caveat to the Court is you're going to have to realize

1  when you're reading this that most of this, for example the

2  first week's worth, is dealing with New Jersey and California

3  and other states, and not that much with Alabama.

4         THE COURT:  And I guess --

5         MR. CALLAWAY:  And I don't --

6         THE COURT:  I don't know how I could --

7         MR. CALLAWAY:  It would be impossible to object on a

8  question by question basis at this point, I think.

9         THE COURT:  Yes.  That's what I was going to tell

10 you; short of doing that, and I'm not sure how I deal with

11 that, and it isn't that anybody was trying to do anything

12 improper because I hadn't ruled.

13        MR. CALLAWAY:  Just, the landscape has just changed a

14 little bit since that.

15        THE COURT:  And I think you -- I would leave it to

16 argument and let me just read it, and you can tell me what, you

17 know.  I don't know what it says yet, obviously.  But to the

18 extent that it's about practices or procedures or whatever

19 which may have been, then I'm going to look at it potentially,

20 if it's Wells Fargo itself we're talking about, if it's law

21 firms that aren't operating in the state, whatever, I think it

22 probably is going to be irrelevant and I won't pay -- you know,

23 I'm not going to worry about it.

24        MR. CALLAWAY:  All right.  That's fine, Your Honor.

25        THE COURT:  Is that acceptable to everybody?

1           MR. OLEN:  It is, Your Honor, because we are

2  convinced when you hear what it is that you will be able to put

3  it in context.

4           THE COURT:  Well, that's the way it seems to me after

5  reading some cases and reading your briefs.  I think clearly

6  what Wells Fargo did in general terms is relevant to this case,

7  as a corporate policy or not, if there was one or not one.  I=

8           If it relates to what law firm agents may have done

9  in California or New Jersey, I don't think that's my problem.

10 Is that --

11          MR. OLEN:  And we think you'll see that it is --

12          THE COURT:  Okay, all right.

13          MR. OLEN:  -- it is different than Wells Fargo would

14 want to characterize it.  But it goes to across the board

15 practices.  It goes to management type witnesses talking about

16 how things were, so.

17          THE COURT:  Okay.  Well that, I'm going to let you

18 folks tell me if you think there are things that were

19 irrelevant, but I will -- I'm going to receive the seventeen

20 depositions the Plaintiff is offering and receive the three

21 depositions the Defendant is offering, and in whole.  But I've

22 told you -- in toto -- but I've told you I'm not going to

23 consider relevant and I will disregard things that go to

24 actions of agents or others from -- in other states, other

25 districts, period.

1          Okay, all right.  Go ahead, Mr. Olen.

2          MR. OLEN:  Your Honor, we'd like to start by telling

3   you briefly, from the Plaintiff's perspective, what this case

4   is about, what it's not about, and how it got to the posture

5   it's in because I think that will be helpful.  Despite all of

6   the efforts of Wells Fargo to say something different, this

7   case is not, it is absolutely not just about eight pre-signed

8   affidavits.

9          What this case is about is that Wells Fargo, for a

10  substantial period of years, had an across the board policy.

11  That policy may not have been reduced to writing, but the

12  policy and practice and procedures and pattern of absolutely

13  totally disregarding the sworn affidavit process.  And that

14  manifested itself in a number of ways, but that's what the case

15  is about at the very uppermost level.

16         THE COURT:  Okay, you've answered one of the

17  questions, from your perspective at least, one of my biggest

18  questions that I had to ask in the argument part.

19         Okay, so that is your theory, is that it is a

20  procedure or practice or pattern of action, or I guess

21  inaction, disregarding the sworn affidavit process.  All right.

22         MR. OLEN:  And we want to provide you with a summary

23  of the overwhelming evidence that Wells Fargo's affiance did

24  not verify these affidavits, or if they did, they didn't do it

25  in anything remotely approaching the correct manner, that

1  systematically, they did not even read the depositions, either

2  all of them or at least substantial parts of them.  So that, in

3  essence it was their practice never to sit and actually read an

4  entire deposition including all the exhibits that were a part

5  of the deposition.

6       MR. CALLAWAY:  You're saying deposition; do you mean

7  affidavit?

8       UNIDENTIFIED SPEAKER:  Do you mean affidavit?

9       MR. OLEN:  I'm sorry, affidavit.  Thank you, both of

10  you.

11      Now, to help the Court understand how the case got

12  to where it did, I think, it will be helpful and it will also

13  help you see the way the depositions start off.  There was a

14  hearing in 2003 before Judge Klein in California in a case

15  involving a creditor other than Wells Fargo.  And the Brice

16  firm appeared at that hearing and that hearing was about pre-

17  signed affidavits.

18      And when this case began and you look at the Brannan

19  affidavit, it looked like it was about pre-signed affidavits,

20  but it turned out that what Wells Fargo was doing was far, far

21  bigger than that.  That is such a small piece of what they were

22  doing as it turns out, at least as it relates to the Southern

23  District of Alabama.

24      As it turns out, Brice is only the fourth largest

25  filer of affidavits in the Southern District.  There are

1  others, and we will talk about them.  There's McCalla Raymer;

2  there's Shapiro & Tucker; and there's Stephens, Millirons.  And

3  so, what it started was the Plaintiffs focused on that and they

4  focused on that in the initial depositions, but in the course

5  of that in discovery learned substantial additional

6  information.

7         And again, to understand where we are, you have this

8  chart that has 631 affidavits on it.  When this started, the

9  way that the Plaintiffs have proceeded, and Your Honor has

10  heard this several times and I'll say in advance that we're

11  sorry for repeating ourselves.  We went on PACER and you plug

12  in Norwest Mortgage, you plug in Wells Fargo Home Mortgage,

13  Wells Fargo Bank, and America's Servicing Company, America's

14  Servicing Company of some division of Wells Fargo, and it gives

15  you a printout of every case in which Wells Fargo was a part.

16  And in this district, thankfully, it is an all-inclusive

17  printout because of you all's pre-electronic filing software,

18  and you can actually do that.

19         And then, what you get, I just brought the book with

20  me, is you get something like -- this is the one for Wells

21  Fargo Home Mortgage, and it's just case after case.  But all

22  that means is that Wells Fargo was a party.  It could be just a

23  request for notes, it picks those up.

24         THE COURT:  Yes.

25         MR. OLEN:  It could be an adversary proceeding.  It

1  can be any kind of filing in that case.

2          And at a point in time when we had no deposition

3  discovery, no document discovery from the Defendant, literally,

4  I took every single case on those printouts, called them up on

5  PACER, looked at the docket sheet, ran down the docket sheet,

6  and if you saw a motion, you looked at it, because it wouldn't

7  always tell you an affidavit was attached.  Sometimes it would,

8  sometimes it wouldn't.

9          Frequently, affidavits were filed separate from the

10 motions, and so you would have to look at every single docket

11 sheet and looking for entries for motion or affidavit, and

12 click on them.  And when I was dumb enough not to know better,

13 print them myself and ultimately learned to get somebody else

14 to do that.

15         And the reason that's important -- and when we're

16 doing that, Your Honor, we didn't know things like Jeannette

17 Massey, who worked for Wells Fargo, would testify in her

18 deposition she never read a single affidavit she signed, ever,

19 ever, ever.  She was 65 -- 65; and we didn't know that.

20         So, there may be some affidavits filed in this

21 district that are not included on our list.  We don't know how

22 many.  We certainly have the ability if it comes to that to go

23 back and re-run the list up through whatever date, mark of the

24 ones we already have checked, and then go check every one of

25 the rest of them and find how many of those affidavits we

1  actually have included on our chart.

2         THE COURT:  So, let me -- so the chart has every

3  affidavit that you found in your PACER search, or only those

4  that you found to be improper or fraudulent, to use some of the

5  words you've used?

6         MR. OLEN:  Some of both.

7         THE COURT:  Okay.

8         MR. OLEN:  Some of both.  Here's what we did.

9         THE COURT:  Okay.

10         MR. OLEN:  And this is my recollection.  I'm not

11  certain, I didn't write it down.  I am confident that it's

12  every McCalla Raymer affidavit, unless we accidentally missed

13  one.  It is every Shapiro & Tucker affidavit.  It is every

14  Brice affidavit.

15         There may be, you know, some small number of

16  affidavits that we didn't include because at the time there was

17  nothing on the face of that affidavit that jumped out at us,

18  but we also had far less information than we now have.

19         THE COURT:  All right.

20         MR. OLEN:  And again, we just don't know the number,

21  because all I know is how many cases we checked.  We don't even

22  know how many of those cases had affidavits filed in those

23  cases, but --

24         MR. CALLAWAY:  Wait.  Is this Mr. Olen's --

25         Excuse me.

1          Is this Mr. Olen's testimony that he has provided

2   every single Wells Fargo affidavit?  I mean because now what

3   we're -- he's testifying essentially as some kind of expert

4   witness and Your Honor, this is not proper -- not proper

5   evidence.

6          MR. OLEN:  Okay.  I'm not testifying as anything.

7          THE COURT:  Okay.  You're just --

8          MR. CALLAWAY:  That list was produced as a list of

9   alleged improper or false affidavits.

10         THE COURT:  Okay.

11         MR. CALLAWAY:  And now I think we're getting into

12  your --

13         THE COURT:  So, these are the improper -- all right,

14  that's what I'm --

15         MR. CALLAWAY:  He's trying to testify beyond that

16  it's all affidavits that were filed in the Southern District.

17         MR. OLEN:  No, I didn't say that.  I absolutely am

18  not testifying -- I'm telling you the exact opposite,

19  Your Honor.  It is not every affidavit filed in the Southern

20  District.

21         THE COURT:  I thought you said there was some small

22  number it didn't include, but it is every McCalla Raymer,

23  Shapiro & Tucker, and Brice?

24         MR. OLEN:  We believe it is.

25         THE COURT:  Okay.

1    MR. OLEN:  I mean and maybe we missed one here or

2  there.

3    MR. CALLAWAY:  I don't -- I don't -- I have no way of

4  verifying that or testing that.

5    MR. OLEN:  Okay.

6    MR. CALLAWAY:  I don't think the Court can take that

7  as his --

8    THE COURT:  Okay.  Then I won't take that as --

9    MR. CALLAWAY:  -- his testimony.

10    THE COURT:  -- as a fact, I'll just -- but that's

11  what Mr. Olen believes, but it's not a fact, and he's not --

12  you're not testifying so, okay.

13    MR. OLEN:  All right.

14    MR. CALLAWAY:  Continue, all right.

15    MR. OLEN:  If I might, what I -- well, let me just

16  say this.  Anyway, I think we've made the point that the case

17  as we took testimony, we got some limited discovery, evolved

18  into something, a much bigger practice on the part of Wells

19  Fargo.

20    I also want to point out, and this is critical, that

21  we asked Wells Fargo for every loan file for every one of these

22  affidavits, and they strenuously resisted that, and they

23  ultimately produced a sample of fifty -- fifty loan files.  So,

24  we only have the Wells Fargo loan files for 50 of the 600 and

25  -- but, I shouldn't say 631.  If there is a debtor where more

1  than one affidavit was filed, we only have 50 loan files, I'll

2  leave it at that.

3            THE COURT:  Okay.

4            MR. OLEN:  And so you've got a substantial number of

5  debtors.  And so, there's that limitation on the evidence we're

6  able to present at this point, as opposed to when we get to

7  trial.

8            One of the most fundamental points that the

9  Plaintiffs want to make is this, Your Honor:  If -- if all we

10  were talking about this morning, quote all.  I put "all" in

11  Mr. Stewart's quotes like he likes to do -- were eight

12  fraudulent pre-signed affidavits where Wells Fargo had their

13  affiant sign a blank signature page, had their notary notarize

14  it; so it's falsely sworn to, it's falsely notarized.  It goes

15  to the Brice firm and at least Ms. Bonial can remember they did

16  it.  Mr. Vander Linden has total amnesia.

17            And they then falsely date it, and it gets filed in

18  the court.  And the point is this; what happened here in terms

19  of fraud on the court when we look at everything, is so huge,

20  it is so egregious, it is so monstrous that we urge the Court

21  not to lose sight of that fact.

22            If we were talking about eight affidavits with this

23  mortgage company, with the active involvement of its lawyers;

24  and when I say lawyers it's bankruptcy lawyers.  Obviously,

25  it's absolutely not anything to do with the people who are

1  representing them today.

2         THE COURT:  Right.

3         MR. OLEN:  That would be a very serious matter.  That

4  would be eight separate instances of as intentional a fraud on

5  the Court as it is possible to commit.  But this is way more

6  than that, and it is absolutely astonishing, astounding, I

7  don't know what to call it for the Defendant to come in, in

8  their briefs, and say first of all they want to try to

9  marginalize it, and then what they want to do is they want

10 literally to take advantage of the sheer magnitude of their own

11 fraud on the Court and say:

12         We're going to throw up our hands here.  We did it so

13 much, we did it so many different ways, Your Honor, you can't

14 do a thing about it.  You can't touch us, because we were so

15 pervasive in committing fraud on the Court.  When you boil it

16 all down, that's really what's being said.

17         But we want to show you that in fact we can prove

18 what they were doing and we can prove that it was done

19 consistently across the board and that the evidence under the

20 law that Mr. Nicholas will tell you about shifts the burden at

21 that point for them to come forward and say here are instances

22 where we didn't do that.

23         Now, that's going to be exceedingly difficult for

24 them, because many of their witnesses say it doesn't matter

25 what you show me, this is Lisa Joseph.  You can show her

1    whatever you want, she can never tell you which ones are pre-

2    signed and which ones are not, and admits that she pre-signed

3    them.

4           The same applies to other practices.  They'll admit

5    that they swore to affidavits that didn't have exhibits

6    attached, but they don't know when and they don't know which

7    ones.  But to just talk about a couple of the things that we

8    have here:  You have pre-signed affidavits.

9           THE COURT:  Right.

10          MR. OLEN:  You have fifteen instances where an

11   affiant has sworn to this Court under oath on behalf of Wells

12   Fargo that in the month of October, they are swearing to

13   Your Honor that the November payment is past due.  Not coming

14   due, not will be due, that it is past due.

15          Now, it doesn't matter what explanation they have for

16   that, that is a fraudulent affidavit, whether they swore to it

17   intentionally and knew what it said, whether somebody has

18   changed it around, it doesn't matter.  The only somebody's

19   involved are Wells Fargo and their lawyers.  But you saw one of

20   these in another case, and there are fifteen of them, where

21   just incredibly, one of them it's October 11th and they swear

22   under oath that the payment is past due.

23          And as you'll see in a minute, what's even more

24   incredulous is they have witnesses who say they don't see

25   anything wrong with that.  They absolutely don't see anything

1   wrong with that.  But we just think it's critical to understand

2   this context where the fraud is -- I mean fraud on the Court is

3   so massive, they want to hide behind it.  They want to use

4   their own conduct as a shield.

5         You have, to just give you a couple of examples so we

6   make it crystal clear that this is not about just eight pre-

7   signed affidavits.  You have a lady named Jeannette Massey, who

8   worked for Wells Fargo.  And for a period of time they would

9   bring her affidavits to sign.  These are Shapiro & Tucker

10  affidavits, that being the law firm who prepared them.

11        And Ms. Massey said they would be brought to her by

12  First American.  First American bought out (inaudible) -- well,

13  it's not in evidence.  First American is somebody who worked

14  there on the premises at Wells Fargo, and according to

15  Ms. Massey, they'd bring her an affidavit.  Her sole job was to

16  put her signature on the affidavit.  She is crystal clear,

17  there is no mistake about it, and she did that, I've forgotten,

18  sixty something times, I believe.  She never read a single word

19  in the affidavit, never, 65 times.

20        We have instances where Wells Fargo witnesses

21  repeatedly swear that there are notes and mortgages attached to

22  affidavits, when in fact they were never attached.  You have

23  Wells Fargo witnesses who swear, and not once or twice, I mean

24  this is again and again and again, that the note and mortgage

25  attached thereto, blah blah blah, incorporated herein; but

1   Your Honor, they're dated later.  It's impossible.

2           And the way we look at it, it would be as though --

3   we'll take Lisa Joseph, who is one of these folks.  She was a

4   bankruptcy supervisor and then she was the manager for the

5   whole Bankruptcy Department.  It would be as if she came in

6   your courtroom this morning and gave you testimony about

7   Ms. Brannan's -- and by the way Ms. Brannan a Zayas now, Kelly

8   Brannan Zayas is here.

9           THE COURT:  I assumed that was who you were?

10          MS. BRANNAN:  Yes, ma'am.

11          THE COURT:  But hello.

12          MS. BRANNAN:  Hello.

13          MR. OLEN:  But went to the effort to be here, went to

14  the effort to come here for her deposition that Mr. Callaway

15  took.

16          If Ms. Joseph got on the witness stand and she gave

17  you information about the Brannan's account and she said:  The

18  information I just gave you is based on the note and mortgage

19  that's part of my testimony.

20          And Your Honor said:  Could I see the note and

21  mortgage?

22          And Ms. Joseph said:  Sure, Your Honor.  Give me a

23  couple of days and I'll go get it and I'll give it to you.

24          I mean, that's the way to look at what they're doing.

25  This is not something to be marginalized like Wells Fargo would

1  have you do, and it's unconscionable that they would do what

2  they did and then take that approach.

3        You have John Schlotter, head of the Bankruptcy

4  Department at McCalla Raymer, one of Wells Fargo's two national

5  law firms, still.  Nothing's happened to him, no action has

6  been taken against him.  I guess on the other hand you could

7  look at it in terms of if you're Wells Fargo, it's kind of hard

8  to point the finger at your lawyers when you were as bad as you

9  were.  But they've done nothing to them, done nothing to Brice,

10  nothing to any lawyers.

11        The head lawyer at McCalla Raymer for bankruptcy and

12  of the 631 affidavits on our list; they filed 341 of them.  He

13  filed.  He swore to affidavits in this court saying, quote:  "I

14  am an assistant secretary for Wells Fargo Bank."  He was never

15  employed by Wells Fargo.  He was never an assistant secretary

16  for Wells Fargo.

17        He now says, "I have a piece of paper that authorized

18  me to sign foreclosure deeds."  And we're going to cover this

19  document.  It's very limited in what it authorizes.

20        And it says, "This is strictly limited to

21  foreclosures."  And he says that authorized him to sign as

22  assistant secretary for Wells Fargo.

23        What it actually says is he's authorized to attest to

24  other signatures on a foreclosure deed as an assistant

25  secretary.  But he's a lawyer.  He has 30 years experience.

1   All he had to do was put in that affidavit, "I am an assistant

2   secretary -- I am authorized to sign as an assistant secretary.

3   I'm a lawyer at McCalla Raymer."

4           I think one of their witnesses comes out and admits

5   that this Court, reading that affidavit, would have no way of

6   knowing that Mr. Schlotter worked for McCalla Raymer law firm

7   instead of Wells Fargo.  And the reason you'd have no idea is

8   Wells Fargo didn't want you to have any idea.  It was crystal

9   clear.

10          Now, he didn't do that once or twice or eight times.

11  He did that more than 150 times.  In his first affidavit, he

12  said, "I am an employee of the Bankruptcy Department."  And

13  then I guess after the first one, somebody figured out that

14  they needed to perpetrate their fraud a different way.

15          And you know, these are not all of them.  These are

16  just some of the examples.  But the point of this is the case

17  is about so much more than just the pre-signed affidavits.  If

18  we were talking just about a lawyer in a national bankruptcy

19  law firm for Wells Fargo intentionally misleading this Court

20  with the active participation of Wells Fargo; he says Wells

21  Fargo authorized him to sign these affidavits, leading this

22  Court, the Debtors, the Debtors' attorneys, the Trustee, the

23  Bankruptcy Administrator to believe he was an assistant

24  secretary for Wells Fargo.  Again Judge, not once, not twice,

25  but more than a hundred and fifty times, more than a hundred

1   and fifty, and so on.

2          Now let me move from there and talk about Plaintiff's

3   Exhibit 140, this is our chart.  And I just want to talk about

4   objectively what the chart shows.

5          The chart:  Of the 631 affidavits, 341 of them belong

6   to McCalla Raymer, and by that I mean they prepared it; 180 to

7   Shapiro & Tucker; 60 to Stephens, Millirons; and 44 to Brice;

8   and six to Morris Schneider.

9          THE COURT:  Let me -- so Shapiro, then I've got 44 to

10  Brice?

11         MR. OLEN:  Yes, Your Honor.

12         THE COURT:  Is that what you said?

13         MR. OLEN:  Yes, Your Honor.

14         THE COURT:  And what's the last one?

15         MR. OLEN:  Six for Morris Schneider.

16         THE COURT:  Thank you.

17         MR. OLEN:  I'm sorry, I forgot -- I'll slow down a

18  little bit so you can --

19         THE COURT:  No, that's all right.  I don't need to

20  write down everything, but that might be important, so okay.

21         MR. OLEN:  Of the 631 affidavits on the chart, 537 of

22  those affidavits, and we have for a visual aid, we have

23  prepared --

24         THE COURT:  Okay.

25         MR. OLEN:  -- a highlighted copy of Exhibit 140 that

1  demonstrates what we're about to tell you.  We have highlighted

2  in yellow each instance where we submit that if you examine

3  each affidavit one by one, you will see that what's marked in

4  yellow is an affidavit where the exhibit referenced in the

5  affidavit or attached -- there may be one or two or a few

6  apparently where it says something like it mentions the note

7  and mortgage and they're attached, and they may not every

8  single time say attached hereto or incorporated herein; but

9  virtually all of them say, you know, they are incorporated

10 herein by reference.  There may be a few where that's not the

11 case, but they are absolutely attached.

12        But all of the ones in yellow, they either were

13 attached later, and when I say attached later, Judge, later in

14 that we can show you objectively from the face of the

15 affidavit, no other testimony, no other anything, or they were

16 referenced in the affidavit and sworn to as being attached and

17 they are not.  And you will see there's a lot of yellow

18 highlighting on that exhibit, lots of it.  And it's, the yellow

19 is just that category.

20        And again, we didn't go back and go to these

21 witnesses at Wells Fargo who say they routinely never had the

22 exhibits in front of them.  This is where if you sit down and

23 you look at all 631 on there, all of the ones in yellow, the

24 affidavit talks about a note, a mortgage, some kind of document

25 as being attached, or it has it attached, and it's either dated

1    later or it says specifically that it's attached and it's not.

2              THE COURT:  All right.

3              MR. OLEN:  Highlighted in orange is only the

4    following, I want to be clear.  The affiant's name is wrong or

5    the affiant's job title is wrong in at least one place.  And

6    the reason that I say that is some of these affidavits

7    incredibly, they have different job titles sworn to by the

8    affiant within the same affidavit, consistently, particularly

9    in the Shapiro & Tucker affidavits.

10             And so, if you look at just those two categories and

11   you ignore all of the other things we're talking about, and it

12   does include Mr. Schlotter.  We think it's fair to say that

13   Mr. Schlotter had his title wrong, big time wrong.  That

14   accounts for 537 out of 631 affidavits.  It doesn't take into

15   account Massey saying she didn't read them.  It doesn't take

16   into account instances where we now know from somebody's

17   testimony that the job description was wrong, where we didn't

18   know that before we took her testimony.

19             It is just the ones where it is discernible from the

20   affidavit itself, or like some of the Brice affidavits in there

21   where it's crystal clear what happened when you have different

22   footers on different pages and so forth.  So, that accounts for

23   -- I don't know what that percentage is; it looks like it's

24   above 80 percent, and represents just that.

25             Just to give you a little bit more information:  Of

1    the 180 affidavits filed by Shapiro & Tucker, 177 out of 180 --

2    that's got to be the high ninety-something percent -- is one of

3    these two things.  And the three were -- okay, I think one of

4    them had a page missing, so you don't know what might have been

5    on that page that was missing, but 177 out of 180.

6         McCalla Raymer, 287 out of 341 affidavits; just from

7    the face of the affidavit, this is what we know.  And again, it

8    doesn't take into account where Erin Brown, who is the person

9    who literally did the electronic filing for every single

10   McCalla Raymer affidavit from a certain point on, and I think

11   early on Cerote (phonetic) may have filed some of them for

12   them, but purely it was local counsel where they wouldn't know

13   what they're getting.

14        It doesn't take into account Erin Brown saying from

15   the time she was involved, the exhibits were never attached

16   when the affiant had them because she attached them, that she

17   did it all the time.  And I'll point out some of that testimony

18   and give you the page reference.

19        So, the point we're making is at a trial, when we

20   have the ability to incorporate all of the deposition

21   testimony, get the loan files that we don't have; we are going

22   to show Your Honor that it was across the board as to all of

23   these affidavits that they had an utter total disregard for the

24   sanctity of the affidavit process in terms of send the affiant

25   whatever you want.  The affiants didn't read, they ignored

1   whatever they wanted.  They verified or didn't verify as they

2   wanted.  We're going to show you that even when they verified,

3   they only did it partially, and that this was just an across

4   the board policy at Wells Fargo.

5           And again, these are just some illustrations of what

6   we know.  And again, so far what I'm talking about here is just

7   from the face of the affidavits.

8           Let me switch gears and talk a little bit about --

9   and I think it's important to do it in this order.  We want to

10  point out to Your Honor so that when you're reading the

11  testimony, you can see and to understand what they're saying

12  and why they're saying it, you have to understand that witness

13  after witness, high level management people at Wells Fargo, to

14  -- I can't say to this day, because they're not here, but

15  certainly through the time we took their depositions in 2009,

16  and some of them in 2007; they see nothing wrong with the

17  things that they did.

18          I'll start with Kim Miller.  She was a bankruptcy

19  manager, which means -- for Wells Fargo, which means she had I

20  think 40 or 50 people that she supervised, and then she became

21  vice-president for bankruptcy, foreclosure and default with

22  several hundred people under her supervision.

23          At Page 58, and some of them I'm going to summarize,

24  one or two of them and I'm going to read so there can be no

25  issue about what they said.

1          THE COURT:  All right.

2          MR. OLEN:  "From your perspective as vice-president

3    of Wells Fargo, do you think there was anything wrong with

4    using pre-signed signature pages on affidavits, declarations

5    and certifications?"

6          Answer:  "In the context of the affidavit process,

7    no, sir, I don't."

8          Now, that's three years into this lawsuit.  "No, sir,

9    I don't."

10         Page 89:  "Did Wells Fargo abuse the bankruptcy

11   system when they used pre-signed signature pages on affidavits,

12   declarations, and certifications, in your opinion?"

13         Answer:  "No, sir."

14         And it's true that some of these questions are

15   limited to pre-signed signature pages because we didn't know

16   what else was out there.

17         THE COURT:  Right.

18         MR. OLEN:  Some of them are not limited to that.

19         At Page 96:  She sees nothing wrong -- and again,

20   what's informative about this, Your Honor, as you can

21   understand if they see absolutely nothing wrong with it, then

22   it makes sense -- not makes sense, it explains why they would

23   do the egregious things they did, because they thought it was

24   okay to do it however they wanted.  They were Wells Fargo.

25         She sees nothing wrong -- and again, this is present

1  tense.  This isn't back when she did it.  It's all the way into

2  2007 -- doesn't see anything wrong with swearing to, I think it

3  was a declaration in this instance, without having the entire

4  document and the exhibits, everything that are referenced in it

5  in front of you.  "You don't see a problem with that?"

6          "Not to my knowledge, sir."

7          Doesn't have a problem with attaching -- this is at

8  Pages 190 and 191 -- a payment history, even if the payment

9  history was provided -- generated and provided by someone other

10  than the affiant, nothing wrong even with that.

11          Then, I just have to point these out:  The vice-

12  president of default for Wells Fargo when asked some tough

13  questions along the lines of, you know, why don't you see

14  anything wrong with this?

15          At Page 128 says:  "Now I understand.  Now, going

16  through this, there's the technicalities of the Court."  These

17  affidavits are just technicalities to Wells Fargo, and they

18  sure treated them as not even that.  That was Page 128.

19          Pages 165 and 166; this is where if it wasn't signed,

20  it's a pre-signed if it wasn't signed on the date that it has

21  on it, it may be even talking about the Brannan affidavit:

22          "Then, should Wells Fargo have been concerned about

23  the accuracy of that part of the sworn statement they filed in

24  Judge Mahoney's court?"

25          Answer:  "I've told you what our concern was, was on

1 the accuracy of the figures." She means the financial figures.

2 "I can't change that, sir."

3        "Do you understand that an affidavit is something

4 sworn to under oath?"

5        "Yes, sir, I'm -- we're learning all of that and

6 we're learning the technicalities of that. Yes, sir, we are.

7 We're learning that now."

8        Page 178 she talks about technicalities again.

9        THE COURT:  What page, again?

10        MR. OLEN:  Page 178.

11        THE COURT:  Thank you.

12        MR. OLEN:  This is where we asked, and you know,

13 you've got Mr. Vander Linden out there, who you'll see

14 virtually never practiced bankruptcy, and he's got all kinds of

15 opinions and he doesn't understand why this affidavit made a

16 difference to the Court.

17        One thing Ms. Miller got right is she says at Page

18 178 that she realizes that Your Honor in fact relied upon this

19 very affidavit in entering an order in this case, in the

20 Brannan's case.  She does admit that.

21        And then I ask her and say, "You know you use the

22 word technicalities; are you saying the provision in the

23 affidavit that I declare under penalty of perjury is a

24 technicality?"  That's the question.

25        Answer:  "I can tell you that our focus was on the

1  accuracy of the figures.  I can't tell you any more.  We relied

2  on our attorneys as to what documents needed to be filed in

3  court.  As far as how they were signed, that was our attorneys,

4  that wasn't Wells."

5          Wells Fargo, Your Honor, never made the decision to

6  stop pre-signing signature pages.  This is their own testimony,

7  starting with Kim Miller, their own vice-president.  She

8  contends -- no, she testified under oath that their lawyers

9  stopped using pre-signed affidavits.  They admit that the only

10 law firm that ever said anything to them was the Brice firm,

11 and it's unclear exactly what transpired, but clearly there was

12 some communication in mid April of 2003 between Brice and Wells

13 Fargo.

14          There's no evidence in the record of any such

15 communication in terms of any other law firm ever saying that

16 they weren't going to do it any more.  And even Brice didn't

17 say it's wrong, they just said we're not going to do it any

18 more.

19          And so, Wells Fargo, through Ms. Miller and other

20 witnesses says:  We never made a decision to stop.

21          I asked her:  "Has Wells Fargo told any of its

22 lawyers you'll no longer provide pre-signed signature pages?"

23 This is at 43, Page 43.

24          "Our attorneys are the ones that determined whether

25 or not to start or stop pre-signed affidavit pages, not Wells

1    Fargo."

2           That's amazing stuff.  I don't have enough adjectives

3    for that stuff.

4           Then we asked:  "Did they ever communicate to their

5    lawyers?"

6           "No."

7           "Why not?"

8           "Because our attorneys have already decided to stop

9    using pre-signed signature pages."

10          But the evidence in the record is the only one they

11   knew in '03 that decided to stop was Brice.  Even when they go

12   to their lawyers, two years into this case to get a discovery

13   response when we asked, "Which of your law firms pre-signed

14   signature pages?"

15          They never say, "Tell us when you stopped.  Tell us

16   if you're still doing it."

17          The only question they asked of their lawyers who

18   they call was:  "Did you ever do it?"

19          Now, you'd think at least they'd have called every

20   lawyer.  Oh no, they just picked a few, the ones they thought

21   might have done it, never made a decision to stop.  That

22   certainly tells you something about their willingness to do it

23   again, absent some definitive decision from this Court.

24          They never communicated to their lawyers to stop, not

25   even to Brice, not to anyone, ever.  They never investigated

1  anything about who did it, how long they did it, where they did

2  it, nothing, nothing.

3          Again, at Page 122, you know, "Did you ever talk

4  about getting your pre-signed pages back?"

5          "No, because they stopped on their own, and so, that

6  never came up."

7          Page 101 and 102:  "Tried to do anything to decide

8  which cases they were used in?"

9          "No, they've not."

10          "Nobody at Wells Fargo ever suggested that there was

11  anything wrong with what they did."  That's Kim Miller's

12  testimony.  She's the head honcho over default.

13          McCalla Raymer and Brice are their two national law

14  firms, and they are still.  Their two biggest first, their two

15  national law firms, and of course, they're right in the thick

16  of all of this.  And in fact, Ms. Miller says they do more work

17  for them now than they did in the middle of 2003.

18          Lisa Joseph was bankruptcy manager.  She was the

19  person who signed the Brannan affidavit.  When she was

20  bankruptcy manager, she supervised 40 people.  Now, she was

21  involved in the affidavit process continuously from 1998

22  through 2003.

23          Page 209; now again, this is somebody who was the

24  bankruptcy manager.  She was in charge of everything to do with

25  affidavits.  She was over all these people for a little -- I

1  think over a year.  Referring to pre-signed affidavits or pre-
2  signed signature pages:

3       Question:  "Did it ever cross your mind the practice
4  was just plain wrong?"

5       Answer:  "No."

6       Page 210:  "As you sit here today, is it your view or
7  is it not your view that the practice Wells Fargo had engaged
8  in of using pre-signed signature pages on affidavits,
9  declarations and cert pages was just flat wrong?"

10      Answer:  "No."

11      And we're in 2007 and they're in the middle of a
12 lawsuit, a serious one they should have figured.

13      Page 210, 211:  "As you sit here today as an employee
14 of Wells Fargo and former bankruptcy manager; do you have a
15 view as to whether Wells Fargo's practice of using pre-signed
16 signature pages hurt or undermined the integrity of the
17 bankruptcy process?"

18      Answer:  "I don't believe it did."

19      I asked her whether she thought using pre-signed's
20 had a good, bad or indifferent impact on Wells Fargo's -- or
21 whether from a borrower's perspective, whether from the
22 Brannan's perspective, pre-signed signature pages was good, bad
23 or indifferent.

24      She said, "Indifferent."  That tells you everything
25 you need to know about their attitude.

1          Page 212 to 213:  "As you sit here today, do you have

2   a view as to whether Wells Fargo employees who pre-signed

3   signature pages, knowing that they would later be attached to

4   sworn affidavits, declarations and certifications were properly

5   swearing to those documents; is it your view that they were or

6   were not proper swearing to those documents, as you sit here

7   today?"

8          "They were."

9          I mean they were given every opportunity to say, you

10  know, this was a bad thing and we shouldn't have done it, and

11  to the contrary.  And again, it's really critical here because

12  it helps explain why they did all the things they did, or at

13  least it provides some explanation.  I don't mean by that any

14  excuse or justification whatsoever, it's just perhaps some

15  insight into it.

16          "Did it ever once cross your mind that this process

17  might be harmful to the integrity of the bankruptcy system?"

18  That's at Page 220.

19          "No."

20          "Did it ever cross your mind that this process might

21  be an abuse of the bankruptcy process?"

22          "No."

23          She never heard anybody say there was anything wrong

24  with pre-signed signature pages.

25          Page 83, she says a different practice.  She was

1    asked, "Do you ever think -- did you ever think it was

2    important before you signed an affidavit, declaration or

3    certification on behalf of Wells Fargo that you should

4    personally make sure that each and every exhibit you were

5    verifying was attached and was what you were saying it was?"

6         "No."

7         That's talking about exhibits to affidavits. It's

8    not talking about anything to do with pre-signed signature

9    pages.

10         I asked her if she had any problem with Wells Fargo's

11    lawyers attaching copies of the mortgage, the promissory note,

12    an assignment of mortgage or payment history after the Wells

13    Fargo employee had signed it. That's at Page 79 and 80.

14         She didn't see anything wrong with that, because she

15    said they would have already sent the security instruments to

16    their lawyers. She says, "The security instruments; we would

17    have sent them so we knew they had them already, it was

18    waiting."

19         Page 93 and 94; this is one where she's got an

20    affidavit in front of her, her title is wrong. And so, I guess

21    she didn't want to admit she just didn't read it, or here's

22    what she says:

23         "Would you knowingly have signed your name under a

24    legend?" It's right under her name, her title is wrong, so she

25    couldn't miss it, I guess. It says I certify under penalty of

1   perjury that the foregoing is true and correct with an

2   incorrect title.  "Would you have knowingly signed?"

3          "Yes."

4          Page 146; this is where I ask them, "Should Wells

5   Fargo have told Judge Mahoney in Mobile and Judge Shulman that

6   they were using pre-signed signature pages?"

7          The answer, of course, is one word, "No."

8          And so, I asked, "Why not?"

9          "I don't believe it was our responsibility, and the

10  attorneys were the ones using the forms."

11         We asked at Page 136 and 137; and there's another

12  victim in this, Your Honor, and that's some fine lawyers with

13  fine reputations who were local counsel for Wells Fargo and

14  these law firms of Wells Fargo, who never told the local

15  counsel what they did.

16         Kent McPhail.  We never wanted to take Kent's

17  deposition, and you notice they've got nothing to offer from

18  Kent, and there's a reason for that.

19         Chris Kern.

20         Mike Vybie (phonetic) actually filed some for Brice

21  here.

22         Now, Erin Brown's a different category.  You'll see

23  that she's in the middle of it.  But I'm talking about folks

24  like that, and I'm asking them, you know, "Do you think you

25  should have told these guys?  Give them a chance to say I won't

1  do that.  I won't even be the vehicle by which that happens."

2          "I don't think it" -- and this is Lisa Joseph's

3  quote, "I don't think it was Wells Fargo's responsibility."

4          And then I asked her, "Why?"

5          "It was the attorney that was using the forms."

6          Now, when she says that, she's talking about McCalla

7  and Brice.  She's not talking about these guys.

8          And of course, you know, then I asked her, "But it

9  was Wells Fargo's people that were signing them, right?"

10          So you know, nothing wrong with throwing these guys

11  under the bus, too.

12          Karan Abernathy; she's been the bankruptcy manager

13  after Lisa Joseph since 2005, and she reports directly to Kim

14  Miller.  And so, I'm asking her about, first of all, about the

15  deposition that she -- I mean, not the deposition, I keep doing

16  that, the affidavits, Page 37.

17          She had sworn to a declaration and it's in New

18  Jersey, come right out and say that.  But here's the point.

19  These management people themselves had done these very

20  practices, and that's critical, because it informs you about

21  their perspective about what was right and what was wrong and

22  what they were doing.

23          Long story short, there was a sworn affidavit -- a

24  declaration that she swore to, that said she was employed at

25  Brice Vander Linden law firm.  And so, I asked her how she

1    could swear to that?

2          And she says, "Because I generally don't look at

3    that, all of the documentation.  What I concern myself with is

4    what's due or past due on the financial piece."

5          So, here is their manager for years and years, who is

6    saying she personally, when she signs them and did sign them,

7    only reads the financial information, you know, what's the

8    balance owed to Wells Fargo?  How much money are we going to

9    get out of this?  How far behind are they?  How much money are

10   we going to get out of that?  And that she isn't reading

11   anything else.

12          And certainly, you can draw the inference that if all

13   of the management people were signing pre-signed signature

14   pages, not having exhibits attached, not reading affidavits;

15   you can certainly figure out from that what the practices were,

16   what the overall policy was, what the training looked like, you

17   name it.

18          And so, that is just a glimpse of why these

19   affidavits are critical.  This is there to show you that Kim

20   Miller, Lisa Joseph, Karan Abernathy were right in the thick of

21   this in terms of having engaged in these various practices

22   themselves, personally.

23          And as you can see, there are a lot of questions in

24   these depositions where there may be references to affidavits

25   from New Jersey, California, and so forth, but there are a lot

1 of overall procedure questions, policy questions.

2    Page 38, "So, on some occasions you did not review

3 the entire documents before you swore to them?"

4    "Sure."

5    "As the bankruptcy manager of Wells Fargo, does that

6 bother you?"

7    "No."

8    No wonder the people working under her never got it

9 right.

10    "Did it ever" -- Page 40, "Did it ever once cross her

11 mind that to not read all of these affidavits was harmful to

12 the integrity of the bankruptcy process?  Did that ever occur

13 to you?"

14    "No."

15    On Pages 22 and 23; this is one where --

16    THE COURT:  What pages?  It was Pages 22 and 23, you

17 said?

18    MR. OLEN:  Pages 22 and 23.

19    THE COURT:  Okay.

20    MR. OLEN:  Where she signs a certification and

21 something is attached with a date ten days later.  It's

22 apparent on the face of it, an exhibit.  And I'm asking, "Why

23 doesn't that bother you," since she swore to it.

24    And she says, "I think the data in that, that I was

25 certifying to, as far as the payments that are due, is

1    correct."

2         And what's so informative and so powerful about this

3    testimony is that there is one thing.  We will concede there is

4    one thing that it sometimes, sometimes mattered to Wells Fargo

5    to verify, because it wasn't consistent, but at least they say

6    it was.  They wanted to verify, at least at times, how much

7    money we owed, how far behind is the Debtor.  So much so they

8    didn't mind saying the Debtor was in default before they missed

9    a payment, even before they missed it.

10        But it just becomes clear when you read this, that is

11   the only single thing in any of these affidavits that they ever

12   remotely, possibly, occasionally actually verified or read.

13        Page 77:  "Was it okay to swear to affidavits that

14   talked about there being no equity in the Debtor's property?"

15        Yeah, just a minor issue in a Motion for Relief from

16   Stay, nothing serious about that, just these Debtors home

17   places.  And you know was it okay for her to swear that there

18   was no equity in the Debtor's property when Wells Fargo itself

19   had done nothing to make that determination and had instead

20   relied solely on whatever its lawyers put in the document?

21        She says, quote, "It was acceptable to our policy and

22   procedure based on that."

23        Okay.  Here is another example of why something that

24   was going on in New Jersey is relevant here.  We had Kim Miller

25   testify the first day, and I showed her some signature pages

1    and asked her if they were Xerox copies.

2            She wouldn't quite commit.

3            And then I showed her bunches more and she finally

4    said, "Maybe so."

5            And anyway, that in itself is not important.  It's

6    going to set the stage for a phone conversation she had with

7    that lawyer, which is important.

8            And so, after Kim Miller's deposition is over, the

9    third deposition we take is Karan Abernathy, who at the time of

10   her deposition reported directly to Ms. Miller.  And she's now

11   testifying because I asked her if they ever talked to Michael

12   Ackerman, and he's in New Jersey.  I'll tell you that right up

13   front.  He is in New Jersey.

14           So, after I take Ms. Miller's deposition, she gets

15   Ackerman on the phone.  And according to Karan Abernathy,

16   starting at Page 118, and you just have to read it through Page

17   123.  I'll tell you the high points, but I won't read all of

18   the quotes.

19           Kim Miller talks to Ackerman.  Again, here's their

20   vice-president.  And to quote their own witness, she goes

21   ballistic.  Ms. Abernathy uses that word a couple of times and

22   says when I ask her what did she say when she went ballistic?

23           She didn't want to use the words, because she said

24   they're swear words.

25           Here's what Kim Miller was mad about.  Not that

1  Michael Ackerman had previously used pre-signed signature

2  pages.  She was made about the fact that -- this is Abernathy's

3  answer -- that Miller mentioned this lawsuit and was highly

4  offended.

5           And I said, "This, meaning using the certification at

6  this later date?"

7           "Yes."

8           So, it wasn't that he had done it, it was that he had

9  done it this far down the road.

10          And then, I'll skip over one of the things here that

11  I was going to mention since arguably, it's not as relevant.

12  She talks about the swear words.  The other thing that

13  Ms. Miller was appalled about was this:  In the <u>Rivera</u> case

14  before Judge Stern in New Jersey.

15          THE COURT:  Right.

16          MR. OLEN:  And this is from the testimony now, this

17  is not me saying it.  Ms. Abernathy explains that what

18  Ms. Miller was so furious about was that in the <u>Rivera</u> case,

19  the Shapiro & Diaz law firm tried to insulate themselves or

20  soften the blow or whatever by submitting declarations or

21  certifications filed in New Jersey by other mortgage

22  companies.

23          And a couple of the ones they filed were from guess

24  who?  Wells Fargo.

25          And this is Ms. Abernathy's words.  She wasn't only

1   appalled with the fact that Ackerman -- blah, blah, blah -- but

2   was also appalled at the other attorney, the Shapiro & Martone,

3   I believe it was.

4          I say, "You mean Shapiro & Diaz?"

5          Question:  "So, she," meaning Kim Miller.  "So Kim

6   Miller was upset about -- ballistic about the fact that Shapiro

7   & Diaz had done this filing in the Rivera case that implicated

8   Wells Fargo?"

9          And she said, "Yes, absolutely."

10         Ms. Abernathy then went to the trouble to check three

11  of the ones filed of record in the Rivera case, and determined

12  they were pre-signed.

13         In fact, what they found out, Your Honor, was that

14  they bore the signature of Shumbala Chambers, who at the time

15  these were filed, and when I say "filed," not the time they

16  were filed in the Rivera case, but at the time Wells Fargo's

17  New Jersey law firm filed them, she was no longer in the

18  Bankruptcy Department.

19         THE COURT:  I remember.  I've read the case,

20  obviously, yes.

21         MR. OLEN:  So, she finds out, there are three of

22  these, and when she saw there were three, what does Wells Fargo

23  do?  They stopped.  Have they done -- have she and Kim Miller

24  done anything more to see if there are others?

25         "No."

1        Have they done anything to further investigate the

2  issue?

3        "No."

4        Did they look to see if there were any other

5  employees who had signed -- supposedly, quote, quote, "signed

6  after they were out of the department"?  That's at Page 101

7  through 103.

8        "No, no, no," they didn't do anything.

9        Teresa Diaz-Cochran, another supervisor for four

10  years for Wells Fargo; as a supervisor she supervised sixteen

11  people.  She reports to Abernathy, who reports to Miller.

12        I asked her if she saw anything wrong with Wells

13  Fargo's default management guidelines, saying if you need our

14  signature, ask us and we'll send you a supply of signature

15  pages so that you can pre-sign them.

16        I said, "Do you see anything wrong with the second

17  sentence of document number, and it's the Bates number?"

18        "No."

19        "Why not?"

20        "Because I didn't -- I don't see anything wrong with

21  doing it."

22        Page 11:  "Do you see anything wrong with using pre-

23  signed signature pages?"

24        "No."

25        The same at -- oh, I'm sorry, Page 142 and 143; she

1    doesn't see anything wrong with documents being attached after

2    she signs the affidavit under oath.

3            And then we take Ms. Cochran's deposition, again, and

4    at Page 294 of her second deposition, which will be at Tab 5, I

5    believe.  It's her 2009 deposition.

6            THE COURT:  Okay.

7            MR. OLEN:  At Page 294, I asked her about something

8    about, "When you were doing training, were you still -- you

9    were still doing pre-signed affidavits?"

10           She says, quote:  "I didn't say there was an issue

11   with pre-signed affidavits."

12           Question:  "So, when Wells Fargo, in your view, when

13   Wells Fargo used pre-signed affidavits, that in no way impacted

14   the integrity of the bankruptcy process, is that your

15   position?"

16           Answer:  "In my opinion, no, because I counted on my

17   attorney to tell me what was correct for each jurisdiction."

18           At Page 121 through 123, I asked the same questions

19   about telling local counsel, and --

20           THE COURT:  This is in the first deposition or in the

21   second deposition?

22           MR. OLEN:  This is in the 2009 deposition.

23           THE COURT:  Okay, so all of these --

24           MR. OLEN:  Which would be the second, I'm sorry.

25           THE COURT:  All of these are going to be from the

1   second deposition?

2           MR. OLEN:  All of what I'm telling you now --

3           THE COURT:  Okay.

4           MR. OLEN:  -- is from the second deposition.

5           THE COURT:  Great.

6           MR. OLEN:  I apologize.

7           THE COURT:  That's all right.

8           MR. OLEN:  I broke them out that way.

9           THE COURT:  Okay.

10          MR. OLEN:  And you know, I asked -- she starts off by

11  saying she can't answer because it's a legal question.

12          And so, I say:  "Well, you know, it's not legal.  How

13  about good old fashioned decency and fairness; tell these guys

14  what you're having them do, let them know."

15          And at first she said, "Well, I'm not the attorney."

16          And so, then I say, "Well, what does that have to do

17  -- what does what's legal have to do with doing what's fair and

18  decent?"

19          Answer:  "I don't know what's wrong with pre-signed

20  affidavits, to begin with, legally."

21          Well, if that's your view, of course you're not going

22  to tell your local counsel.  On the other hand, it sure is

23  interesting that they didn't tell the local counsel, isn't it?

24  They probably had a good idea of what their local counsel would

25  have told them they could do with the Wells Fargo business.

1          Page 132; I call these future payments.  I don't know
2  what else to call them, Your Honor, but these payments where
3  you're swearing now --
4          THE COURT:  Oh, okay.
5          MR. OLEN:  -- to you know.
6          THE COURT:  Right.
7          MR. OLEN:  They're past due and yet the due date
8  hadn't even come.
9          THE COURT:  Right.
10          MR. OLEN:  And I asked Ms. Cochran at Page 132; did
11  she anything wrong with that?
12          "I depend on the attorneys to tell me what's right
13  and wrong."  And that's all she would ever say.
14          So then, Page 150 I'm asking her, you know, "Won't
15  you admit that when Brian Theiler" -- now, these are all
16  affidavits filed in Alabama.  All of this is Alabama -- not
17  Alabama, the Southern District of Alabama.  Won't she admit
18  that his figures were wrong, you know, because they want to
19  talk about the figures and we verify the figures.
20          And I'm saying, "Well, won't you admit the figures
21  were wrong when Brian Theiler on February 24 says the March 1
22  payment is past due?"
23          And she says, "No, I didn't say they were wrong."
24          And then I say, "Are you seriously telling Judge
25  Mahoney that it was correct for Brian Theiler on February 24th,

1  2004 to represent in this affidavit under oath that the March

2  2004 payment had not been made?"

3        Answer:  "I don't know what the affidavit practice is

4  in Alabama.  If the attorney said we needed to include the

5  payment that the homeowner wanted then a consent order would

6  have included it."  I mean she'll never come out and answer the

7  question.

8        And you'll have to read, there are a couple of these

9  depositions.  Here is their story about how this came to be.

10 They say, and I'll just let you read it.  I don't even have

11 page citations.  They say that the reason the Wells Fargo

12 affiants were swearing under oath that payments that hadn't

13 even come -- hadn't even come up on the calendar yet, were past

14 due, was that the Debtors' attorneys needed that in the

15 affidavits in order to have a consent order entered.

16       Their explanation is so preposterous that I have a

17 hard time getting it out of my mouth.  And here's all the

18 things wrong with that:

19       That means that -- I'll take my friend, Melissa

20 Wetzel.  Melissa somehow knows they're going to file a Motion

21 for Relief that they haven't even yet filed.  And Melissa's

22 going to pick up the phone and call the Wells Fargo lawyer and

23 say, "Hey, we need to do a consent order here, so I need you to

24 put in the affidavit that the payment that's going to be due

25 ten days from now or 20 days from now is past due."

1          And I hadn't even thought about this until I'm

2   standing here arguing it, think what they're saying about

3   Debtor's attorneys in Mobile.  They're saying that Debtor's

4   attorneys in Mobile would ask them to commit a fraud on the

5   Court by putting something in an affidavit.  Just throw whoever

6   they can under the bus, indiscriminately.

7          I asked her if they've ever had discussions about

8   taking steps to make sure they no longer sign affidavits that

9   incorporate exhibits, and then have the exhibits attached

10  later.

11         She doesn't remember.  That's at Page 169.

12         Page 171; she says, you know, "Whatever we do about

13  that, it's up to our lawyers."

14         And then what you get, Your Honor, is you've got

15  McCalla Raymer saying that they never, ever talked to Wells

16  Fargo about their affidavit practice, never.

17         You've got Brice saying; you've got Hilary Bonial

18  saying she never offered advice about how to do affidavits, and

19  they never asked her for advice.  So, they would profess

20  they're relying on lawyers for all of these fraudulent acts,

21  but there's absolutely no evidence that it ever happened.  They

22  haven't produced a single memo, a single anything, a

23  communication of any kind where they ever asked any of their

24  lawyers how to do any of this or that their lawyers ever told

25  them how to do any of this.

1          In fact, it goes back to something else I need to

2    mention, and it's too voluminous to have put it in my

3    presentation with specific cites.  The Wells Fargo witnesses

4    from time to time will say that it was our lawyers who started

5    this practice.  But there's nothing to show that, and of

6    course, even assuming it were true, somebody had to sign the

7    pre-signed.  Somebody had to say it's okay to sign affidavits

8    without the exhibits attached.  Somebody had to put their

9    signature on the ones where the payments aren't yet due.

10          I'll skip over the minor stuff like the way that they

11   would do notary dates.  I mean they, you know, notarized -- it

12   was okay if the affiant filled in the notary date for the

13   notary.  It was okay if the notary filled in the affiant date

14   for the affiant.  Sometimes the notary's dates would already be

15   filled in by the affiant beforehand, sometimes they would be

16   done after.

17          And then, what you get is you have Wells Fargo, among

18   the other things they say, come in here and say, "You know,

19   when the Plaintiffs, Mr. Olen, he's so picky, they want to --

20   they want to chastise us because we have all of these blank

21   dates in the affidavits."

22          We're not saying that a blank date in an affidavit is

23   frauding the Court.  We're not that stupid.  The point is that

24   with the frequency with which it happens, it is compelling

25   evidence of something much bigger going on.  And it's no wonder

1    when they're all dating each other's dates that sometimes they

2    fail to date it.  We're just saying it's evidence of their

3    overall practice.

4           You know, like Kim Miller said, "Affidavits, they're

5    just a technicality."

6           And you've seen the regard that they have -- that

7    wouldn't be regard -- total disregard that they have for this

8    process.

9           Teressa Jones, another supervisor; so, so far all of

10   the people we've talked about, every one of these people, is a

11   supervisor, manager or vice-president.  I asked her if they

12   ever had a policy that the entire affidavit including exhibits

13   ought to be in front of them, before they signed the

14   affidavit?

15          And she says she doesn't recall there ever being such

16   a policy.  That's at Page 73.

17          Page 74 and 75, I asked her, "If you were signing

18   affidavits today, would you do the same thing?  If once you

19   sent the affidavit to McCalla Raymer they print the note and

20   mortgage or they copy the note and mortgage out of the file and

21   attach it?"

22          She says, "I rely on them if it says that they do.

23   But if they didn't attach it with the affidavit," meaning if

24   they didn't give it to her to begin with.  So, she relies on

25   her lawyers.  If her lawyers say that it's okay, it doesn't

1 matter, they're going to do it.

2        Switching gears, verification.  Wells Fargo's -- well

3 obviously, when you don't read affidavits it's impossible to

4 verify them.  That goes without saying.  If you don't have

5 exhibits there to look at, you're not verifying them.  If you

6 don't have payment histories, you're not there to verify them

7 and you can't verify them.

8        And keep in mind now, this is not talking about a

9 pre-signed signature page.  We're talking about all of these

10 other hundreds and hundreds of affidavits that they filed  with

11 a note, a mortgage, and a payment history, an assignment of

12 mortgage; some combination of those attached.

13        Lisa Joseph at Page 58 said -- I asked her -- I

14 started off by asking her if she knows why somebody would have

15 dated the affidavit before she signed it.

16        And she says, "What a lot of my staff did when they

17 had affidavits ready that they -- that they had reviewed and

18 verified, they would ask me if I was available that day."

19        And she admits, and of course the reason she admits

20 it is she sees nothing wrong with it.  Now, she went way out of

21 her way to never admit that she pre-signed the affidavit in

22 Brannan.  She won't even admit she pre-signed affidavits for

23 the Brice firm, and that's one of the reasons Exhibit 2B is

24 into evidence because we took the list of cases that Brice

25 submitted and where we could get them off PACER.

1    We filled in the affiant name and the notary name.

2 The reason there's so few names in there is most of them are

3 old closed filed that we haven't gone and tracked down yet.  I

4 didn't realize I hadn't done that until I saw that exhibit the

5 other day.

6    So, you know, she's walk a mile to say I didn't pre-

7 sign the Brannan affidavit and I didn't pre-sign for Brice,

8 even though Brice says she did and even though Karan Abernathy

9 says she did, but she readily admits that it was her staff who

10 reviewed and verified these affidavits.

11    The simple truth, what comes screaming out of her

12 testimony at Page 58 and other pages is she was signing these

13 things and that's all she was ever doing, it's clear.  And

14 there are times when they say other things, but that's what the

15 real testimony is.

16    Page 61; I'm asking the same kind of thing.  I was

17 asking her, you know, right here where it says, "Under penalty

18 of perjury, the foregoing is true and correct.  Would you have

19 read the document carefully before you signed your name under

20 oath?"

21    "Either I would have or the representative that

22 verified it before me would have reviewed the document."

23    Come on, ask yourself:  Why didn't they have the

24 representative to sign the affidavit?

25    Page 63; the person validating it wouldn't

1  necessarily be the person who pre-signed it, meaning on pre-

2  signed affidavits, there is this claim that they had all of

3  these signature pages and Brice was oh so meticulous and they

4  would send the affidavit by e-mail to somebody at Wells Fargo

5  and say, "Here is what the rest of your affidavit is going to

6  look like, where you've already signed the signature page. Is

7  it okay?"

8         And Hilary uses the word -- Hilary Bonial says, "That

9  manes the affidavit become," quote -- and I love this word --

10  "active." It's active.

11         And what I would say to her is she left out three

12  words, four words: It's active fraud on the Court when that

13  happens.

14         And so, here Ms. Joseph says, and again it shows you

15  their mindset about, quote, verification. Even in that

16  instance where they're so crowded with the so called

17  verification process, it's okay if whoever verifies it is

18  somebody other than the one signing it.

19         I asked her about lost note, affidavits of lost notes

20  at Page 114.

21         And she says, "No problem if somebody else verifies

22  that.

23         She says the same thing at Page 174.

24         Page 195, again, I'm asking her about verifications.

25         And she says, talking about the people who verify it

1  for her.  "I can't speak for them on whether they would have

2  looked at something else."

3          Page 42, and this is now -- I'm switching.  This is

4  Karan Abernathy.

5          THE COURT:  Okay.

6          MR. OLEN:  So, here we are --

7          THE COURT:  Wait, what was the page again?

8          MR. OLEN:  Page 42.

9          THE COURT:  Thank you.

10         MR. OLEN:  And this is their bankruptcy manager,

11 long-time bankruptcy manager.

12         I asked her, "Was the reason you sometimes didn't

13 read all of the documents that you wanted to save time?"

14         "No.  I have people that report to me that are

15 designated to look at a lot of that information."

16         And so I asked her, "Would you have any way of

17 knowing if they really did check?"

18         And she says, quote, "That was their job."

19         So, their job was to read and verify affidavits for

20 her so she could swear to them under oath, and file them in the

21 Southern District of Alabama.

22         Page 72, no problem with swearing that there was no

23 equity in the property, even though they did nothing to find

24 that out.

25         Page 76, the same thing.

1          Next is Teressa Jones.  She is another supervisor,

2     and she was a processor for four years before that, and over a

3     five year period she says she did the same -- all of her

4     processes were the same, both as a processor and as a

5     supervisor.

6          And so, I show her an affidavit that she signed under

7     oath and her name is Teressa Jones, and the first page her name

8     is not misspelled.  Her name on the first page is Rhonda

9     Jordan, three times.  Three times; in the caption and twice

10    more.

11         And so, I asked her:  "Did you read it?"

12         And she says, "I would like to think I would" --

13         MR. CALLAWAY:  What page is it?  What page is this?

14         MR. OLEN:  Oh, Page 107.  I'm sorry.  Thank you.

15         MR. CALLAWAY:  Thank you.

16         MR. OLEN:  "I would like to think I would have caught

17    that, but I would have probably gone straight to identifying

18    Paragraph 2."

19         And she says, "Because that's the paragraph that

20    talks about the principle amount owed to Wells Fargo."

21         And then they want to trot out this Ms. Chanah-Bey

22    and then talk about how oh, they really read all of these

23    things.

24         Page 101, asking if she did anything before she swore

25    about the value of the property shown on the Debtor's

schedules.

And said: No, their general practice was to rely on the lawyers for that.

Christina Traynor; her supervisor was Theresa Williams. You can sort of see the connections here. Here she is, she's trained by the lady I just talked about, where that was her supervisor.

And at Pages 19 and 20 we're asking, "What were you trained and instructed to verify?"

"The figures that were contained on the affidavit."

And then I asked at Page 20: "Anything else you were trained to verify?"

"The main thing we were looking at is the figures."

So finally, I say, "Well, anything else?"

"Not that I can recall."

So, their training, the institutionalized training was to train the people who were some of the people who were signing these affidavits when the higher muckety mucks weren't signing them. All you're supposed to verify is the financial numbers. Make sure you get it right on what we, Wells Fargo, are owed.

Switching gears to Jeannette Massey. I've already mentioned her some, and I'll try to skip over the things that I've already covered.

It starts at Pages 53 through 55 of Jeannette Massey.

1  She was a processor for five years.

2        By that I mean, question, this is -- "And by that I

3  mean, not do anything at all other than to simply put your name

4  on the affidavit, is that correct?"

5        "That's correct."

6        That's all she did was put her name on the affidavit,

7  under oath.

8        Wouldn't have looked at the first page of the

9  particular one I showed her and see that it was Kelly Brown's

10  name and not hers.  Wouldn't have looked at the first page to

11  see that she's shown as an employee of McCalla Raymer where she

12  has never worked.

13        And so, again Your Honor, the concept that we are

14  singling out an affidavit and saying:  Oh, look at this.

15  Teressa Jones signed an affidavit where it has Rhonda Cochran

16  -- not Rhonda Cochran.  I get confused with, I guess Wanda

17  Cochran.

18        THE COURT:  Right.

19        MR. OLEN:  Rhonda Jordan.

20        THE COURT:  Okay.

21        MR. OLEN:  It has her name three times, and we're

22  saying that's fraud.

23        No, what we're saying is if that happens once, okay.

24  Two or three times, maybe.  But because this is happening again

25  and again and again, it is evidence that these people weren't

1    reading these affidavits.  You know they would have -- if they

2    had read them, you've got to believe they would have seen their

3    own name was wrong, their own job was wrong.  There were blanks

4    all over the place.

5          And the only alternative explanation, Your Honor, is

6    simply, "Yeah, I saw it was wrong and I signed it under oath

7    anyway."  I mean I don't know which of those works, because

8    they do swear at the bottom, you know, that the thing was true.

9    So, if they didn't read it, there's no way to know that it's

10   true.

11         "Your sole responsibility," this is Page 55 of

12   Massey, "was to sign your name as the affiant and not to do

13   anything to verify any aspect at all of the affidavit; is that

14   a correct statement?"

15         Quote:  "That is a correct statement."

16         In summary of Jeannette Massey, she signed 65

17   affidavits prepared by Shapiro & Tucker, from January of 2002

18   through May of 2003, seventeen months.  Seventeen months, 65

19   out of 65.  You've got to give them credit.  Wells Fargo batted

20   a thousand.

21         The exhibits either were not attached or they were

22   attached late; every single one of 65 times, although I don't

23   know why I should worry about that, because she didn't read the

24   affidavits anyway.  But I guess it's double kill.

25         In 51 of the 65, they have her position wrong.  They

1 say she's a supervisor and she never ever was.  And that for

2 example is the kind of thing you learn about in depositions.

3 You know, you don't know she's never been a supervisor until

4 you go take her deposition.

5 And the pages of the chart that have Jeannette

6 Massey, just for your convenience, are Pages 35 through 44 of

7 Plaintiff's Exhibit 140, and it's Numbers 453 to 566.  Hers are

8 included in that range.

9 THE COURT:  I see them, okay.

10 MR. OLEN:  All right.  On Page 75 she says again,

11 "The only thing I did was sign it."

12 Page 78, she says it again.

13 And then there are some occasions where they attach

14 things to her affidavit later and she says she absolutely had

15 no involvement in that, or they faxed things to be attached

16 later.  She had no involvement in any of that.

17 There are some where the law firm Shapiro & Tucker is

18 trying to get a recorded copy of the mortgage after Ms. Massey

19 has already signed the affidavit.

20 Switching gears again, a little bit, just again,

21 just a few highlights about how exhibits were handled.  Lisa

22 Joseph says at Page 70 that she can't say she ever had the

23 entire affidavit, including the exhibits in front of her when

24 she signed them.  And again, that's a very powerful admission

25 by her, since she wouldn't even admit that she pre-signed for

1  Brice.

2          Then I asked her, at Page 73:  "If you had been

3  presented with this entire declaration, would you have read

4  this paragraph," and I think it's the one talking about the

5  note and the deed and assignments were attached.  "If you had

6  been presented with this entire declaration, would you have

7  read this paragraph and then checked to see whether the

8  exhibits referenced in the sworn declaration were attached?"

9          "No."

10          And then I say, "Well, if it had come to you, nobody

11  was checking to see whether there were any exhibits that were

12  attached?"

13          She says, quote, "I don't know about any exhibits."

14  That's Page 73, 74.

15          I asked her whether she ever once, and this is at

16  Page 75, 76; ever once signed an affidavit where each of the

17  exhibits referenced was already attached.

18          Answer:  "I don't know."

19          And so, the point there is, Your Honor, for Wells

20  Fargo to then come in here and tell you that there needs to be

21  some individualized inquiry that the Plaintiffs need to

22  conduct, so we can show you every time Lisa Joseph didn't have

23  the exhibits in front of her, is absolutely exactly backwards.

24  We've got her saying she can't tell you she ever did it.

25          And so, she does it so much, she doesn't know when

1  she did and when she didn't.  At this point with all of this in

2  front of you, when you have a chance to read it and digest it

3  and study it; we submit that they've now got to come forward

4  and say, "Here is one of those rare occasions when Lisa Joseph

5  by golly actually had it all in front of her."  Not that we

6  have to show that, in effect, you know, not with this kind of

7  testimony.

8      That lets them hide behind the magnitude of the

9  fraud, and that's exactly what they're trying to do.

10      At one point she talks about looking at affidavits or

11  certain cases, and then she, you know, we get her to admit,

12  "Well, that doesn't include the exhibits, you know, that's

13  different, they're different."

14      Page 79; she says, "Well, the security instruments,

15  we would have sent them so they had them."

16      I asked her at Page 82 if she ever instructed any of

17  the -- as a supervisor, if she ever instructed anybody or

18  trained any of the employees working under her to have

19  everything in front of her.

20      She doesn't remember.  That's at Pages 82 and 83.

21      The same type of thing for Karan Abernathy at Pages

22  88, 89; she professes in her answer not to have pre-signed a

23  signature page, but admits she can't say that she ever had the

24  entire affidavit in front of her.  That at Pages 88, 89.

25      Page 94:  "I didn't look at every attachment for a

1  note or a deed.  I didn't review every single, the affidavit

2  for that."

3          She didn't review the affidavit for the things she

4  swore under oath were attached to that affidavit.

5          And so not surprisingly, and again now, this is a

6  New Jersey affidavit.  Here's Ms. Abernathy, their bankruptcy

7  manager since '05 and she swore on June 6th that the Debtors

8  were delinquent for their July 1 payment.

9          Now, I'm not saying there's an issue with that

10 New Jersey certification.  What I'm saying is, the issue is

11 that Karan Abernathy, their bankruptcy manager, would do that.

12 That certainly informs the Court about her perspective of

13 whether it's permissible to commit fraud on the Court, and

14 she's a supervisor.  There's certainly an inference to be drawn

15 about what she's instructing and training her folks to do; and

16 she manages everybody in the Bankruptcy Department.

17         Teresa Diaz-Cochran, the second deposition, the 2009

18 deposition at Page 197; frequent occasions when she signed the

19 affidavit without the exhibits attached.

20         Page 32 of Cochran, again the 2009 deposition;

21 certainly there were times when she didn't have exhibits in

22 front of her.

23         Then we asked her at Pages 32, 33:  Wasn't it the

24 standard practice that she didn't get an affidavit with the

25 exhibits attached?

1          Answer:  "I cannot tell you if that was the standard

2    practice."

3          So, she can't say under oath the standard practice

4    was for her to get the exhibits.

5          And then Pages 33, 34, I follow up and say, "You

6    know, do you ever have the affidavits presented where you had

7    the exhibits?"

8          "Yes."

9          "How often?"

10          "I couldn't tell you."

11          Then, this is a telling answer, Pages 245, 246, I

12    asked her, "Well, who do you think was attaching the notes and

13    mortgages four days after you signed this affidavit?"

14          Answer:  "I'm assuming the attorney."

15          The attorneys were attaching them all the time.

16          Teressa Jones at Page 41; she was verifying the

17    financial information.

18          And then at Page 42, "Sometimes the exhibits have the

19    attachments."

20          It says it again at Page 44.

21          And then, at Page 49:  If she got an affidavit and

22    there was no mortgage or note attached, would she sign the

23    affidavit?

24          "Yes."

25          It didn't matter.  It didn't matter that she swore to

1    it in the affidavit.

2           At Page 92, "She was relying on the law firm to

3    attach the note and mortgage as exhibits."

4           And then, this is in 2009, Your Honor, this is at

5    Pages 92, 93.  This is after citing that she would rely on the

6    law firm to attach the note and the mortgage.  "And it

7    continues to work that way today.  If you got an affidavit just

8    like this one tomorrow, they'd have that exact language in it

9    about the note and the mortgage and they were not attached, you

10    know, would you sign it?  Would you still rely on the law firm

11    to attach them?"

12           "Correct."  Her answer is, "Correct."

13           Okay.  Next Your Honor, and I know I'm just sort of

14    jumping around but --

15           THE COURT:  All right.

16           MR. OLEN:  Wells Fargo in its second reply brief has

17    trotted out -- I have no idea how to pronounce her name --

18    Kamiylah Chanah-Bey.  I'll say Ms. Chanah-Bey.  I won't tackle

19    that first name again.

20           And they want to parade her out here as somebody who

21    was consistently doing it the right way.  And I don't have it

22    in front of me all of what they said, but I recall there was

23    some testimony in her deposition where she says when she'd get

24    the affidavit, she'd print the whole thing, that she'd print

25    the exhibits.  If it didn't have the exhibits, she'd tell the

1  law firm that she'd thrown that one in the trash and they had

2  to send her one with all of the exhibits.  It's some mighty

3  fine testimony.

4          The problem is, and one of the things we want to be

5  sure we do today is give you some context; that testimony is

6  flatly contradicted by the evidence in this case, totally,

7  completely, absolutely, unequivocally.  And I'll start with

8  Erin Brown, and then I'll go back to Ms. Chanah-Bey herself.

9          But you've got Ms. Chanah-Bey saying the affidavits

10 were coming to her with all of these attachments and that's how

11 she signed them and that's how she sent them back.

12          Erin Brown is an attorney in Montgomery who has been

13 local counsel, the only local counsel for McCalla Raymer on

14 Wells Fargo matters for a number of years.  I don't know how

15 far back it goes, but a good ways back, certainly well before

16 Ms. Chanah-Bey started signing affidavits in I think late '07.

17          Page 35 and 36.

18          MR. CALLAWAY:  What deposition?

19          MR. OLEN:  Erin Brown.

20          MR. CALLAWAY:  Thank you.

21          MR. OLEN:  I asked if she would file the affidavit

22 once she got the PDF.  What would happen is as soon as the

23 affiant signed an affidavit, it would go back to McCalla and

24 they would PDF her that copy, and then ultimately would deliver

25 her the original.

1          But when she got the PDF, I asked:  "Would you file

2    the affidavit once you got the PDF e-mail, or would you wait

3    until you got the original?"

4          "I did it" -- meaning file it -- "when I got the PDF

5    most of the time."

6          "When you received affidavits by PDF, did they have

7    any of the exhibits as part of the PDF, or only the body of the

8    affidavit?"

9          Answer:  "I, you know, more or less know they don't

10   have the exhibits attached to it."  So that flatly contradicts

11   what Ms. Chanah-Bey says.

12          And again, you know, Your Honor gets to weigh all the

13   evidence and that's the reason we've got all of these things

14   submitted.

15          At Page 37 Ms. Brown says:  "When you got a PDF, you

16   got a PDF of the affidavit itself, correct?"

17          Answer:  "Correct, uh-huh."

18          Question:  "That PDF did not -- did not include the

19   note, the mortgage or assignments, correct?"

20          Answer:  "Correct."

21          Page 89, I won't read the whole thing; she says it

22   again.

23          And she, by the way, she was the only person in her

24   office so she did all of the scanning herself.  She knows

25   exactly what she filed.

1          Page 92; "So every time the affidavit came to you,

2    you were the person who was assembling and putting the exhibits

3    together with the affidavit, for purposes of electronic

4    filing?"

5          Answer:  "Yeah."

6          Page 94, the same thing again:  "It was only the

7    affidavit; it was no exhibits?"

8          "Yes, because they had already given me the

9    exhibits."  No way, I can't ask the same question just once.

10         Page 94:  "When the affidavit came to you, the

11   signed affidavit came to you by itself with no attachments,

12   right?"

13         "Right."  I mean, "Correct," that's correct.

14         And then at Page 96, this says a lot.  I point out to

15   her that, you know, all of this when it got filed in court,

16   she's piecing it together.

17         And I said, question:  "Then you then put those

18   together as part of either a motion or notice of filing

19   affidavit, a single document?"

20         "Correct."

21         Question:  "So the Court, when it saw all the

22   affidavits, the Court would have every reason to believe the

23   affiant had all of those exhibits as part of the affidavit when

24   the affiant signed the affidavit, correct; that's how it

25   looks?"

1          Answer:  "I never thought of it that way."

2          Question:  "Well, you agree that's how it looks; it's

3   a single document to the Court?"

4          Answer:  "Sure, I see how it looks.  When you say

5   this here today, I see how that looks, but that's now how I

6   looked at it."

7          But one thing is crystal clear; affidavits were

8   coming to her with nothing attached.  She says it again and

9   again and again and again and she is the person on the

10  frontline filing them.

11         Page 125:  "When it comes to her today --"

12         And this is in 2009, I think.

13         THE COURT:  Well, what was the page number again?

14         MR. OLEN:  I'm sorry.  This is Page 125.

15         THE COURT:  All right, thank you.

16         MR. OLEN:  I don't see the date.  I think it was the

17  end of '09.

18         THE COURT:  Okay.

19         MR. OLEN:  We took this deposition.

20         "-- is it still coming that way?"

21         "That is correct, just for simplicity because the

22  loan documents are very -- can be very long."  So, she's still

23  getting just the affidavit, no attachments.

24         And so, you have to weigh Ms. Chanah-Bey's testimony

25  that they have trotted out here in light of what Ms. Brown says

1   about whether there really was anything attached.

2          Page 126, more of the same.

3          And then, John Schlotter --

4          THE COURT:  You know what, let's take a break and

5   then we'll break whenever it makes sense, around noon as well.

6   But let's take a break now for ten minutes and then we'll come

7   back.

8      **(Recess from 10:27 a.m. to 10:41 a.m.)**

9          THE COURT:  All right, you may be seated.

10         All right Mr. Olen, when you're ready.  And you were

11  going to Mr. Schlotter's deposition?

12         MR. OLEN:  Yes, Your Honor.

13         THE COURT:  All right.

14         MR. OLEN:  John Schlotter, as I said, was the head of

15  the Bankruptcy Department at McCalla Raymer, and at Pages 80,

16  81 of his deposition he says -- and I'm showing him a specific

17  affidavit signed by Brian Theiler and asking if only the two

18  pages of the affidavit were sent to Mr. Theiler; and he says

19  that's his understanding.

20         And then I ask him if it's his understanding that

21  Erin Brown is the one who actually attached the note and

22  mortgage on the affidavits sent to her by McCalla Raymer;

23         He says, "I'm not sure."

24         And then at Pages 80, 81 I tell him, "Well, that's

25  what she testified to yesterday.  Ms. Brown also testified

1    yesterday that she was the person, and in fact she didn't have

2    any staff, that she would take the note, the mortgage

3    assignments and so on; do you have any reason to disagree with

4    that statement of fact on her part?"

5            "No."

6            So, you have Erin Brown and John Schlotter saying

7    affiants were getting just the affidavit, no exhibits.  Erin

8    Brown was the one attaching the exhibits, and I don't know what

9    better testimony you could have than Schlotter, the head of

10   bankruptcy at McCalla Raymer and Erin Brown, the person who is

11   actually assembling them; and by that, I mean adding the

12   exhibits and filing the affidavits.

13           At Pages 41 and 42, we're asking him how they came to

14   him;

15           And he said they didn't -- they usually didn't have

16   the specific exhibits.  He said but -- and then he wants to

17   hedge and say, "Well, but you know, I had the note and the

18   mortgage in my file."

19           But I asked him if the motion had the note and the

20   mortgage attached at Page 44;

21           And he said they were just in the physical file.

22           At Page 53, and this was the -- we get to the heart

23   of it, the question:  "And what you would, the actual paper

24   you would have in front of you, the affidavit as it existed

25   in front of you was just the two pages of the affidavit,

1  correct?"

2          Answer:  "That's correct."

3          THE COURT:  What was that page again?

4          MR. OLEN:  Page 53.

5          THE COURT:  Thank you.

6          MR. OLEN:  And Mr. Schlotter signed these things for

7  I think about three years before Ms. Chanah-Bey.  He has

8  immediately preceded her.

9          And so, that brings us to Ms. Chanah-Bey.

10  Ms. Chanah-Bey's supervisor was Theresa Williams.  Okay, it

11  starts at Page 35 and it really runs through about, let's see,

12  Page 40.  And actually, this is testimony that was designated

13  by Wells Fargo.

14          THE COURT:  All right.

15          MR. OLEN:  Ms. Chanah-Bey says that in the morning

16  she does a mass print of the affidavits that have been e-mailed

17  to her, and that it could be 90 that morning by 7:30 a.m.  The

18  first thing she does in the morning is she prints every

19  affidavit that's come in.  And then she does a mass print more

20  than once during the day.

21          She says, quote to my question, let me read it:  "And

22  do you do a mass print," meaning all of the affidavits that

23  have come to her e-mail box since she last printed, "more than

24  once a day?"

25          Answer, quote:  "All day long."  She's mass printing

1  all day long.  And you will see in a minute why that's

2  important.

3          And then I ask, "Every hour or every couple of

4  hours?"

5          She says, "Now, it's when I start in the morning at

6  7:30, it usually takes about an hour, an hour and a half to

7  print all of those; and once I get those I work my relief

8  mailbox."

9          And then she says, "If I get like twenty more, I

10  print again because I'm trying to keep up so it won't be so

11  many."

12          Quote:  "And then around 11:00, I start working the

13  affidavits and it takes me up to lunchtime, which is 1:30."

14  From 11:00 a.m. to 1:30, two and a half hours.

15          And then I ask again:  "I'm not trying to hold you to

16  that, but approximately from 11:00 a.m. to 1:30 p.m. you work

17  on the affidavits?"

18          Answer:  "Correct."  She says it twice, under oath.

19          "How many in the morning?"  Now, this is just what

20  she gets in the morning, forget what comes in later.

21          "Anywhere from 80 to a hundred and something, and

22  that doesn't include busier times like the first of the month

23  and sometimes the last of the month."  That's at Pages 37 and

24  38.

25          Here is what she does in two and a half hours:  After

1  she's printed them, she staples them.  Now you know, think

2  about it.  Now, she says, and I want to be clear, I want to be

3  fair here.  She says in her testimony somewhere that she's got

4  all of the affidavits with all of the exhibits.

5        And truthfully, I wanted to print a stack of a

6  hundred and Mr. Nicholas didn't think that was such a good

7  idea.  I was going to bring them in here so you could see what

8  it looked like, if it really had the exhibits.

9        She staples them and then what she does, is she has

10  to count them to keep up with how many.  So, she counts them.

11  And she puts her name stamp on them.  She has a stamp for her

12  name, and she stamps it three times.  It's in the caption, I

13  think, anyway, and right below her name where she writes it,

14  she stamps it.  But she has to stamp a hundred affidavits three

15  times to show where her name is.

16        And so then, I asked you know, what do you --

17        "And then I verify them with the system."

18        "Tell me step by step how you verify a given

19  affidavit?"

20        She says, "I go over the affidavit."

21        "What do you mean?"

22        "I'm getting the loan number."  And then she goes in

23  using the loan number to the computer, and she verifies the

24  information on the affidavit in terms of the homeowner's name,

25  the property address, goes through all of that verifying the

1 figures, whatever they're saying. If there are attachments,

2 see those attachments are there, "because I've printed so many,

3 you know, I need to make sure again what's where."

4       So, in two and a half hours she's stapling them,

5 she's stamping them, she's reading it. She would say she's

6 reading all of it, she says. And she's verifying it, so she

7 has to go to the computer for a given one; she has to log in

8 something to get information.

9       And Randall, do we have Kamiylah Chanah-Bey's

10 deposition excerpts? Could you give me that binder?

11       I was going to give you just the affidavit first to

12 look at it, and then I think we can talk, if we can find the

13 one.

14    (Pause.)

15       MR. OLEN: This is the affidavit --

16       THE COURT: All right.

17       MR. OLEN: -- of Tracy Dukes.

18       THE COURT: Okay.

19       MR. OLEN: May I have my copy? All right.

20    (Pause.)

21       MR. OLEN: So, if you look at Dukes, Your Honor,

22 you'll see she stamps her name in at the top where it says

23 affidavit of, my name is -- oh, and by the way, I might as well

24 just cover this while we're here.

25       She absolutely is not and has never been an assistant

1   secretary for Wells Fargo.  That is absolutely false.  And

2   there is no contention, none, zero, by Wells Fargo that she

3   ever was appointed such.  She signs a bunch of these, I can't

4   remember, ten or twelve or so, and the last one that we happen

5   to have, she catches on, I guess, or something happens, she

6   says she's a bankruptcy specialist, she corrects it.

7           Now, we don't have beyond a certain date, Your Honor,

8   because at some point I quit looking at PACER.  So, I don't

9   know what that would hold if we were to update our search.  But

10  if you look at this, you look at all of the information here.

11          Oh, and she admits that she doesn't do anything to

12  verify what the Debtor's bankruptcy schedule says.  And you

13  know, nobody said that these folks have an obligation to go

14  look at the Debtor's schedules unless and until they put it in

15  a sworn affidavit.  And then, even though it's in the schedule,

16  I don't, you know, our view is you don't get to swear to this

17  under oath in an affidavit and present it to the Court unless

18  you verify it; and she readily admits she never did that.

19          But she's got to go look and check to see principle,

20  the interest, late charges; you see them all.  Check all of

21  that.  She's read it.  If you believe her testimony she's got

22  the exhibits there to check.  So, let's be -- and the pro rata

23  time it takes to staple them, stamp them, sign it -- forgot

24  about that, she's got to actually sign it.

25          She later takes it to the notary, so we'll push that

1 aside for the moment, takes them to the notary en masse.

2       Let's give them the benefit of the doubt.  Let's

3 assume ten minutes; she can do one of these in ten minutes with

4 stapling it, stamping it three times, verifying all of this

5 information, calling up the loan, calling up the loan file.

6 It's not like she can just (snapping fingers) bing, you know,

7 she's got to go find it.

8       Assuming there are no computer issues, there's none

9 of that ever once, ever, no interruptions, no nothing; doesn't

10 get up to eat -- well, that's right, lunch is at 1:30.  She

11 doesn't get up to go to the bathroom, doesn't have anybody

12 interrupt her, 150 minutes.  A hundred affidavits, déjà vu,

13 Debra Clark, Barrett Burke; a hundred affidavits, I mean, this

14 is serious stuff.  This is what she testified to here.  A

15 hundred affidavits is a thousand minutes.  It's sixteen hours

16 and 40 minutes -- sixteen hours and forty minutes worth of

17 work.

18       Or, you could come at it another way.  A hundred

19 affidavits, 150 minutes; we get to the reality of it, 1.5

20 minutes.  And if she's hustling, if she's absolutely blowing

21 through it, she might can staple them, stamp the heck out of

22 them, bang, bang, bang, bang, bang, bang, bang; a hundred of

23 them, 300 times she's stamping them.  Sign them a hundred

24 times, and she's done, maybe in two and a half hours, maybe.

25       And the notion that Wells Fargo has the audacity to

1    come up here and say that that's what she really did in that

2    time frame, it's just more of the same.  It's more of the

3    same.  It defies any logical analysis, whatsoever, and that's

4    the best they got.

5              Then, that doesn't --

6              THE COURT:  One second, please.

7              Okay, go ahead.

8              MR. OLEN:  Let me back up.  Let me back up,

9    Your Honor.  Let's cut them a little slack, slow day, 80 -- 80

10   affidavits, it's a slow day, 800 minutes, thirteen hours and 20

11   minutes.  It's just like Debra Clark saying that she reviewed

12   proofs of claims for more hours than there were in the month of

13   December.

14             Maybe she's super lightning fast and she can do eight

15   minutes an affidavit.  You know, you get the point.  There's no

16   way.  It didn't happen, it can't happen; her testimony is

17   incredible in the sense of totally not believable.  It is not

18   possible to do what she swore that she did.

19             And it makes sense to look at it from the perspective

20   of what these other people have said, Your Honor.  She didn't

21   have these exhibits.  She didn't have these attachments.  If

22   she did this would be so bulky -- I hadn't even thought about

23   the fact that she probably couldn't even carry all of this

24   stuff in one trip to the notary.  I mean it would be -- I don't

25   know how high the stack would be.

1          She has then got to find time to get them to the

2    notary.  Now, she does help the notary out.  She fills in the

3    notary date every single time.  She sees absolutely nothing

4    wrong with that.  She's certain, it doesn't matter how many are

5    coming in and how fast they're coming in, they're going to get

6    it all out that day, which again proves what's really

7    happening.  They've got to get them out.  She's got to get them

8    notarized.  She's blowing through them, she's signing them as

9    fast as she can sign.  She's the epitome of Robo signing, or

10   whatever you want to call it.

11         Goes to the notary, the notary's got to blow through

12   notarizing a hundred times.  At least the notary doesn't have

13   to date them, because Ms. Chanah-Bey did that for her.

14         And then she says that, and this gives you an idea of

15   the volume, Your Honor.  She says in her testimony it takes 30

16   minutes just to sort them out by the different lawyers she's

17   sending them to.

18         All right.  Then, if you look at --

19         What tab number was that?

20   THE CLERK:  Tab J.

21   MR. OLEN:  I'm sorry?

22   THE CLERK:  Tab J.

23   MR. OLEN:  Tab J?

24   THE CLERK:  Yes.

25   MR. OLEN:  It is, I got it.  I've got it.  I forgot

1  it, all right.  I'm sorry.

2       THE COURT:  Is this the same thing that I've got here

3  now?

4       MR. OLEN:  Yes, Your Honor.

5       THE COURT:  Okay.

6       MR. OLEN:  That's why I'm going back to this.

7       THE COURT:  All right.

8       MR. OLEN:  At Page 64 she says it was her practice to

9  sign for the notary.  Yes, quote, I quote:  "Yes, just to speed

10  things up."  And they say they didn't do anything on account of

11  speed.

12      Then I ask her at Page 65:  "Why did you get a

13  signature stamp?"  And technically, it's not a signature stamp.

14  I'm not trying to say she actually stamped her signature.

15      THE COURT:  Okay, right.

16      MR. OLEN:  It's her name stamp.

17      THE COURT:  I see it.

18      MR. OLEN:  I miscalled it that in the deposition.

19      THE COURT:  Uh-huh.

20      MR. OLEN:  "And why did you get a signature stamp?"

21      Quote:  "To speed things up."

22      "Did anybody at Wells Fargo ever tell you that the

23  notaries ought to be dating their own signatures?"

24      "No."

25      Page 69:  "All right, you have never been an

1  assistant secretary for Wells Fargo, have you?"

2         Answer:  "No."  That's Page 69.

3         Now, you can see she's swore differently in her

4  affidavit.  I mean, Wells Fargo throughout this time, this

5  policy of total disregard in every aspect of the affidavit

6  process, they thought nothing of having this woman swear to

7  this Court repeatedly that she was an officer of the company

8  when it was -- it was just false.  I don't know what else to

9  say.  It wasn't just wrong or untrue.  I mean, they knew it was

10 false.

11        And then I asked her, I said, "Well, you said you

12 verified everything in the affidavit.  Why didn't you insist

13 they get your position right?"

14        And on the first one, I wish I had it in front of me,

15 she didn't stamp in her name next to "my name is," so it reads,

16 if you just look at Duke's, Your Honor, and pretend her name

17 isn't stamped in there; she says:  "My name's not there.  I

18 didn't stamp it saying that I am.  My name is Kamiylah Chanah-

19 Bey and I'm assistant secretary."

20        And I said, "You're not saying that you are an

21 assistant secretary?"

22        And she says, quote:  "It's not saying that I'm

23 saying it either because my name is not there."

24        So, she wants to go say because she didn't stamp her

25 name in the block, I guess she forgot she swore under oath on

1  the second page that what was in this was true.

2        Now, at Pages 71 and 72 we get a glimpse of the truth

3  here. "But you do understand that when you signed this

4  affidavit, you were saying under oath to the Court that you

5  were an assistant secretary for Wells Fargo?" This is the one

6  that's blank, that was in front of her when I asked her that.

7  "You do understand that that's what the affidavit says?"

8        "That's what I -- yeah, that's what I understand."

9        And here we go, question: "If you had noticed that

10 it said you were an assistant secretary would you have had the

11 law firm change that?"

12       Answer: "I certainly would have." And eventually

13 she did, about twelve or so later.

14       Well, what that testimony shows you is she wasn't

15 reading it. She wasn't reading it. Or if she was reading it,

16 she intentionally lied to the Court under oath and represented

17 the fact that she absolutely knew it was false.

18       At Page 73 is when she admits that she not only

19 didn't verify the statements about the Debtor schedules, and

20 those statements are in a number of her affidavits. They are

21 not in all of them, but they are in several of them. She said

22 she wouldn't even know how to find the Debtor's schedules on

23 Wells Fargo's computer system.

24       And then I asked about PACER.

25       And she says she has access to PACER, but not for

1    this purpose.  So unequivocally, she never verified her sworn

2    statements about what was in the Debtor's schedules.

3            And then Page 74, she admits she relied on the

4    attorney to put that in there correctly.

5            Pages 79 and 80; some of the affidavits she signs

6    say, and this one may be one.  Yes, if you look at Paragraph

7    two,  because they would sometimes filed the motion first and

8    the affidavit later, of many, maybe all of hers say as

9    evidenced by the note and mortgage attached to the Motion for

10   Relief from Stay.

11           I don't know if you see that language at Paragraph

12   two?

13           THE COURT:  Yes, I do, right.

14           MR. OLEN:  So of course then the question is, well,

15   if the affidavit wasn't attached to the motion, did McCalla

16   Raymer send you the motion that had already been filed?

17           And of course, at Pages 79 and 80 she says, "No."

18           So, she had no idea if the note and the mortgage were

19   attached to the motion.  And so, even if it came with the

20   affidavit, which we don't remotely think it did, you know, she

21   never verified that fact.  She says that.

22           Now, some of her affidavits -- and again, just to be

23   fair, I'm not saying that there is some issue with this.  Some

24   of them, even though it has that language in it, do have a note

25   or a mortgage attached, actually.

1        And so, I asked her again, "Wells Fargo was relying

2   on the law firm to correctly attach the note and mortgage to

3   the mortgage that she swore to under oath were attached?"

4        And she says, "Correct."

5        And I asked, "Well, you know, were you ever told that

6   you need to look at that first?"

7        "I wasn't trained that way, no."

8        "Wells Fargo never instructed or directed you that

9   what I just asked you about was something you should try to

10  verify, correct?"

11       Answer:  "I was never informed by the person that

12  trained me."

13       THE COURT:  And what page is that?

14       MR. OLEN:  I'm sorry.  That is at Page 80.

15       THE COURT:  Thank you.

16       MR. OLEN:  I asked her at Page 89 if she had any

17  explanation of how eight times in a row she failed to correct

18  the misstatement of her position with Wells Fargo;

19       And she says, "No."

20       Well, the reason she has no explanation is it's

21  clear, she didn't read it.

22       So, when you come down to it, here's all of this

23  stuff about what she did, it isn't true.  Compound that with

24  three substantial false statements in each of her affidavits,

25  except the last one.  She says she's an assistant secretary.

1    She wasn't.  She says that note and mortgage were attached to

2    the motion.  Again, sometimes it's attached to the affidavit.

3    I'll count that one as something.

4              But there are several where it's not attached to the

5    motion.  So, she could not possibly have verified it.  If it

6    were attached, she still couldn't have verified it, because she

7    said she never saw the motion and then she swears to what the

8    Debtor listed as the value of the property and admits she never

9    looked at that.

10             And then, just to cap things off, dated all the

11   notary dates for the notary in every single instance.  And

12   that's the best Wells Fargo has to offer.

13             And again, that brings me to a point that's

14   important, and that is that there are instances here and we

15   just want to say this, where there's testimony that we have

16   excerpted or highlighted or whatever you want to call it, and

17   it's there not necessarily for the truth of what's said, it's

18   there so we can then show Your Honor my other testimony that

19   what's said there is not true.

20             THE COURT:  Okay.

21             MR. OLEN:  For instance, Lisa Joseph saying, "Oh, I

22   never -- I can't tell you I ever did them for Brice."

23             Karan Abernathy says, "Yes, you did."

24             Brice says, "Yes, you did."

25             Things like that; and when you get to Mr. Vander

1  Linden you'll just have to read it for yourself.  It's the most

2  remarkable thing you'll ever read.  He doesn't know whether

3  they ever did pre-signed signatures, but he's not saying they

4  didn't.  He knows they changed the policy, but he doesn't know

5  what they changed it from.

6          When I asked him, "Well, how can you know you changed

7  it if you don't know what it was before?"

8          "Well, I don't know."

9          And I was just going to touch on some of the high

10  points of his in a bit.

11          But the point is, there are instances where we ask

12  Your Honor to look at things because we think it will become

13  clear from the other testimony, just like this stuff with

14  Ms. Chanah-Bey.  I mean, it is absolutely the same thing from

15  the Slick case.

16          Next, different category:  Lost no affidavits.

17          There are multiple, multiple instances where the

18  affiants from Wells Fargo swear the notes attached, and then

19  what's attached is an affidavit of lost note.

20          As Mr. Rowe put it, you could, if you wanted to be

21  nice to him, say that they're using the belt and suspenders

22  approach, they want to cover it both ways.  The truth of course

23  is that the people who are signing these affidavits under oath

24  don't read them, don't pay attention to what they say, and I

25  want to point out that although there are a few exceptions, the

1   vast, vast majority of these affidavits say what you typically

2   see them say, and that is:

3          "Attached hereto and incorporated herein by

4   reference."

5          And I think that even if it didn't say that, if you

6   attach it to your own affidavit, you're certainly saying

7   something about it.

8          But there are many of these where they say the note

9   is attached and instead, there is a lost note affidavit.  Now,

10  they cover that every kind of way.  Sometimes a lost affidavit

11  -- a lost note affidavit is dated earlier than the main

12  affidavit, sometimes it's dated later.  If it's dated later,

13  then you've compounded the problem.

14         The note wasn't there when the affiant swore it was;

15  and then the affidavit of lost note that you attached to his or

16  her affidavit is subsequently attached and they didn't see that

17  either.

18         But Your Honor, it is significantly worse than that

19  when it comes to these affidavits of lost note.  And here

20  again, you know, you can describe this, it's just one small

21  piece of their overall policy of saying:

22         "We're Wells Fargo and we do not have to follow the

23  rules about sworn affidavits.  That's our policy.  Our policy

24  is that doesn't apply to us; we don't have to do it that way,

25  and we're going to do it however we see fit.  As long as we get

1    an affidavit in the court file, we're okay.  It doesn't matter

2    how it was reviewed or not reviewed, not verified, doesn't

3    matter how it's signed, doesn't matter how it's dated, doesn't

4    matter how it's assembled back when they were pre-signed, none

5    of that matters."

6           Wells Fargo sent -- do we have the Henson loan file?

7    I can't remember the number of that one.

8           Essentially, what I want to show Your Honor is Wells

9    Fargo sent e-mail referrals and they look like a standard

10   referral e-mail.  Keep in mind we only got a sampling of loan

11   files, and I don't remember how many we got from Shapiro &

12   Tucker.  All right, here it is.

13          I apologize.  I've just got too many books.

14          THE COURT:  That's all right.

15          MR. OLEN:  And it's too much to have it --

16          THE COURT:  That's all right.

17          MR. OLEN:  -- all lined up ahead of time.

18          THE COURT:  And should I put away this one that I

19   had?

20          MR. OLEN:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. OLEN:  Yes.

23          THE COURT:  And I'll give that back to you, all

24   right.

25          MR. OLEN:  Now, this isn't the right book here.  This

1  stops at 65 and I just want 67.

2      (Pause.)

3          MR. OLEN:  This is Plaintiff's Exhibit 67C.

4          THE COURT:  All right.

5          MR. OLEN:  And the language that I want Your Honor to

6  look at is highlighted, I believe.

7          Oh, here we go, I don't need it, Randall.  I've

8  quoted it in a deposition.

9          In deposing Ms. Massey, I showed her -- this is the

10  loan referral e-mail from Wells Fargo to Shapiro & Tucker, and

11  it says:  "In the event a note is required, please have your

12  office prepare a lost note affidavit to be executed by Wells

13  Fargo Home Mortgage."

14          Look what's missing.  It doesn't say, "In the event a

15  note is required and cannot be found."  It does not say, "In

16  the event a note is required and is lost."  It clearly says

17  something different.

18          There's another one just like it in the Derrick Davis

19  loan file, and again, it shows up in two of these.

20          What's the exhibit number for Derrick Taylor's,

21  Randall?  Will you just get it for me and we'll just give the

22  Judge the reference and the exhibit number and she can look at

23  it later.

24          THE COURT:  Right.

25          MR. OLEN:  Now, you know one might say, well, did

1    they really follow that policy?

2          But here is an interesting statistic.  Shapiro &

3    Tucker, from February of 2002 to May of 2003, that's --

4    February to January is twelve -- fifteen months, I think.  I

5    wrote it down wrong in my notes.  Fifteen months; well, that's

6    just perfect.  They were averaging one lost note and affidavit

7    a month -- a month.

8          In that time frame, in the Southern District of

9    Alabama, they filed 107 affidavits; Shapiro & Tucker did,

10   Your Honor.  And if you want to look at this for yourself, it's

11   between Numbers 459 and 565 on Exhibit 140, fifteen out of 107.

12   Fifteen percent of the time they swore under oath the note was

13   lost.

14         Now, I'll just mention and I won't go get all the

15   quotes; the other thing that happened that's just instructive

16   about how to do things is they had a case where the McCalla

17   Raymer guy is bugging Wells Fargo for the note, and I've

18   forgotten the Debtor's name and I'm sure it's in the testimony

19   -- I know it's in the testimony.  And he asked five, six times

20   for the note and the mortgage, or the note.

21         He doesn't get it, doesn't get it.  So, somebody else

22   at McCalla Raymer sends a lost note affidavit to Wells Fargo;

23   Wells Fargo signs it.  McCalla Raymer gets the lost note

24   affidavit back, and before they send it to local counsel, they

25   get the note.  They send the lost note affidavit on to

1  Ms. Brown and have her file it.  They don't even tell her

2  they've got the note.

3          Derrick Davis, the other Shapiro & Tucker file that

4  has the identical form e-mailed is 142.

5          THE COURT:  All right.

6          MR. OLEN:  The other thing instructive, we think,

7  about these two e-mails is here is the sort of thing we only

8  have a small smattering of, because we only got a sample of the

9  files.  You know, it's not a trial on the merits here, it's to

10 try to give some indication of what we might be able to show at

11 trial.  We get all of the loan files, they may have said this

12 to Shapiro & Tucker every single time.

13         And then, there's every other kind of thing

14 imaginable in terms of lost notes, in terms of how they're

15 dated and how they're signed.  A lot of the same issues with

16 those affidavits as impact or we see present on the other

17 affidavits.

18         Let me skip next to -- I've talked about Erin Brown a

19 little bit.

20         THE COURT:  And this is in relation to the lost note

21 affidavit?

22         MR. OLEN:  No.

23         THE COURT:  No?

24         MR. OLEN:  No, now this is just to Erin Brown,

25 generally.

1             THE COURT:  You want to switch?  Okay.

2             MR. OLEN:  I'm moving on, I'm sorry.

3             THE COURT:  All right.

4             MR. OLEN:  I'm moving on from the lost note

5  affidavits.

6             THE COURT:  All right.

7             MR. OLEN:  At some point, I think it's at Pages 119

8  and 120, I'm asking Erin Brown, you know, does it bother her

9  that Schlotter swears that a mortgage is attached to the

10 motion, and then -- oh, I know, it's the case where the

11 mortgage attached to John Schlotter's affidavit comes 42 days

12 after he signs the affidavit.  It's a 42 day delay; that's sort

13 of at the top.

14             And on the chart he'll note his:  If we put something

15 that says subsequent attachment; if it's more than a day, we

16 put how many days it is.

17             THE COURT:  Okay.

18             MR. OLEN:  If it says subsequent attachment, no;

19 paren twelve, paren six, that's how many days later it came.

20             THE COURT:  Okay.

21             MR. OLEN:  So, I'm asking Erin Brown.  I mean, she's

22 a lawyer for Wells Fargo:  "Do you think that's, you know,

23 don't you think Mr. Schlotter ought to have attached to his

24 affidavit, his sworn affidavit, the copy of the mortgage he

25 actually laid his eyes on, if he laid his eyes on it?"

1    And she says, "Oh no, no, no.  We want only the

2  recorded copy attached."  But they see nothing wrong with

3  swapping things out that are sworn to, nothing, just whatever

4  suits them.

5    We cover at some length the future payments of

6  Ms. Brown; I won't go back over that.

7    Pages 77 -- and this is just the pages to this lost

8  note episode.  Pages 77, 78 is where Ms. Brown looks at --

9  again, we get the loan file, that's how we found out about

10  that, Your Honor.  It was only from the McCalla Raymer notes in

11  the loan file that we found out that on January 4, Wells Fargo

12  told McCalla Raymer that Wells Fargo found the note, and on

13  January 5, McCalla Raymer sent the lost note affidavit that had

14  been signed by Wells Fargo to their local counsel, without

15  telling her that they had the note.  It's just incredible.

16  That's at Pages 77 and 78.

17    And again, just illustratives of how the Defendant

18  Wells Fargo and some of its law firms viewed the system.

19    I asked her at Page 83, did McCalla Raymer ever tell

20  her they found the note?

21    She says, "It doesn't appear so from the log."

22    Then at Pages 84 through 87, you've got the flip side

23  of the equation.  She's filed a lost note affidavit.  They do

24  tell her they've got the note.  They send her the note.  She

25  does nothing with it, just sits on it.

1          And I won't bore you with other details from Erin

2    Brown's deposition, other than to say that you'll see that

3    frequently, you'll have to ask the question a whole bunch of

4    times to get anything resembling an answer.  Ask the question

5    as simple as how she got authority to compromise Motions for

6    Relief since she wasn't talking directly with Wells Fargo, but

7    only talked to McCalla Raymer.

8          And for pages, told me she didn't know what the word

9    "compromise" meant.  She wanted me to define it for her.

10          But again, the point of that is somebody as combative

11    as she was, and I'll leave it to Your Honor to decide whether

12    she was combative; ultimately makes tremendous admissions.  And

13    the reason is, in her mind things that we view as tremendous

14    admissions, she didn't see anything wrong with it.  She didn't

15    see anything wrong with all of these things.

16          John Schlotter; let me go to the heart of

17    Mr. Schlotter.

18          I need his deposition excerpt, Randall.

19      (Pause.)

20          MR. OLEN:  This is at Tab 279.  It is the affidavit

21    of John Schlotter in the Brian Mason bankruptcy case,

22    Your Honor.  And I'll tell you what --

23          THE COURT:  Yes, and I've just got to give that to

24    Antoinette to give back to you.

25          MR. OLEN:  Okay.

1          THE COURT:  Okay, this is Tab 279, all right.

2          MR. OLEN:  Now, that just means Tab 279 is the

3   deposition excerpts.

4          THE COURT:  The deposition, right.

5      (Pause.)

6          MR. OLEN:  Now first at Pages 56 and -- yes, Page 56

7   I asked Mr. Schlotter how it even came about that he was

8   signing affidavits for Wells Fargo.

9          And he says, "I was asked by the team," meaning his

10  team, "I was asked by the team, because they were under time

11  lines to get the motions to local counsel."

12          I think the answer goes over to Page 57, Pages 56 and

13  57.

14          So, it was all about time limits, speed, whatever was

15  easy for them, total disregard for the system, but time limits

16  matter.  And that's because they were under certain time

17  constraints, and if it didn't meet them, this is set out in

18  Wells Fargo's policies, their default management guidelines.

19  They would have -- they potentially could have financial

20  penalties.

21          All right, here's what matters.  If you will look at

22  the first paragraph of John Schlotter's affidavit, I've already

23  covered the first part where he says, "My name is John

24  Schlotter and I am an assistant secretary for Wells Fargo

25  Bank."

1           But then if you start with the second sentence, and

2   I'm going to take it a piece at a time, "A portion" -- now, you

3   know, it's sworn testimony here, and this is in every one of

4   his affidavits, every single one, and there are more than 150.

5   "A portion of my responsibility is to monitor the processing of

6   payments."

7           Deposition question, Page 45:  "But it was not part

8   of your responsibilities at Wells Fargo to monitor how payments

9   were processed by Wells Fargo, is that correct?"

10          Answer:  "That's correct."

11          And you're going to see these questions track the

12  affidavit.  I'm sitting there in the deposition with the thing

13  in my hand, not showing it to him, and asking him the

14  questions.  Going back to the first of the sentence:  "A

15  portion of my responsibility is to communicate with various

16  parties relating to a loan made by movers."

17          That question; "And to the extent things were going

18  on, on the underlying loan between Wells Fargo and that

19  Debtor who was in bankruptcy, you were not involved in

20  communications with those Debtors in terms of if you don't have

21  this payment made, you're behind; it's not part of your

22  responsibilities?"

23          "That's correct."

24          Then he says, quote, "I have an understanding of how

25  the books, records, and so forth," and you can read it.

1          And then at Pages 47 and 48, and the first part is --

2    and these are Pages 45 through 48.  That's where all of this is

3    found.  I asked him, "It was not your function to have an

4    understanding of how Wells Fargo kept its books and records and

5    computer systems; it was only there for you to look at on rare

6    occasions, they had read only access?"

7          He says, "That's correct."

8          And then here's the question:  "And in fact, you

9    would not at any point have known or understood how Wells Fargo

10   actually kept, changed, updated their books, their records,

11   their computer systems for these loans for people in

12   bankruptcy?"

13         Answer:  "I wouldn't have known that, specifically.

14   I mean if -- if it was explained to me, I could understand it,

15   but I wasn't there to do an audit."

16         "Right."

17         And then his answer, "So, I wouldn't have

18   understood."

19         Question:  "And you have no personal knowledge of how

20   Wells Fargo kept their books and records and computer systems

21   on these loans for people in bankruptcy in Alabama?"

22         Answer:  "No, I should say that's correct."

23         Every single affidavit; I just don't know how a

24   lawyer and a, quote, national law firm for a company like Wells

25   Fargo could swear to this again and again and again; I can't

1  say again enough times, in this court, and that's just in this

2  court.

3          You know, again, it just comes from Wells Fargo's

4  overall practice and policy of whatever it takes to do it the

5  most fastest, the quickest, the easiest for us.  We will

6  disregard every rule of affidavits, every rule of sworn

7  testimony, every rule of taking an oath.

8          And then in the second paragraph, Mr. Schlotter

9  wanted to make sure he covered all of the bases for us in this

10 one.  He swears that the note and mortgage were attached to the

11 movant's motion.  A thirty year lawyer swears to that.  But if

12 you look at the third page, he's got a problem, another problem

13 besides the ones that I've mentioned.  It's a lost note

14 affidavit.  He swore under oath to a note that was lost.

15         And of course, again, typical of Wells Fargo, in the

16 Paragraph Number 4 where they're supposed to tell you what kind

17 of search they did, it's blank.  It just says, "The note was

18 not located after a thorough and diligent search which

19 consisted of the following actions," colon, and there's nothing

20 there.

21         But that gets attached to his affidavit fourteen days

22 later, and it gets filed that way.  And again, I once knew he

23 filed more than 150, and the only reason it's not more is for

24 some reason, and we don't know yet, many times only one page of

25 the sworn affidavit was filed by Erin Brown.

1          Now, whether that means he was sending the signature

2   page separate and she didn't get it, I don't know what it

3   means.  But so, you've got a bunch of those where, for

4   instance, we can't put on the chart that he said he was the

5   assistant secretary because maybe we're missing the first page

6   of that affidavit.

7          THE COURT:  Okay.

8          MR. OLEN:  But there are all kinds of other issues

9   about his affidavits.

10          He claims that he asked Wells Fargo for authorization

11  to sign documents on their behalf.  And we might as well

12  address this, because Wells Fargo is going to trot out this

13  policy.

14          I need their Exhibit Number -- I've forgotten which

15  one it is.  Oh wait, I know.  I think it's Number 92.  I've got

16  a copy right here, Randall.  It's Exhibit Number 32,

17  Defendant's Exhibit Number 32.

18          Their Exhibit Number 32 has three of these same

19  documents, but I'm going to show Your Honor the one that was

20  March of 2005, because that one is the most pertinent to the

21  time frame to begin with.

22          THE COURT:  I see there are several, yes.

23          MR. OLEN:  All right.

24          THE COURT:  Okay.  I've got it.

25          MR. OLEN:  But do you have it?

1          THE COURT:  I've got it.

2          MR. OLEN:  Correct?

3          THE COURT:  I just pulled it from here.

4          MR. OLEN:  Great.  Now, this is what he says gave him

5   authorization to sign bankruptcy affidavits as an assistant

6   secretary of Wells Fargo.

7          The second paragraph, "The bank desires to reduce

8   delays in foreclosures."

9          The third paragraph, it's the second whereas, "In

10  connection with foreclosure services."

11         The fourth paragraph, quote, "In connection with

12  foreclosure services, including deeds and conveyances of real

13  property acquired through foreclosure."

14         And then, this is the best one, the second from the

15  bottom, "Resolve further that such execution authority shall be

16  specifically and strictly limited to activities in connection

17  with relating to foreclosure services."

18         Shoot, Wells Fargo's got separate Bankruptcy and

19  Foreclosure Departments, that's part of the record and the

20  record evidence in this case.  It is complete and utter

21  nonsense.  It is further lack of candor by Mr. Schlotter with

22  this Court to suggest that this document authorized him to sign

23  bankruptcy affidavits for this company.

24         And then finally, at the bottom it says, "Shall not

25  entitle any such individual to status as an employee or officer

1   of the bank."

2          And at Page 73, I asked him point blank, you know,

3   "It says that you're an employee of the bank.  Were you ever an

4   employee of the Bankruptcy Department at Wells Fargo?"

5          That's that other affidavit, "No."

6          And this was so simple, so simple.  And

7   Mr. Schlotter, I noticed that Wells Fargo highlighted the

8   excerpt of his deposition where he points out that he had

9   Chapter 11 debtor experience.  If Wells Fargo had wanted to be

10  truthful with the Court, either he would have signed it as John

11  Schlotter, attorney, or he would have signed it as, "I'm John

12  Schlotter, I'm an attorney with McCalla Raymer.  I am

13  authorized to sign as an assistant secretary for."

14         And he was a lawyer and he knew how to do it, and

15  they knew how to do it.  They knew how to write this document

16  here very narrowly.  And the only logical inference you could

17  draw from this is they wanted, he said it himself, they wanted

18  to speed up the process.  His people at his law firm wanted to

19  go faster.

20         I think they say somewhere in his -- he says in his

21  deposition they were having a slow turnaround from Wells

22  Fargo's people.  So you know, you can't go do the logical

23  thing, which is to say, "Hey Wells Fargo, you're imposing time

24  deadlines on us.  You've got to turn these things back around

25  to us faster, or we're going to get in trouble with you on the

1  time deadlines."

2          Nope, totally circumvent the system and it's not just

3  the law firm.  Wells Fargo lets them do it, and they let this

4  guy sign 150 plus affidavits where the clear intention was to

5  give this Court the impression -- no, to tell this Court under

6  oath, that he was an officer of Wells Fargo.  That's what he

7  did.

8          And what makes it clear that that's what he was

9  intent on doing, Your Honor; and Wells Fargo was in it with

10  him, he swears in three different respects to the kind of

11  personal knowledge he had to have for that affidavit to pass

12  muster, and none of it was true.  None of it was true.

13          And this isn't just false statements in the

14  affidavit.  It's all part of this scheme that -- I mean, it's

15  incredible.  His staff is inconvenienced because Wells Fargo

16  drags their feet.  No problem, we'll fix that.  We'll just tell

17  Judge Mahoney and the Trustee and everybody down in Mobile that

18  he works as an assistant secretary of Wells Fargo, with Wells

19  Fargo's blessing.  He says that.  It's undisputed.

20          Then, and I won't cover these specifically, I go

21  through with Mr. Schlotter; there are fifteen affidavits all

22  prepared by McCalla Raymer where -- and I can tell you the --

23  give you a little bit of reference.  There are fifteen

24  affidavits.  They start in April of '05, let's see, and they go

25  through June of 2006.

1        So, for thirteen months, fifteen times, Wells Fargo's

2   affiants, and it's a whole bunch of different affiants too, so

3   it isn't like it's just one person -- are swearing to payments

4   that haven't yet come due in these sworn affidavits.

5        And Mr. Schlotter's explanation of that is, and I

6   think this is what he's trying to say, "Somebody must have

7   altered the affidavits somehow."

8        And of course, even if that were true, and he offers

9   no evidence of that other than to say, you know, that's just

10  what had to happen.  He offers no evidence of that.

11       And let me go back.  I missed something important

12  about Mr. Schlotter.  At Page 69, this is after I asked him

13  about signing as Wells Fargo's assistant secretary.  Oh, here

14  it is.  I asked him if he had -- if he ever considered changing

15  the affidavit to say, "My name is John Schlotter and I'm

16  authorized by Wells Fargo to sign as its assistant secretary."

17  Did he ever consider it?

18       Answer:  "No."

19       Question:  "Do you see anything in this affidavit

20  that you signed for Wells Fargo that indicated to Judge Mahoney

21  in Mobile that you actually were an attorney for McCalla

22  Raymer, signing for Wells Fargo as opposed to being an actual

23  employee of Wells Fargo?"

24       "No.  There's nothing on the face of the affidavit to

25  say that -- that says that."

1          And so, then I asked him about, you know, "As you

2    look at the affidavit, does that cause you any concern?"

3          Answer:  "It would if I hadn't have had authorization

4    from them to sign on their behalf."

5          I'll go back to his Chapter 11 experience.  The

6    first three rules of Chapter 11:  Disclosure, disclosure,

7    disclosure.

8          Okay.  Then I cover with him, I think, every single

9    one of these affidavits where people at Wells Fargo swore

10   payments were due before they came due, and every single time I

11   asked Mr. Schlotter if he had an explanation for how it

12   happened;

13         And he said, "No."

14         At one point he said:  Well, he might know something

15   but it was speculation, I think one time.  But again and again

16   and again, he has no information about how it happened.  And

17   here again, this is just one piece of the puzzle, but it is

18   powerful evidence that either the Wells Fargo affiants, and I

19   think there were four different people who signed these; Brian

20   Theiler, Rhonda Jordan, Teressa Jones -- there's four.  Those

21   are the ones that I remember.

22         It's powerful evidence that either they absolutely

23   never read the first word of the affidavit, including the

24   financial part that they sometimes profess to have verified, or

25   they absolutely swore under oath to something that not only was

1   untrue, that they had to know was preposterous.  Again, as I

2   said about that, something like that earlier, I don't know

3   which is worse.

4           Clay Wilder; that was the other one who swore to one

5   of those affidavits.

6           THE COURT:  What was the name?  Clay?

7           MR. OLEN:  Clay Wilder.

8           THE COURT:  All right, thank you.

9           MR. OLEN:  Mr. Schlotter is no different than the

10  others.  In the Scorver case, at Pages 113 and 114, he signed

11  an affidavit that said three times on the first page, his name

12  was Teressa Jones.

13          He did it again in the Spencer case.  That's covered

14  at Pages 117 and 118.

15          At Page 165 I asked him, "Has McCalla Raymer had any

16  written guidelines directing its staff when they send

17  affidavits to Wells Fargo, that any exhibits or documents had

18  to be sent to the employee along with the affidavit?"

19          "No."

20          All right, I've got two other things to cover and I

21  will be very brief.

22          It's got Hilary Bonial.  Hilary Bonial is in charge

23  of all of the bankruptcy work at Brice.  At Page 61 she knows

24  that Teresa Diaz-Cochran, Lisa Joseph and Karan Abernathy pre-

25  sign signature pages.  The same Lisa Joseph that says she can't

1    remember.

2         And she says the way she knows that is their

3    notations in some of their files that show that they sent them

4    to Lisa Joseph to -- under this, quote, verification procedure

5    that they had; the same for Teresa Diaz-Cochran.

6         I think this is important, Your Honor, because it

7    goes to a bunch of Brice affidavits, several of which we don't

8    otherwise have comments about on our chart. In fact, it may go

9    to virtually all of them.

10         At Page 118, Ms. Bonial admits that the note and

11    mortgage were not attached when they went to the affiant at

12    Wells Fargo.

13         She said, "Well, if the note and mortgage were

14    originally received from Wells Fargo, we would not send them

15    back with the affidavit." You know, just a technicality.

16         The only time they might send it was if they had

17    obtained a document from a third party, like I guess a recorded

18    mortgage.

19         And then I asked, "How did that get attached?"

20         And she says she's not sure, "It was either them or

21    local counsel." And of course, that's her throwing local

22    counsel under the bus. It's nonsense that it was anybody other

23    than them.

24         And then I asked her, "Are procedures the same about

25    exhibits to affidavits now, as before?"

1     And she says, "Yes," and they've been that way

2 throughout the time she's been there.

3     Page 165, never was asked -- never was asked and

4 never offered advice about how Wells Fargo should do their

5 affidavits.

6     All right, I will not bore you with all of this, but

7 just recite you to the pages.  It starts at Page 186 and you'll

8 just have to see for yourself when you read Hilary Bonial's

9 deposition and Lance Vander Linden's.  They were represented by

10 counsel, who started the proceeding by saying he didn't

11 understand what kind of proceeding we were having.  He didn't

12 really think it was an adversary proceeding, and he went on

13 from there.  There were far many more instructions not to

14 answer than we had in Thigpen, and there's a lot of that.

15     But I asked Ms. Bonial whether there was anything

16 wrong with doing pre-signed signature pages.

17     He wouldn't let her answer.

18     Finally, I said, "Well, did you say that in Thigpen

19 v. Matrix?"

20     She admits she did, that she didn't think it was

21 legally wrong.  She didn't think it was morally wrong.

22     And I asked her if she stood by that testimony at the

23 time of her deposition.

24     He instructed her not to answer.

25     I asked her if the integrity of the bankruptcy

1  process was important to her law firm and her.

2          He instructed her not to answer.  You'd think he'd

3  want to let her answer that.

4          Then, Mr. Vander Linden, just a couple of things,

5  Your Honor.  It is clear that Mr. Vander Linden's game plan was

6  he was going to say he had absolutely no personal knowledge of

7  pre-signed signature pages, but he was not going to deny it

8  happened.

9          And you'll see it and I will give him credit.  As

10  persistent as I am, he's equally persistent, and I could never

11  get straight answers to many, many, many questions, lots of

12  instructions not to answer.

13          There were times when I said, "Mr. Madoul (phonetic),

14  you know, your client was ordered to answer that by Judge

15  Mahoney in Thigpen."

16          And he said, "Well, he thinks he's right anyway.

17  He's going to do it again."  So, all of that.

18          Here is the most amazing thing.  I guess I pressed

19  him hard enough, Mr. Vander Linden, that I must have asked him

20  twenty times:  What his basis was for saying that his law firm

21  -- and here's my question:  "Is the Wells Fargo default

22  management guideline" -- and I'm asking him, "Do you have any

23  basis for saying you might have signed pre-signed signature

24  pages, that your firm might have used them, I'm sorry."

25          And he starts off by referring to the default

1   management guidelines.

2          And so, I say, "Are the guidelines that we looked at

3   earlier the only factual basis you have for saying that your

4   firm, quote, could have, closed quote, used pre-signed?"

5          "No. What other factual basis?"

6          So, I asked him again: "What factual basis?"

7          He says, "Well, the Wells Fargo Default Manual."

8          Question: "Already covered that. What else?"

9          Answer: "The standard in the industry at that time.

10  I don't know what else to tell you."

11         The standard in the industry at that time, Page 88.

12         I asked him was it proper for them to do these pre-

13  signed signature pages?

14         He wouldn't let him answer.

15         I asked him was he unwilling to tell Judge Mahoney

16  whether that's improper?

17         He wouldn't let him answer.

18         "Do you see anything wrong with this?"

19         He wouldn't let him answer.

20         And as I understand the rules of evidence, you get to

21  draw an inference from that. If they choose not to answer a

22  question, I think you get to draw an inference about what the

23  answers would be.

24         I think just one or two other things from his

25  deposition and then just a couple of final points.

1          THE COURT:  All right.

2          MR. OLEN:  Yeah, here it is.  It starts at the bottom

3   of Page 160 and it goes through Page 163.

4          I kept asking him and asking him and asking him if he

5   saw anything wrong with it.

6          Finally, he gives me this hypothetical where they

7   have the signature pages but they send the affidavits so the

8   affiant can look at it by e-mail and the affiant can see

9   whether that affidavit is correct.  Of course, it's not the one

10  that they're going to sign, and why in the world would you do

11  all of this, I don't know if they really do it all the time.

12         But I finally say, you know, "Make all the

13  assumptions you want, answer my question."

14         And he says, and this is you know, in a question

15  about, "Are pre-signed signature pages okay?"

16         "Then I think the real and true information is before

17  the Court, before the Debtor, the real and true information.

18  It's real time, it's good information and it's something that

19  can be relied on."  Then he says, "It's all the information the

20  Court needs."

21         Then I asked him -- he says, "And if you look at the"

22  -- here it is.  "I think all the information that the Court

23  needs that the Debtor's counsel needs, the Debtor needs; all of

24  that information would be provided to the Court, it would be

25  true and correct, and then the Court could act upon that.  It's

1   real time, it's timely information, and if you look at the

2   <u>Brannan</u> case, if you look at that case, the motion, the

3   affidavit and the order; the affidavit wasn't even a -- wasn't

4   even considered."

5           So then I asked, "Well, was that procedure harmful to

6   the integrity of the bankruptcy process?"

7           First, Madoul doesn't let him answer.

8           Then I ask it again -- oh, he asked me what adjective

9   I used.

10          I said "harmful to the bankruptcy process."

11          This is his answer, the ultimate:  There's nothing --

12   we've done nothing wrong, we're doing nothing wrong.

13          And implicit in that is absent some definitive

14   ruling, they'll do it again, or something similar to it, or

15   worse.

16          Answer:  "If the affidavit or declarations were

17   accurate and everybody could rely on them, the Debtor was

18   represented by counsel; I'm not sure why that information would

19   be considered inconsistent or shouldn't be considered.

20          Question:  "A simple question:  Was that process,

21   given all the assumptions you want to make, harmful to the

22   integrity of the bankruptcy process?  That is the question on

23   the table."

24          Answer:  "I don't think so."

25          Page 160 there are a couple of other questions that

1  I'll just point to.

2          Page 166 through 168, at Page 168 I asked if

3  Your Honor had the right to rely on these affidavits being done

4  in a matter consistent with the integrity of the bankruptcy

5  process.

6          And he was instructed not to answer.

7          Page 169, I asked him if they'd use pre-signed

8  signature pages again if Wells Fargo wanted to do it.

9          And he instructed him not to answer.

10          I won't bore you with it, but there are plenty more

11  of those.

12          Let me just touch on a couple of things.  I think

13  I've covered these, that we stopped the list at some point.

14  Just a couple of things to emphasize in winding up; at this

15  point this is not a trial on the merits.  And by that I mean

16  we're nowhere near having all of the evidence we would expect

17  to have at a trial.

18          We have, for instance, and again I think it's

19  important, and we have it -- and this limitation was done by

20  the Court and we understand that.  We simply want to make it

21  clear that we only have 50 loan files.

22          And there are a number of things that we have learned

23  about from the few loan files that we've got, and they are not

24  just loan specific, that's the point, the issue about lost note

25  affidavits.

1      Another thing that's in the loan files, I forgot to

2  mention earlier, is it's clear when you read them that McCalla

3  Raymer is sending the affiant just the affidavit.  It talks

4  about the affidavit, and in the same e-mail, it says, "Erin,

5  here's the note and the mortgage.  We've sent the affidavit to

6  the affiant."

7      There are things in there that would go -- that would

8  be probative, we think, if we got them, to you know, broader

9  practices.

10      I've got a note that says:  Be sure to point out to

11  you that in the McCalla files that -- I think -- one minute.  I

12  had an okay.

13      UNIDENTIFIED SPEAKER:  You know that, you know, in a

14  case.

15      MR. OLEN:  Oh right, right.

16      Erin Brown says in her deposition that she would

17  always e-mail McCalla Raymer back and tell them the affidavit

18  as shown to her was okay, and that she did that routinely, but

19  there's not a single e-mail in those files to show that ever

20  happened.

21      There are just all kinds of things that are

22  information about these lost note affidavits.  I think it's

23  informative about Wells Fargo that when you look at the

24  particular loan file and they're asking -- McCalla is asking

25  again and again and again for a note and they can't get it,

1    that you know, because their disregard is so utter and

2    complete, they simply send off a lost note affidavit to the

3    client.

4            But then it's compounded, Your Honor, because the

5    client's okay with it too.  They know somebody's looking.  They

6    even get their manager of default documents involved.

7            But somebody says, "Well hey, you know, it's okay.

8    We'll just say it's lost, just like our referrals say to do.

9    Let's just tell the Court it's lost."

10           Again, to go back to where we started, you could take

11   any one of a number of practices or examples of the overall

12   practice is a better way to put it, take any segment of it, and

13   that by itself, if that's all we had, would just be shocking

14   and startling.

15           And, you know, I thought of even you know, what kind

16   of analogy to use?  I haven't had a good one, that the

17   magnitude of what Wells Fargo did is such that it's important

18   to understand that what it all flows from, however it manifests

19   itself, is we're Wells Fargo, we want to speed this up.  We

20   want to make it easy.  These are people who are in bankruptcy.

21   We're already losing money.

22           Whatever it takes, we're going to do it to get these

23   affidavits filed, because these affidavits have to be filed in

24   court, and we will disregard any of the rules about the

25   sanctity of the process of signing affidavits, notarizing

1   affidavits, verifying affidavits, any of that, what's said in

2   the affidavit.  You know, any practice is acceptable, any

3   misstatement is acceptable.  But again, the practice, the

4   policy is we will do whatever we want to do.

5          And again, if we were talking about -- I mean the

6   notion that an officer of this court would do what John

7   Schlotter did, on the scale that he did it, and we put

8   everything else aside, if we cleared the courtroom of

9   everything but what he did; it's just astonishing.  And he

10  didn't do it by himself.

11         His client knew what he was doing.  They authorized

12  him to sign that way.  They either saw the affidavits he filed

13  or they could have seen the affidavits that he filed if they

14  just wanted to, and all of that was okay with them.

15         And we would submit that it is further evidence of

16  Wells Fargo's view of the bankruptcy court system and it's

17  utter disregard for the integrity of that process to come in

18  here and say, "Plaintiffs have tried to take a case, it's just

19  about eight pre-signed affidavits, and they want to blow it up

20  into something bigger and this is all a lot of yeah-yeah about

21  nothing, and it's all these mistakes."

22         And you notice, we didn't even talk about a bunch of

23  things that are out there, different handwriting, blank notary

24  dates, blank affiant dates.  That's because never, ever, ever

25  would we suggest that those things by themselves mean anything,

1  but they are just additional evidence to put on the top of the

2  very high pile that show the utter disregard with how it was

3  done, and that there are all of these things happening that

4  collectively show what Wells Fargo was doing.

5      If Your Honor had just our Plaintiff's Exhibit 140

6  and the affidavits that underlie that, if you have just the

7  affidavits and just what they show on their face, the evidence

8  of Wells Fargo's systematic, widespread, constant fraud on the

9  Court is compelling.  If you took just the testimony, the

10 deposition testimony, it would be compelling, and you have both

11 of those.

12      And for them now to somehow say:  Yes, we did it.  I

13 mean, literally, this is what they did in most of the

14 depositions.

15      There are some admissions, "Yes, we did certain

16 things.  We can't tell you when we did it and we can't tell you

17 when we didn't do it.  We certainly don't see anything wrong

18 with it, if we did it."

19      And to then take the position legally that, "Hey,

20 we've done nothing ourselves to find out anything, no

21 investigation about any of this stuff, nothing.  And you all

22 just, you know, you can't have a class.  You can't get a class

23 certified because it's too hard to figure out.  We did it on

24 such a widespread scale, and we did it in so many different

25 ways, that you can't touch us.  You can't get at us."

1      And that just looks past the obvious, which is it all

2 started at the top.  All of these people who said that I did

3 nothing wrong are their vice-president, their managers, their

4 key lawyers, their top two law firms; and we submit that that

5 is the evidence that's sufficient to support certification of

6 the class in this case.

7      Thank you for your patience.

8      THE COURT:  All right.

9      All right, do you have any other evidence that you

10 are going to present; are you resting on what has been

11 admitted?

12      MR. OLEN:  Yes, Your Honor.

13      THE COURT:  Okay.

14      MR. OLEN:  We rest on what has been admitted.

15      THE COURT:  Okay.

16      Mr. Callaway, how do you want to proceed?  Do we need

17 to deal with the objections now, or would you rather wait until

18 you put in what you're going to talk about and then we can deal

19 with it in the context of all of the evidence, or how do you

20 want to do that?

21      MR. CALLAWAY:  Let's see.  The objections we have

22 left are --

23      THE COURT:  The ones you have left are to documents

24 -- I've got to find it again.  Here, here it is.

25      MR. CALLAWAY:  The New Jersey --

1          THE COURT:  All right, yes.

2          MR. CALLAWAY:  Out of state.

3          THE COURT:  Now, wait until I find it.  I have too

4  many piles of stuff.

5          Okay.  Yes, it is to, first of all, Number 2B, you

6  had, which was -- and then the rest was 3, 17 through 31, and

7  then 33.  Let's see.

8          So, 2B was Brice's list of Wells Fargo affidavits

9  with pre-signed signature pages.

10          No, wait.  That's not 2B.  Exhibit 2B is affiant and

11  notary information for some of the affidavits identified in the

12  Brice list.

13          And you say you needed an explanation?

14          MR. CALLAWAY:  Right.  I couldn't tell what this

15  was.

16          THE COURT:  Mr. Olen, do you want to tell me, maybe?

17          MR. OLEN:  Sure.

18          THE COURT:  And make it clearer?

19          MR. OLEN:  Sure.

20          To the extent the actual affidavits were available on

21  PACER, we got the affidavits, or maybe we already had them and

22  we filled it in on the charts, but from the affidavits

23  themselves, we put in the affiant and the notary.

24          And the reason there are so many blanks is those

25  are jurisdictions where the affidavits were not available on

1  PACER.

2          THE COURT:  Okay.  So, 2A is the list of Brice

3  affidavits for this -- for the Southern District?

4          MR. OLEN:  No, 2A is for the entire United States.

5          THE COURT:  Okay.

6          MR. OLEN:  That's the one that Brice gave to Wells

7  Fargo.

8          THE COURT:  Okay.

9          MR. OLEN:  And Wells Fargo produced to us in

10  discovery.

11          THE COURT:  Okay, all right.  And then 2B is?

12          MR. OLEN:  Is that same list, except we added to it.

13          THE COURT:  Okay.

14          MR. OLEN:  The names of the affiant and the notary,

15  where it was available through an electronically available

16  affidavit.

17          THE COURT:  Got you, okay.

18          MR. OLEN:  And that's the only thing that we've

19  added.

20          THE COURT:  Mr. Callaway?

21          MR. CALLAWAY:  No objection, Your Honor.

22          THE COURT:  Okay, so 2B is now received.

23          Then we are to Number 3, and actually, I guess to the

24  extent we can do these together, 3, 17 through 31, and 33 are

25  objections to the affidavits and pleadings from outside this

1  state.  So --

2          MR. CALLAWAY:  I guess my question to Mr. Olen, there

3  is -- were these all ones that were discussed in the

4  deposition?  I can go back and look at that.  Are they --

5          MR. OLEN:  Yes.  We only -- the only affidavits

6  listed as exhibits were ones that were covered in the

7  depositions.

8          MR. CALLAWAY:  Well, I'll withdraw my objection with

9  the Court's agreement that you're going to only consider these

10  as far as they go to general practices.

11          THE COURT:  That's just what I was going to say.

12          MR. CALLAWAY:  And that there's --

13          THE COURT:  I think that's right.  They're not

14  evidence.

15          MR. CALLAWAY:  Yes.

16          THE COURT:  So, what happened in here or anything

17  that will be dealt with in terms of any damages or anything

18  else, if there would be any or any injunction -- whatever kind

19  of relief could be entered, if any, if ever.  I am not going to

20  exercise authority for the reasons I've already indicated

21  outside the Southern District.

22          So, for --

23          MR. CALLAWAY:  We've got different law firms.

24          THE COURT:  Yes.

25          MR. CALLAWAY:  We've already had some mention of a

1    law firm in New Jersey, who apparently was Xeroxing --

2              THE COURT:  Yes.

3              MR. CALLAWAY:  -- somebody's signature page.

4              THE COURT:  We're not -- yes.

5              MR. CALLAWAY:  It doesn't have anything to do with

6    Alabama.

7              THE COURT:  No.

8              MR. CALLAWAY:  It doesn't have anything to do with

9    the firms involved in this case.

10             THE COURT:  And I -- but I think it's relevant to

11   pattern and practice potentially, and therefore, I'm going to

12   allow Number 3, 17 through 31 and 33, because they've been

13   mentioned in the depositions and two, because they were dealt

14   with and mentioned in terms of pattern and practice, which may

15   be an issue here.

16             So, for all of those reasons, those are received.

17   Okay.

18             Then we will go to your case, Mr. Callaway.  How do

19   you want to proceed?

20             MR. CALLAWAY:  Well, I have one question.

21             THE COURT:  And wait a minute.  Wow, the time went

22   faster.

23             MR. CALLAWAY:  What do we want to do in terms of our

24   time?

25             THE COURT:  Okay.  You're right, it's noon.

1          MR. CALLAWAY:  I'm glad to start now, but it's going

2     to -- and I'm not going to be more than four or five hours.

3     No, I'm just kidding.

4          (Laughter.)

5          THE COURT:  Oh.

6          MR. CALLAWAY:  I'll just, I'll probably be an hour or

7     less.

8          THE COURT:  Now, and forget the break.  Yes, I'm

9     good.

10          MR. CALLAWAY:  Mine will be much shorter.

11          THE COURT:  How long do you think?  Maybe -- what did

12     you say?

13          MR. CALLAWAY:  Oh --

14          THE COURT:  I just missed what you said, an hour?

15          MR. CALLAWAY:  An hour, an hour and a half.  If you

16     don't mind, my preference would be just to break now, I'm sort

17     of brain dead after sitting here for three and a half hours.

18          THE COURT:  That works for me, if that's all right

19     with everybody else.  We'll break for an hour.

20          MR. CALLAWAY:  That's fine.

21          THE COURT:  We'll come back.  I mean, conveniently,

22     we're right at noon.  We'll come back at one.  And if you're an

23     hour and a half, that puts us at 2:30.  I know we talked about

24     how long people were going to argue then.  I guess what I'm

25     going to ask you is, we won't go any longer than five, so I'm

1 going to have you allocate the time after that, accordingly.  I

2 think the evidence we have to get in, we have to do that, and I

3 recognize Mr. Olen made some argument as far as that.

4      MR. CALLAWAY:  I was going to say about an hour of

5 his --

6      THE COURT:  I've got you.  He's got --

7      MR. CALLAWAY:  -- needs to be counted already.

8      THE COURT:  He's got -- and I'm going to give you

9 that leeway too.  I can sort out the difference between what

10 were his comments and what was actually pointing me to

11 evidence.  I hear you.

12      Having said that, I guess I'm just going to look to

13 you guys to figure out an allocation if you can.  And if you

14 can't, I'll do it.  And then I'm probably going to hold you to

15 it.

16      Okay, all right.  We'll break until one.

17      **(Lunch Recess from 12:00 p.m. to 1:03 p.m.)**

18                    *    *    *    *    *

19

20

21

22

23

24

25

**A F T E R N O O N    P R O C E E D I N G S**

\*    \*    \*    \*    \*

THE CLERK:  Please rise.

THE COURT:  All right, you may be seated.

All right Mr. Callaway, when you're ready.

MR. CALLAWAY:  Thank you, Your Honor.  I promise I will not be as long.

THE COURT:  That's all right.  As I said, pointing me to the evidence is, to me, really important, so I am giving you and Mr. Olen the leeway you need --

MR. CALLAWAY:  Yes.

THE COURT:  -- to show me what you think I really need to focus on, so.

MR. CALLAWAY:  Okay.  And I'm not going to argue the case because I know we're going to do it afterwards.

THE COURT:  You are.

MR. CALLAWAY:  So, let me just say --

THE COURT:  That's right.

MR. CALLAWAY:  -- a couple of preliminary points.

And one is, one thing that this Court has to remember, this is a hearing on whether a class should be certified.

THE COURT:  Right.

MR. CALLAWAY:  This is not a hearing on the merits of the case.  This is not the time for the Defendant to put on his

1   defenses.  This is not the time that the Defendant has to put

2   on his defenses to the Plaintiff's allegations.  The

3   Plaintiff's got to show -- the Plaintiff's got the burden of

4   proving common issues such that the case should be --

5              THE COURT:  Right.

6              MR. CALLAWAY:  -- certified as a class.

7              THE COURT:  Right.

8              MR. CALLAWAY:  Now, my take is that the whole goal of

9   theirs is to get you so riled up by alleging horrible things

10  that the Defendant has done where you're going to be tempted to

11  circumvent all of the class certification proceedings.

12             THE COURT:  No, I understand that's all we're talking

13  about here.  I hear you.

14             MR. CALLAWAY:  The burden for the Plaintiff is to

15  prove -- and I'm not going to argue, I'm going to try to hold

16  back -- is to try to prove that this case is appropriate for

17  class certification, that the issues are common.  And I'm not

18  -- and I'm going to talk about commonality when we argue.

19             THE COURT:  All right.

20             MR. CALLAWAY:  But so that the case can be

21  determined, you know, in a class action the case is determined

22  by what happens to the class representative.

23             THE COURT:  Right.

24             MR. CALLAWAY:  In other words, whatever happens to

25  the class representative, whatever the ruling is in that

1  person's case, it happens to everybody.

2          THE COURT:  Right.

3          MR. CALLAWAY:  And so, it has to be something that

4  could be determined that way.  And all we heard from the

5  Plaintiff today was:  Judge, we've got notebook after notebook

6  of affidavits that are bad, that you've got to look at them

7  all.  We only got 50 loan files which they agreed to.  Judge,

8  we want more.  We're going to be able to prove it on more and

9  more evidence.  Once we dig into all of these files, we're

10  going to be able to put more -- we're going to show you even

11  more horrible things that they've done.

12          It's all stuff not related to Kelly Brannan.  You

13  know, if this was a true class action then you would be able to

14  hear the case of Kelly Brannan and that would determine what is

15  going to happen for the whole class.  That's the whole purpose

16  of class certification, not to just have an open-ended multi

17  Plaintiff never-ending case.  It's supposed to be a shortcut

18  process, and not an expanded process, which the Plaintiffs are

19  trying it into.

20          So, now having said that, I'll try to refrain from

21  doing any more argument and talk about the evidence, primarily.

22          THE COURT:  All right.

23          MR. CALLAWAY:  And realizing that I adhere to the

24  usual rule that when your client is being deposed, when

25  Plaintiff says -- when the other attorney says:  Now, that's

1   all I have, and I usually try to get out there before they

2   think of any more questions.  So, I've only got probably about

3   five or -- about two pages worth of direct examination in all

4   19 depositions that were taken.

5           But here's the summary of the evidence as I see it,

6   and Your Honor I'm going to be referring to exhibits, both

7   Plaintiff exhibits and Defense exhibits.

8           THE COURT:  Okay.

9           MR. CALLAWAY:  So, do you have the notebooks there,

10  Your Honor?

11          THE COURT:  I don't have their notebooks, because it

12  was too many to put up here.

13          MR. CALLAWAY:  Okay.

14          THE COURT:  But if, as we come to things, I'm sure

15  they can give them to me.  Or if it's something like with their

16  depositions and stuff, I take, as you all already know, copious

17  notes.

18          MR. CALLAWAY:  Uh-huh.

19          THE COURT:  So, if it's something you just want to

20  refer me to, and I can look at it later, we'll deal with it

21  that way.  If you want me to look at something, they will pull

22  it.

23          MR. CALLAWAY:  I think I'm going to need you to look

24  at it.

25          THE COURT:  All right.

 1          MR. CALLAWAY:  Yes.

 2          THE COURT:  I'm going to have them pull it for me.

 3          MR. CALLAWAY:  And the reason being that all I've

 4  done is -- a lot of what I'm going to be talking about, I've

 5  just excerpted about 20 of the Plaintiff's affidavits to show

 6  you different things.

 7          THE COURT:  Okay.

 8          MR. CALLAWAY:  And how there are factual issues.

 9          THE COURT:  Okay.

10          MR. CALLAWAY:  But I think you're going to have to

11  look at them.

12          THE COURT:  Okay.

13          MR. CALLAWAY:  And to some extent it has already

14  been --

15          THE COURT:  Well then, I will have them pull them.

16          MR. CALLAWAY:  When they come up.

17          THE COURT:  I'll make them do that for me here,

18  because I do have your exhibits here and I can pull those, so.

19          MR. CALLAWAY:  The evidence on the Wells Fargo side

20  is that yes, they did allow the use of pre-signed affidavits in

21  the early '80s.  And there are outside counsel guidelines which

22  are, as of May 2003, which are Defendant's Exhibit 28 I do

23  permit -- they don't require, but they permit the use of pre-

24  signed affidavits.

25          THE COURT:  And that's Plaintiff's Exhibit --

1          MR. CALLAWAY:  Twenty-eight.

2          THE COURT:  Plaintiff's Exhibit 28?

3          MR. CALLAWAY:  Defendant's Exhibit 28.

4          THE COURT:  Okay.  Defendant's 28?

5          MR. CALLAWAY:  Yes.

6          THE COURT:  Okay, all right.

7          MR. CALLAWAY:  The same guidelines as of June 30,

8    2004, which is Defendant's Exhibit 29, do not contain that

9    instructions; it's gone at that point.

10         The evidence on the Wells Fargo side is that Wells

11   Fargo, frankly, never had any express directions from -- gave

12   express directions to their outside counsel for how to do

13   affidavits and how affidavits should be done.

14         Another Defendant's exhibit, Number 30, is also

15   another set of instructions to outside counsel, and it does not

16   contain any specific instructions about how affidavits are to

17   be done.

18         As Mr. Olen said, and he's correct, the Wells Fargo

19   witnesses all testified essentially that they relied on their

20   outside counsel to do the affidavits.

21         THE COURT:  Right.

22         MR. CALLAWAY:  And to do the correct form and to tell

23   them what to do.  For better or worse, as it turns out, they

24   relied upon their outside counsel.

25         The evidence has also been that the only firm that

1   used the, quote, the pre-signed affidavits in the Southern

2   District of Alabama was the Brice firm, from Texas, as you

3   heard.

4         And as Mr. Olen said, the firm got questioned by a

5   California bankruptcy judge in early 2003 --

6         THE COURT: Uh-huh.

7         MR. CALLAWAY: -- in another case involving another

8   client, Mitsubishi. And they made the decision --

9         THE COURT: Now, that's something buzzing. What is

10   that?

11         THE CLERK: I don't know.

12         THE COURT: That's not normal.

13         UNIDENTIFIED SPEAKER: I can unplug a bunch of

14   things.

15         THE CLERK: No, no.

16         THE COURT: No, don't do that.

17         THE CLERK: Let's not unplug anything now.

18         MR. CALLAWAY: Was it on top of that speaker? Is

19   there a speaker that you can turn off?

20         THE COURT: I don't think there's a speaker.

21         THE CLERK: I'll get somebody to come and check it

22   out.

23         MR. CALLAWAY: I'm fine.

24         THE COURT: Okay.

25         THE CLERK: I'll do it.

1          THE COURT:  Instant message them and say -- okay,

2   we'll keep going because I can hear.  Is it creating a problem

3   for you?

4          THE COURT RECORDER:  No, ma'am.

5          THE COURT:  Okay.  We'll keep going, but it is there

6   and we need to get that fixed, so all right.

7          MR. CALLAWAY:  The Brice firm got questioned by a

8   California bankruptcy judge in 2003.

9          THE COURT:  Right.

10         MR. CALLAWAY:  The law firm decided to stop.

11  Ms. Hilary Bonial testified that they sent an e-mail to

12  clients, to all of their clients including Wells Fargo on a

13  specific date, April 15th, 2003.  She testified that they

14  destroyed the affidavits they had in the office.

15         And then, there has not been any -- there's no

16  evidence in this case in the Southern District that they were

17  used any more after that.  I think actually, as we've said in

18  the brief, the last one was April 1 of 2003, the last one that

19  anyone has been able to find.

20         Now, Mr. Olen was correct that Wells Fargo never gave

21  any express directions to its attorneys to stop.  It did

22  disappear from the Manual, but essentially, it sort of petered

23  out; the attorneys quit using it, overall.

24         I mentioned earlier there is some deposition

25  testimony about a paralegal with a law firm in New Jersey, he

1    was -- who was Xeroxing signature pages of the Wells Fargo

2    affiant and using them in New Jersey, and that's what the

3    earlier testimony about Kim Miller who was the default manager

4    was very unhappy and chewing out the lawyer.  That was all --

5    that was in New Jersey; that was not related to Alabama.

6         And as I mentioned earlier, in fact most of the

7    testimony from the management people who were deposed in 2007

8    was not actually from Alabama, because the case -- the focus of

9    the case at that point was on the pre-signed affidavits.

10        As it turned out -- as it turns out, there has been

11   -- the parties have only identified seven or eight, quote, pre-

12   signed affidavits that were used in this district.

13        The procedure according to the Brice firm was that

14   the affiant on these pre-signed affidavits would review the

15   whole affidavit.  They would send the whole affidavit to the

16   affiant, the person who would sign the paper, and they would

17   okay it, and then they would put them together.

18        And in fact, we do have the specific e-mails for

19   Ms Brannan's case, which were saved, and they're very -- it's

20   very brief.  It's Defendant's Exhibits 26 and 27, but it's set

21   out in brief.

22        In Exhibit 26, Bonnie Zergoza (phonetic) e-mailed

23   Teresa Diaz-Cochran, the Wells Fargo lady, and said, "Teresa,

24   please review the attached affidavit.  This was filed -- this

25   will refer for our Motion for Relief.  Thank you, Bonnie."

1        And she has attached to it the whole affidavit,

2   including the signature page.

3        The next day Ms. Diaz-Cochran in Exhibit 27 e-mails

4   back, "Okay."

5        So, it was looked at even though without doubt the

6   pre-signed's procedure was utilized, and we're not contesting

7   that and we're not trying to hide that.  And we have not from

8   the beginning.

9        Ms. Brannan's bankruptcy was relatively, I would call

10  it normal or characteristic, for those of us who practice

11  before the Court.  The testimony though from her end regarding

12  this affidavit was both she and her counsel have testified that

13  they didn't actually see the affidavit.  Ms. Brannan was in and

14  out of her house because she and her husband were having

15  domestic problems, and she doesn't think she saw the Motion for

16  Relief from Stay.  She doesn't think that she saw the

17  affidavit.  She doesn't think that she came to court in

18  connection with the Motion for Relief from Stay.

19       Her lawyer, Ms. Lacey Robertson, testified that she

20  didn't always look at the affidavits, but her office would

21  print out the pleadings.  When we looked at it, the affidavit

22  was a separate exhibit, so it was a separate click through,

23  and it was not in her bankruptcy file where she said it would

24  have been if her office manager had printed it out.  So, she

25  doesn't think that she actually ever saw it.

1          Their procedure is that they call the clients to

2     come to court on Motions for Relief from Stay.  They normally

3     don't try to negotiate it out ahead of time.  They call the

4     Court and they work it out in court, which is what happened in

5     this case.

6          Defendant's Exhibit 7 -- excuse me.  Excuse me,

7     Defendant's Exhibit 7 is the transcript of the brief testimony

8     that was given or an exchange of counsel with the Court that

9     was given in the Brannan's case.

10         THE COURT:  And this is Defendant 7, right?

11         MR. CALLAWAY:  Defendant's Exhibit 7.

12         THE COURT:  All right.

13         MR. CALLAWAY:  And here's the entirety of the

14    exchange.

15         THE COURT:  I've got it.

16         MR. CALLAWAY:  "The Court:  Next, we'll be marking

17    Kelly Brannan, Number 56.  Where does that one stand?  Is that

18    resolved?"

19         "Ms. Robertson:  I believe so, Your Honor."

20         "The Court:  All right."

21         Mr. Rose is with the Movant's office, let's see,

22    Derrick Rose said:  "We're going to hoggle that with a ten day

23    notice of default."

24         "The Court:  All right.  Is that the agreement?"

25         "Ms. Robertson:  Yes, Your Honor."

1       And the Court says, "All right.  And Counsel if

2  you'll draft the order, I will sign it.  Thank you."

3       It's a very typical --

4       THE COURT:  It sounds like exactly what I would say,

5  right.

6       MR. CALLAWAY:  It's a very typical exchange.

7       THE CLERK:  Right.

8       MR. CALLAWAY:  It's a very typical exchange for those

9  of us who practice more before Your Honor.

10       The docket sheet which is Defense Exhibit 13 doesn't

11  reflect that Mr. Brannan was here, although I would submit to

12  Your Honor that he may have been here because of since -- if he

13  didn't actually come to the front, he would not have been shown

14  as appearing.

15       THE COURT:  Right.

16       MR. CALLAWAY:  The order conditionally denying relief

17  from stay is not -- does not have the same numbers as were in

18  the motion, as contained in the affidavit that was filed in

19  court and the Motion for Relief from Stay.

20       Let's see.  The conditional denial orders don't match

21  up, so it's apparent that there was some -- and I can't give

22  you the details right at this moment, but if you look at the --

23  to the -- they're not the same subject.  Apparently, there were

24  some negotiation going on, either -- there may have been

25  subsequent payments that they made.  There may have been that

1  there's some kind of reconciliation going on between the time

2  of the affidavit and the time of the conditional denial order.

3          And Ms. Robertson testified that she would have

4  agreed to the numbers that were in the initial denial order.

5  She agreed to the attorney's fees.  She saw the order and if it

6  had been different from what they had agreed to, she would have

7  filed some kind of motion to get it corrected.

8          Both Ms. Brannan and Ms. Robertson say that they

9  don't know of anything factually wrong with the affidavit.

10 There has been no evidence of any change in the -- that there

11 would have been any change in the result if the affidavit had

12 been signed -- if the pre-signed affidavit process has not been

13 used.  And Ms. Brannan said she never made any payments from

14 that point forward, and she never paid any of the attorney's

15 fees that were awarded.

16         She has been released from liability since that time

17 pursuant to a deed in lieu of foreclosure, which has been

18 marked as Defendant's Exhibit 11.  The case was ultimately

19 dismissed on the Trustee's motion for failure to make plan

20 payments.  The Brannans later got divorced.  As I said, they

21 gave a deed to their house, deed in lieu to their house.

22         Ms. Brannan doesn't know anything about --

23 essentially doesn't know anything about any wrongdoing or

24 anything about the case, except what she has been told by

25 Mr. Olen, and she was contacted by Mr. Olen's office about

1   being a Plaintiff in this case.

2          The rest of the affidavit -- I mean the rest of the

3   testimony dealing with other affidavits is essentially all over

4   the lot.  As I said, there was no policy to do things a certain

5   way, other than the pre-signed affidavit policy which stops

6   some time in 2003 or 2004.

7          The policy as I said, and as you heard Mr. Olen say,

8   that he says they're blaming it on outside counsel, and now

9   they would say they rely upon outside counsel.  Different

10  districts do it different ways, different states have different

11  requirements.  Different law firms are being used among, as you

12  heard, among members -- among the affidavits that are under

13  challenge.  The affidavits change over the time; the forms have

14  been changed over time.

15         Different firms use different forms.  Some file the

16  note and the mortgage with the motion.  Sometimes the

17  affidavits are made exhibits; sometimes they're not.  Many of

18  the things that the Plaintiffs allege are false, or are

19  disputed.  Well, Mr. Olen is trying to downplay it now, but a

20  lot of the things that they have listed on their Exhibit 140,

21  things like notarization date is in a different handwriting.

22         And to which we would say:  There's no requirement

23  that the notary has to handwrite the date himself or herself.

24         The notarization date is sometimes after the affiant

25  date.

1          To which our response would be:  You're not required

2    to sign before the notary.

3          You can acknowledge before the notary, since

4    conceivably you might sign it one day and then you'd come to

5    the notary public the next day and say, "Could you please

6    notarize this for me?  This is my signature," so it's notarized

7    the next day.

8          You heard a lot of hollering, whooping and hollering

9    about John Schlotter signing as assistant secretary of Wells

10   Fargo.  He did have an authorization.  I guess that, in our

11   view, that would be a factual dispute as to whether he was

12   authorized to sign on -- whether he was exceeding his

13   authorization with Wells Fargo in signing the bankruptcy

14   affidavits.

15         Some -- another problem is, for example, as

16   meaningless as Teresa Diaz-Cochran signed several affidavits as

17   Teresa Cochran as opposed to Teresa Diaz-Cochran, and that's

18   alleged in Plaintiff's Exhibit 140 as being improper.

19         And some affidavits -- and many of the affidavits

20   don't refer to exhibits, but they are still alleged to be

21   fraudulent because of the fact that the exhibits post date the

22   affidavits.  And for example, the affidavit just says, "I've

23   viewed the note and mortgage."  It doesn't say that they are

24   attached exhibits.  But the Plaintiffs still allege that they

25   should be class members and that the affidavits are

1    fraudulent, because the exhibits are dated after that.

2              One that I would call a highly unusual aspect of the

3    testimony involves Erin Brown and we'll talk about her in a

4    moment.

5              THE COURT:  One second.

6              Can you hear that noise?

7              THE CLERK:  It has stopped.

8              THE COURT:  Did it?

9              THE CLERK:  Yes, ma'am.

10             THE COURT:  Okay.

11             MR. CALLAWAY:  That noise stopped.

12             THE COURT:  I can still --

13             MR. CALLAWAY:  I might hear a little bit up here.

14             THE COURT:  And now I'm thinking I hear another one.

15   Okay.  Well, if it's stopped we'll get you later, Jim.  Okay,

16   thank you.

17             I'm sorry.  I just thought that was a good break.

18   Now, you're going to Erin Brown, okay.

19             MR. CALLAWAY:  I was surprised to hear Mr. Olen's

20   characterization about Erin Brown's situation, because I think

21   -- I don't think the reality is exactly as he discussed.

22             There were about fifteen affidavits where the body of

23   the affidavit on the second page is for example dated, just

24   I'll just use this month, the affidavit may be dated late

25   October.  But then the first page as filed says that the

1 Debtor has not made the November payment.  In other words,

2 it's --

3          THE COURT:  Right.

4          MR. CALLAWAY:  I would agree with Mr. Olen that it

5 would not be possible for somebody to literally say in October

6 that they haven't made the November payment, because it's not

7 due yet.

8          But, and John Schlotter who was the McCalla Raymer

9 lawyer, the firm that's referring cases to Mr. Brown --

10 referring to Ms. Brown, could not explain that at all.  I mean,

11 he didn't have any explanation for how that happened, and

12 Ms. Brown denied it.

13          But the Plaintiffs own exhibits that we'll get to in

14 a minute show that -- and I know Mr. Olen shares my suspicion

15 because we discussed this, that it's apparent that Ms. Brown is

16 making a change and swapping out the first page of the

17 affidavit to, quote, update it.

18          And we, you know, we have it.  We produced her

19 original files and we let Mr. Olen look at the documents and he

20 made one set of those, an exhibit that we'll talk about in a

21 minute, but I don't know why she did it.  She denied that she

22 did it, but at least the evidence supports it.  And I share the

23 belief with Mr. Olen, I think, that she's swapping out the

24 first page to update the payment, unbeknownst to McCalla Raymer

25 and certainly unbeknownst to Wells Fargo, which if further

1    upstream.

2           And she testified she never had direct contact with

3    the Wells Fargo firm, that she always dealt with the McCalla

4    Raymer firm.

5           There are different fact patterns that we'll go over

6    in a second regarding the use of the affidavit, okay.  The

7    Plaintiffs want to say, "Oh if there's any kind of problem with

8    the affidavit, it's fraudulent.  It's fraud on the Court."

9           But as the Court might imagine, the affidavits are

10   relied upon in different ways.  In many instances the

11   affidavits are -- and we'll look at some instances of this.

12   The affidavits are filed after the hearing on the Motion for

13   Relief of Stay.  And of course, that's a fairly common

14   situation by the Court where the affidavit doesn't get filed.

15          They come up so quickly, in about three weeks, and

16   the Court says:  The parties agree upon the resolution, they're

17   going to do a conditional denial, or whatever.

18          And the Court says, "Fine, but I need the affidavit,"

19   and the affidavit gets filed later.  So that it was apparent

20   that the parties at least are not relying upon the affidavit in

21   terms of reaching their resolution.

22          In some cases there is consent by the Debtors,

23   either in their schedules that they've said that they intend

24   to surrender.  Sometimes pleadings are filed where they

25   apparently were saying they consent to it, or sometimes their

1   Chapter 13 plan says they're consenting to relief from stay.

2           And in other situations of Court there are

3   evidentiary hearings or some kind of hearing where the Court

4   deciding what the amount owed if there's a dispute between the

5   Plaintiff and the movant on a relief -- on a relief from stay.

6           And as pointed out in the Brannan's case, probably

7   the most frequent resolution is that the numbers are

8   negotiated, because the amount owed on a mortgage is a

9   constantly changing number and it's frequent that you have

10  another month rollover before the matter gets heard, or you

11  have payments made in the meantime.  People are trying to catch

12  up their post-petition defaults.

13          And of course the fact that the numbers were

14  negotiated is apparent in the Brannan case, because the numbers

15  don't match up to what they would have been in the relief from

16  stay.

17          Now, what I'd like to do is I'm just going to briefly

18  go through a few affidavits and the purpose of this is not to

19  be able to say, "Oh, these are all perfect affidavits."  I'm

20  not going to be able to show this, but just to show that there

21  are factual issues that the Court is going to have to look at,

22  and with regard to each one, to determine whether they belong

23  to the class where there is fraud on the Court; and so let me

24  -- I'm going to ask you to walk through a few of these with

25  me.

1        THE COURT:  Will you do me a favor, and maybe you

2   don't have it that way; can you give them a list right now of

3   the numbers of their exhibits that you're going to want them to

4   pull out?  And while you're talking about one, and I have one,

5   they can be pulling the rest?

6        MR. CALLAWAY:  You want them pulled out,

7   individually?

8        THE COURT:  Well --

9        MR. CALLAWAY:  Well --

10       THE COURT:  I think -- I don't know how far apart

11  they all are, that's my problem.  And I saw that they pulled

12  them out one by one, but --

13       MR. CALLAWAY:  We can pull them out.  I could pull

14  them out of ours.  Well, I've only got one set of the

15  Plaintiff's exhibits.

16       THE COURT:  It's -- what I'm thinking is they've got

17  so many books, I don't know how far apart they are in the

18  books, but --

19       MR. OLEN:  Just, these are all the exhibits,

20  Your Honor.

21       THE COURT:  Okay.

22       MR. OLEN:  The rest are depositions.

23       THE COURT:  The rest are depositions, as well?

24       MR. OLEN:  Yes.

25       THE COURT:  Then maybe -- maybe we can do it.

1                 If you would just put those up --

2                 MR. CALLAWAY:  It would probably be easier just to

3      not -- to not pull them out.

4                 THE COURT:  They are not what?

5                 MR. CALLAWAY:  I would suggest that it would be

6      easier to just keep them in the notebooks.

7                 THE COURT:  Okay.

8                 MR. CALLAWAY:  And I'll --

9                 THE COURT:  Then fine.  I'll just take --

10                 MR. CALLAWAY:  I'm going to try to walk through them

11      in order.

12                 THE COURT:  I will take those notebooks and you guys

13      are just -- or Mr. Callaway, I guess, more than anybody is

14      just going to have to bear with me while I find the various

15      ones.

16                 MR. CALLAWAY:  Okay.

17                 THE CLERK:  All right.

18                 MR. CALLAWAY:  I'm sorry.

19                 THE COURT:  They're good binders, nothing has fell

20      out.

21                 MR. OLEN:  Once it started going, it was going.

22                 THE COURT:  There we go.  Okay.

23                 Okay, when you're ready.

24                 MR. CALLAWAY:  I'm going to start with about four or

25      five Defendant's exhibits.

1          THE COURT:  Okay.

2          MR. CALLAWAY:  First.  First is Defendant's Exhibit

3    35.

4          THE COURT:  Okay, I'm there.

5          MR. CALLAWAY:  And Your Honor, you're also going to

6    need the spreadsheet.

7          THE COURT:  Okay.

8          MR. CALLAWAY:  I apologize.

9          THE COURT:  Okay, and just a second.  Let's see.

10   I'll use yours.  Yes, all right.  I've got it.

11         MR. CALLAWAY:  All right.  My first point is that

12   there's variation even within the pre-signed affidavit group,

13   and so the first ones that we're going to look at are the pre-

14   signed affidavit group.

15         THE COURT:  All right.

16         MR. CALLAWAY:  Defendant's Exhibit 36 --

17         THE COURT:  Exhibit 35 or 36?

18         MR. CALLAWAY:  Wait a minute, excuse me.  Defendant's

19   Number 35.

20         THE COURT:  Okay.  And that's a docket sheet is what

21   I show, yes?

22         MR. CALLAWAY:  It's the docket sheet in the McGee

23   case.

24         THE COURT:  Right.

25         MR. CALLAWAY:  Which is the first one on that, on the

1  spreadsheet.

2          THE COURT:  Okay.

3          MR. CALLAWAY:  Under Plaintiff's Exhibit 40 it's

4  number one.

5          THE COURT:  Okay.

6          MR. CALLAWAY:  Now, if you'll turn to the -- these

7  are not big points, but I'm just trying to show the variation

8  in what happens.  Defendant Exhibit 35, on Page 2, Wells Fargo

9  filed a Motion for Relief from Stay.

10          Entry Number 6 is the response by Debtor Edwin McGee

11 to the Motion for Relief from Stay.  Unfortunately, it's before

12 I could print it out on a line, so I can't see exactly what the

13 response is.

14          But the Court, on 6/25 in a docket entry, Motion for

15 Relief from Stay -- it says:  Motion for Relief from Stay

16 granted, order Kern.

17          And then Mr. O'Brien, Danny O'Brien the court clerk

18 at that time enters that.

19          THE COURT:  All right.

20          MR. CALLAWAY:  Notice, no affidavit has been filed at

21 that point.  The affidavit is not filed until after the

22 hearing.  The hearing was on 6/25 and that's the docket entry

23 that says the motion is going to be granted.  It's not

24 conditionally denied, it's just granted.

25          So, I'm presuming that the Plaintiff -- I think an

1    assumption is that the Plaintiff agreed to it in his response

2    to the Motion for Relief from Stay, because it's apparent that

3    the only person attending was Mr. Kern.

4              THE COURT:  Uh-huh.

5              MR. CALLAWAY:  The affidavit is filed later and then

6    the order is signed a few days after that.  In other words,

7    apparently the parties and the Court are not actually relying

8    upon or being defrauded by Wells Fargo's affidavit in deciding

9    what is to be done in that case.

10             All right, the Defendant's second exhibit that I'm

11   going to mention is Number 37, which relates to the McDonald

12   case.  The McDonald case is the second pre-signed affidavit,

13   it's number two on Plaintiff's Exhibit 140, which is also on

14   our spreadsheet.

15             This shows -- this is an order signed by Judge

16   Shulman which shows that he had some kind of evidentiary

17   hearing, it looks like it was done on proffers rather than

18   testimony, but the Court said, "Based on proffered evidence,"

19   and then it goes on to find out what -- what amounts are owed.

20             The debtors tender payments of 445 representing the

21   October payment, and 425 representing attorney's fees.  Wells

22   Fargo is holding some amount in its unapplied funds, which is

23   in addition to Check 3104 in the amount of $520, which is

24   currently held by counsel to pay the August and September

25   installments.

1          In other words, the parties are there in court,

2     they're negotiating the -- what the Court orders is based upon

3     what the proffer of evidence was and what the parties agreed to

4     at the time.  The Court -- and it's conditionally denied upon

5     payment by the debtors of all the payments reference above.

6          So apparently, they're showing up at court and making

7     some payments and reaching an agreement.

8          My point there is what the Court did is not -- was

9     not based upon the affidavit, it was based upon the agreement

10    of the parties and it was based upon evidence taken.

11         All right, let me ask you to look at Defendant's

12    Exhibit 33, which is another of the pre-signed affidavits.

13         THE COURT:  Okay.

14         MR. CALLAWAY:  This was a Chapter 7 case, Docket

15    Number 31.  It was the Motion for Relief from Stay by Wells

16    Fargo.

17         Docket Number 34 says that they've moved to convert

18    the case to Chapter 7.

19         Docket Number 12 -- let me see, Docket Number 38 is

20    the affidavit from Motion for Relief from Stay, which is

21    apparently filed the day after the hearing, because the minute

22    entry dated December 12th shows a minute entry H:12/11/02,

23    which was the date that was also shown on the Notice of

24    Hearing, which is Docket Number 32.

25         THE COURT:  Uh-huh.

1    MR. CALLAWAY:  I mean, in other words, there was a

2  hearing on the Motion for Relief from Stay that occurred on the

3  11th.  The affidavits occurred on the 12th.  The minute entry

4  says the motion is granted.  Kern is to submit affidavit with

5  proposed order, and then Motion to Convert the Case to Chapter

6  7 was also being granted.

7    Attending were the Debtors, the Debtors' attorney

8  Barry Friedman, the mover's attorney Chris Kern, and then the

9  Chapter 13 Trustee, Mr. McAleer.

10    My point there being that again; here the parties and

11  the Court have agreed on the 11th what's going to happen in the

12  case before the affidavit is even filed.  There's not any

13  attempt to defraud the Court.  There's no -- the Court would

14  not have reached a different resolution if the affidavit had

15  not been pre-signed.

16    All right, let me ask the Court to look at Exhibit

17  34, Defendant's Exhibit 34.

18    THE COURT:  All right.

19    MR. CALLAWAY:  Entry Number ten on Exhibit 34 is the

20  Motion for Relief from Stay.  In this case the loan documents

21  were filed as an attachment with the motion.  The hearing is

22  scheduled for December 18th.

23    If you'll look at the entry that's dated December

24  23rd, it shows a minute entry hearing on 12/18/02, Motion for

25  Relief from Stay filed by Wells Fargo Home Mortgage, Inc.

1   granted.  Order, Kern.  Attending were Albritton, Kern and

2   Swan.

3       A motion was filed.  No affidavit has been filed at

4   this point.  And then, the affidavit is filed on the 23rd,

5   which is five days after the hearing, and then the Court enters

6   an order granting relief from stay on the 26th, which is

7   document number 16.

8       Again, my point is -- and I'm only just really

9   looking at --

10      THE COURT:  Sure.

11      MR. CALLAWAY:  -- that the pre-signed affidavit was,

12  even within the pre-signed which are arguably the most

13  consistent of the group, there's variation, because you see the

14  Court and the parties are not relying upon an affidavit in

15  terms of what they're deciding to do.  It doesn't -- it didn't

16  affect what the Court decided to do.

17      Let me -- all right, now let me ask you to look at

18  Plaintiff's Exhibit 116.  We're switching over to the

19  Plaintiff's now.

20      THE COURT:  Okay, just one second.

21      MR. CALLAWAY:  Let me borrow Number 116, please.

22   (Pause.)

23      THE COURT:  Okay.

24      MR. CALLAWAY:  This, and then if you'll look at the

25  Defendant's spreadsheet, which is Defendant's Exhibit 93, you

1  know, the spreadsheet.

2         THE COURT:  Right.

3         MR. CALLAWAY:  This is the only one of the pre-signed

4  affidavits that is notarized by Stephanie Gregory.  You can see

5  all of the rest are notarized by Diondra Richardson.

6         THE COURT:  And what number is this on your sheet,

7  just so I can find it --

8         MR. CALLAWAY:  Number 6.

9         THE COURT:  -- when I go back?

10        MR. CALLAWAY:  it's Number 6 on the --

11        THE COURT:  Number 6?

12        MR. CALLAWAY:  -- spreadsheet.

13        THE COURT:  Okay, all right.

14        MR. CALLAWAY:  It's Number 6 on that spreadsheet.

15 It's the only one that's signed by Stephanie Gregory.  And the

16 significance of that one is that she strongly denies she signed

17 any pre-signed affidavit.  She denies that she signed any

18 signature page all by itself and --

19        MR. OLEN:  She's the notary.

20        THE COURT:  She's the notary.

21        MR. OLEN:  She doesn't sign the affidavits.

22        MR. CALLAWAY:  Excuse me, she notarized.

23        THE COURT:  Okay.

24        MR. CALLAWAY:  She notarized.

25        THE COURT:  Okay.

1          MR. CALLAWAY:  She denied that she notarized any pre-

2     signed affidavit page, excuse me.

3          THE COURT:  Okay.

4          MR. CALLAWAY:  And she fought with Mr. Olen for

5     fifteen pages of deposition where he quizzed her up and down,

6     and she just said that, "I have never done that.  I've never

7     signed a signature page separately from that."

8          And frankly, at the time I thought maybe she was

9     wrong, but I realize now, seeing it on -- after this has been

10    organized on the spreadsheet, this is -- this is kind of an

11    outlier, and that she -- you know, I think her deposition

12    testimony is right, that this may have been one that was just

13    signed using the same form, but I don't -- this one doesn't

14    really belong in the pre-signed category, because the notary

15    public has said, "I did not do it.  I did not do it that

16    way."

17         Hilary Bonial when she -- at the Brice firm testified

18    and when they were coming up with this list of affidavits and

19    the other lists that have been admitted into evidence, as to

20    which affidavits were pre-signed; that they were -- that they

21    tried to be overly inclusive.  They didn't try to -- they

22    didn't necessarily go in and look in all of their notes and so

23    forth to determine whether it was pre-signed, but they tried to

24    be a little overly inclusive.

25         So, this is -- the significance of this one it shows,

1  one, that the Plaintiff alleges is pre-signed, but the only --

2  but the deposition testimony is that it is not.  The Plaintiff

3  alleges it, so even that baseline fact is in dispute.

4         All right, now let me -- I'm going to quickly go

5  through some of the Plaintiff's exhibits just to show some of

6  the individualized problems that come up in these various

7  cases, and that the Court would need to consider.

8         THE COURT:  Okay.

9         MR. CALLAWAY:  All right.  And you'll still need the

10  Plaintiff's -- excuse me, Defendant's Exhibit 93.

11         THE COURT:  Okay.

12         MR. CALLAWAY:  All right.  Let's look first at

13  Plaintiff's Exhibit 4.

14         THE COURT:  Okay, and just one second.  I've got to

15  get a different volume.

16      (Pause.)

17         MR. CALLAWAY:  All right, we need the Plaintiff's

18  exhibit book.

19         MR. OLEN:  You asked her to look at Defendant's

20  Exhibit 93, Exhibit 4, or both?

21         THE COURT:  I think both.

22         MR. OLEN:  Okay.

23         MR. CALLAWAY:  All right.

24         MR. OLEN:  Both.

25         THE COURT:  Wait one second.  That's why I'm having

1    trouble.  I was off.  Okay, all right.

2          MR. CALLAWAY:  I realize that it's a little bit

3    awkward.

4          THE COURT:  That's all right.

5          MR. CALLAWAY:  Okay.  What I'm going to be doing is

6    going back and forth between Defendant's Exhibit 93 and the

7    trial, the Plaintiff's trial exhibits, to some extent.

8          THE COURT:  Okay.

9          MR. CALLAWAY:  And you know, when I filed my exhibit

10   list I didn't know what exhibits the Plaintiff was going to be

11   using, and rather than have them accuse me of trying to cherry

12   pick exhibits, I'll just use their exhibits and their

13   affidavits that I presume that they contend are the worst of

14   the worst, since they have picked them out and made them --

15         THE COURT:  All right.

16         MR. CALLAWAY:  -- as exhibits.

17         THE COURT:  All right.

18         MR. CALLAWAY:  Plaintiff's Exhibit 4 is Number 13 on

19   Exhibit 93.

20         THE COURT:  All right.

21         MR. CALLAWAY:  And now, my point -- so, it's listed

22   -- the defect that's listed on Exhibit 93, Defendant's Exhibit

23   93, that according to the Plaintiff, the defect is it is

24   undated, that the affidavit is undated.

25         The notarization is undated; that's the only problem

1   that they picked out on it.  It does not refer, if you look at

2   the affidavit; it does not refer to any exhibits.  It does not

3   itself say, "Attached Exhibit A is a true and correct copy of

4   the note," or anything like that.  It doesn't refer to that.

5   The only defect is that the notarization is undated.

6          I submit that if you look at the statement above her

7   signature, that this probably would qualify as an unsworn

8   declaration under that federal law that allows you to do an

9   unsworn declaration, because it has the magic words, "I declare

10  under penalty of perjury, to the best of my knowledge that the

11  foregoing facts are true and correct."  So, it may qualify even

12  without the notarization.

13          MR. OLEN:  Are we on Number 4?

14          MR. CALLAWAY:  Plaintiff's Exhibit 4.

15          MR. OLEN:  You said it doesn't say the exhibits are

16  attached?

17          THE COURT:  I was going to say, when he finished,

18  that yeah --

19          MR. CALLAWAY:  Oh, I'm sorry.

20          THE COURT:  -- it does say that --

21          MR. CALLAWAY:  I'm sorry.

22          THE COURT:  -- in Paragraph 4.

23          MR. CALLAWAY:  I apologize.  That's my mistake.  I

24  apologize.

25          MR. OLEN:  Yes.

1          MR. CALLAWAY:  I apologize.

2          All right, let me ask you to look at Plaintiff's

3  Exhibit 5.

4          THE COURT:  All right.

5          MR. CALLAWAY:  That's Number 14 on the Defendant's

6  Exhibit 93.

7          THE COURT:  Okay.

8          MR. CALLAWAY:  The Plaintiff's comments are:

9  Undated, subsequent attachment note.

10          Our response is:  The affidavit -- this one according

11  to my notes does not refer to exhibits.

12          THE COURT:  I don't see that it does.

13          MR. CALLAWAY:  I was mistaken on -- well, actually

14  I'm not.

15          THE COURT:  Right.

16          MR. CALLAWAY:  I was jumping ahead.

17          THE COURT:  Okay.

18          MR. CALLAWAY:  This one does not refer to any

19  exhibits.  So, the fact that the affidavit -- that the note is

20  supposedly post-dated, it is not of any -- of any consequence.

21          Now, let me ask you to look behind the affidavit, to

22  look to the actual document.  Well, let's first look at the

23  affidavit.  The first page of the affidavit, which is itself

24  undated says:  "As of September 18, 2003, the total

25  indebtedness was $75,125.04," in Paragraph 4C.

1          So, the affidavit is apparently around September 18th

2  of 2003.

3          THE COURT:  Right.

4          MR. CALLAWAY:  If you look at the note which is

5  attached, it's not an exhibit because as we've pointed out

6  before, it doesn't say it's an exhibit.  It's got a fax

7  notation that says September 17, 2003, the day before.

8          Now, it does have a notation at the top right that

9  says, "NBS 9/30/03."

10          And Ms. Bonial explained that in deposition.  She

11  said that the "NBS," that's their company, National Bankruptcy

12  Service; that's the date that it was inputted into their

13  electronic system, that it was scanned in.

14          THE COURT:  Uh-huh.

15          MR. CALLAWAY:  And put into their electronic system,

16  so that's not the date that it was necessarily generated.

17          My point there being, that it doesn't really matter

18  what the date is in this case.  It's not significant that it's

19  supposedly post-dated, because the affidavit doesn't refer to

20  any specific exhibits.  Now, but even if it were, you would

21  have to look at and you would have to have testimony as to the

22  individual thing to determine whether in fact it was post-

23  dated.

24          And of course you'd also have to assume that the --

25  that this may or may not -- may or may not be correct, that

1  the fax legend is correct and that somebody has properly set

2  up the fax machine so that it has the correct date and time on

3  it.

4          All right, let me ask the Court to look at

5  Plaintiff's Exhibit 15.

6          THE COURT:  Okay.

7          MR. CALLAWAY:  That's Number 34 on the Plaintiff's

8  Exhibit 140 and Defendant's Exhibit 93.

9          THE COURT:  Okay.

10          MR. CALLAWAY:  You have the Plaintiff's comments,

11  "There are wrong date (2003) in Paragraph 4C on the signature

12  page."

13          And I think that's correct, that there is a wrong

14  date.  I would guess that there's a wrong date in this, because

15  I -- I guess we -- because of the fact it says as of -- well,

16  you can look and you can see the affidavit is dated November

17  11, 2004.

18          And then, in Paragraph 4C the second and third -- the

19  second paragraph; the second sentence of 4C is saying that the

20  Debtor is in default on payments due in September, October, and

21  November 2004.

22          So, I think it's fair to say that the August 11, 2003

23  is probably a mistake.  It's just a typo where somebody didn't

24  change it from the last affidavit.  And you're going to run

25  into some of those.

1          Of course, it's apparent on its face that if somebody

2     had a question about it, that if the Debtor's attorney or the

3     Debtor or the Court have a question about it, that it could

4     have been raised and corrected at that time.

5          Let me ask the Court to look at Plaintiff's Exhibit

6     Number 36.

7          THE COURT:  One second.

8          MR. CALLAWAY:  It's Number 12 on Plaintiff's Exhibit

9     Number 40, on our spreadsheet.

10         THE COURT:  Hold on one second.  I'm still not there.

11    Okay.

12         MR. CALLAWAY:  It's Number 12 on our spreadsheet.

13         THE COURT:  Thank you.

14         MR. CALLAWAY:  The Plaintiff's alleged problem, it

15    says, "Subsequent attachment, mortgage and note by 23 days."

16         When you look at the affidavit, this is one of the

17    affidavits that doesn't refer to a specific exhibit.  It

18    doesn't say attached is Exhibit A or B, or true and correct

19    copies of the note and mortgage.

20         And as I pointed out earlier, the only evidence I

21    see on the mortgage at least of any date is 9/19 -- it says

22    "NBS 9/19/03."  And as I pointed out earlier, Ms. Bonial's

23    testimony was that NBS is the date that it was scanned into

24    their system at National Bankruptcy Services, which is

25    affiliated with the Brice firm.

1        So, I don't think that there's any kind of mistake on

2   this affidavit.  I don't think the Plaintiff's complaint is

3   valid.

4        Let me ask the Court to look at Number 39, which is

5   the last one in this volume.

6        THE COURT:  All right, let me see.

7        MR. CALLAWAY:  It's Number 239 on our spreadsheet.

8        THE COURT:  All right.

9        MR. CALLAWAY:  Regina Evans.  According to the

10  Plaintiff's comments, the alleged defect is that the affiant

11  date is in a different -- different handwriting.

12       If you'll look at the second page of the affidavit

13  where it says, "Signed this fifth day of October," and it was

14  signed by Teresa Diaz-Cochran.

15       Does the Court see that?

16       THE COURT:  Uh-uh.

17       MR. CALLAWAY:  To which our response is, you know,

18  number one, how can the Court without testimony make some kind

19  of factual finding as to whether the date was signed by the

20  notary without some kind of expert testimony or the person

21  herself testifying?

22       And number two, what's the significance?

23       Number one, first of all; the affiant doesn't have to

24  date.  And a lot of -- of course a lot of affidavit, the

25  affiant does not date them at all.  You know, it just says --

1    it just stops and then had the signature.

2          So, and then there's no law, nobody has cited any

3    kind of law that says that the affiant has to date it

4    themselves.  There's no reason why somebody couldn't fill it in

5    for them, especially if they're trying to save them a little

6    bit of trouble.

7          So my points there being, number one, you have to

8    make a fact finding to determine whether there's some kind of

9    defect with this; and number two, the alleged defect is not

10   even a defect in any case.

11         I know this is not very exciting, but I'll try to

12   push through as quickly as possible.

13              THE COURT:  No, no.  That's what you --

14              MR. CALLAWAY:  All right.

15              THE COURT:  I understand this is --

16              MR. CALLAWAY:  We are now on to notebook number

17   two --

18              THE COURT:  Okay.

19              MR. CALLAWAY:  -- of the Plaintiff's exhibits.

20              THE COURT:  Okay.  You're just going to have to give

21   me a second to get all of this back and then over to the other

22   side.

23              MR. CALLAWAY:  Number --

24              THE COURT:  Wait, wait, wait.

25              MR. CALLAWAY:  Number 42.

1          THE COURT:  Hold on.  I'm still in the old book.

2    Okay, it's Volume two, you said, right?

3          MR. CALLAWAY:  Yes, ma'am.

4          THE COURT:  Okay.  Okay, Volume two and number?

5          MR. CALLAWAY:  Number 42.

6          THE COURT:  Uh-oh.  It's actually still in Volume

7    one.  I'll just do it this way if I can.

8        (Pause.)

9          THE COURT:  Okay.  And it's number -- what number is

10   it?

11         MR. CALLAWAY:  Number 42.  It's Number 332 on the

12   spreadsheet, which is Plaintiff's 140 and Defendant's 93.

13         THE COURT:  Okay.

14         MR. CALLAWAY:  The alleged defect in this case is

15   that the notary date is in a different handwriting, if you look

16   at Page 2 of the -- of the affidavit.

17         THE COURT:  All right.

18         MR. CALLAWAY:  My first point here, as is in the last

19   one; that would be a disputed issue of fact that the Court

20   would have to decide on an individualized basis and

21   individualized case.

22         And the second point is:  Who cares?  It doesn't

23   matter.  There's nothing that says that the affiant has to date

24   the thing themselves.

25         So, that's -- that just shows that there were

1  disputed facts as to whether it's defective and then also, it

2  shows -- the question is:  Is it any kind of fraud on the

3  Court?  Is there any significance to this alleged defect?

4          Of course our response would be:  "No."

5          THE COURT:  All right.

6          MR. CALLAWAY:  All right.  Let me ask the Court to

7  look at Number 43, which is the next one, and that's Number 466

8  on the spreadsheet.

9          THE COURT:  All right.

10         MR. CALLAWAY:  You've got Number 43?

11         THE COURT:  Yes.

12         MR. CALLAWAY:  All right.  This is a --

13         THE COURT:  Yes.

14         MR. CALLAWAY:  This is one of the Edith Pickett -- I

15  would call them the Edith Pickett affidavits.  And as Mr. Olen

16  said, there are common mistakes, you know.  The form that she

17  was using, and which it was typically filled out by hand by the

18  Wells Fargo people, used the term "bankruptcy specialist" on

19  the first page of the affidavit, as just kind of a general

20  term.

21         And then on the second page in the second paragraph

22  it uses the term "bankruptcy supervisor," which are

23  inconsistent.

24         THE COURT:  All right.

25         MR. CALLAWAY:  Our point there would be that that is

1    mentally incorrect or mildly incorrect, at least for this -- at

2    least for Ms. Cochran, who was not a bankruptcy supervisor at

3    the time.

4         But our point there is that's not really a

5    significant problem.  And if so, and if it was, it was apparent

6    on its face that if the Court has some problem or if the

7    parties have some problem:  Hey, what's going on here?  I can

8    be your bankruptcy specialist or your bankruptcy supervisor.

9         The affidavit also says that there is a statement

10   attached which is not attached.  I don't know why Ms. Pickett

11   kept using this form that said the statements are attached,

12   because they are hardly ever attached to any of these forms.

13   She just should have taken it off of the -- taken it off of the

14   affidavit form, but the statement is not attached.

15        The Plaintiff, of course, would argue that:  Oh, I --

16   now, this means -- all this means is that Ms. Cochran didn't

17   read the affidavit.  We have specific testimony from

18   Ms. Cochran on Page 238 of her deposition where she testified

19   that she did read this affidavit.  Now, you can quibble about

20   well, should she have picked it up?

21        Does the fact that there's a mistake being that he

22   didn't read it?  I would submit that's true.  That's certainly

23   not true.

24        After -- when I was doing my brief in opposition to

25   certification of this case, after reading it probably fifty

1   times, I discovered the next week, a bunch of typos.

2           THE COURT:  (Laughter.)

3           MR. CALLAWAY:  And you'll notice in the court file

4   that I filed an amended brief --

5           THE COURT:  You filed an amended one.

6           MR. CALLAWAY:  -- because I wanted to get rid of some

7   of the misspellings.

8           THE COURT:  I wondered.  I looked and I couldn't see

9   the --

10          MR. CALLAWAY:  It's essentially the same, but I found

11  some typos in it.

12          THE COURT:  Okay, well that's good, because I

13  couldn't pick up on the difference, so that's good to know, and

14  that I really didn't focus on --

15          MR. CALLAWAY:  Yes.

16          THE COURT:  I didn't see any added paragraphs, so.

17          MR. CALLAWAY:  No.  All right, let me ask the Court

18  to look at Exhibit 45, Plaintiff's Exhibit 45.

19          THE COURT:  Okay.

20          MR. CALLAWAY:  My point being that the fact that

21  you have a typo or a mistake, it doesn't mean that it wasn't

22  read.

23          THE COURT:  And Exhibit 45, it correlates with what

24  number on 93?

25          MR. CALLAWAY:  Number 471.

1          THE COURT:  All right.

2          MR. CALLAWAY:  This is another Edith Pickett form.

3    The Plaintiff contends the affiant and notary dates are

4    different, 20 days.  The affiant date is a different

5    handwriting, different job titles on Page 102, blank in

6    paragraph -- the second paragraph on Page 2 and the payment

7    history not correct.

8          So, let's look at those.  It's correct that we've

9    still got the bankruptcy specialist versus bankruptcy

10   supervisor problem.  On the second page, it is correct that

11   there was a blank where I have the number of years.  I've been

12   employed for a number of years.  It doesn't say state a wrong

13   number of years or a false number of years.  It doesn't state

14   anything at all.  You know, if there's obviously any problem

15   there, it would have been apparent to anybody who had any

16   questions or anybody who had looked at it.

17         The other thing is that the notarization and affiant

18   dates are supposedly different if you look at the third page

19   of the affidavit.  The affiant date is clearly March 1 of

20   2002, and I would submit that the notarization date is not

21   absolutely clear as to whether that's 21 or whether that's just

22   a two.  It could be a -- it could be a 21, but it could be a

23   two as well.

24         The figures are given in the affidavit; are as of

25   March 1, 2002, you know, which would jive with the date shown

1    on the affiant's signature.

2         But as I pointed out before, it's certainly

3    explainable or it's certainly not illegal that a document could

4    be notarized after it is signed, because there's no requirement

5    that you have to sign before the notary public.  In other words

6    you could just sign one day and then you could have

7    acknowledged some other day.

8         So, I don't know whether this is just -- I can't

9    frankly tell you whether that's what happened or whether this

10   is a two or whether it was a 21; but that's not something that

11   the Court can decide as a matter of law or decide without

12   looking at the particular affidavit as to whether this

13   constituted a fraud on the Court, or a fraudulent affidavit or

14   improper affidavit.

15        And certainly as we've noted before, all of these

16   problems were apparent on their face, if anybody had any

17   question about them.

18        Let me ask the Court to look at Number 48; and I'm

19   more than halfway through; I'll be glad to tell you.

20             THE COURT:  That's all right.  And it's Number --

21             MR. CALLAWAY:  And that's Number 518 on the chart.

22             THE COURT:  All right.

23             MR. CALLAWAY:  And this is a typical Edith Pickett

24   form for an affidavit.  It does have the specialist versus

25   supervisor problem.  The Plaintiff contends, among other

1   things, that it's false because the affiant's name is

2   misspelled two times, on Page 1 and on the signature page.  Her

3   name is given as Teresa Cochran rather than as Teresa Diaz-

4   Cochran.  She signs it that way.

5           You know, I would submit that the Court would have to

6   make a factual determination as to whether somebody didn't have

7   the discretion to use their non hyphenated name or whether they

8   had to use -- had to always use their hyphenated name, and

9   whether that made it a false affidavit.  But that would require

10  an inquiry on an individualized basis.

11          There are some other mistakes on there.  There's no

12  -- as with many of the others, there no payment history

13  attached.  And it says that there's a BPO attached, but there

14  is no BPO attached.

15          All right, let me ask the Court to look at Number 57,

16  please.

17      (Pause.)

18          THE COURT:  Okay.

19          MR. CALLAWAY:  And it's Number 44 on the chart.

20          THE COURT:  All right.

21          MR. CALLAWAY:  The alleged defect there, according to

22  the Plaintiff's comments for Number 44 on Exhibit 140, is that

23  the notary date is in a different handwriting from the

24  notarization, apparently.

25          To which our response is:  There's no requirement

1   that the notary has to handwrite the date themselves.  First of

2   all, you'd have to have a factual finding as to whether that

3   was their signature, or not.  You would have to have

4   individualized test money or factual findings, whether that was

5   her signature.  But the main point being, it doesn't matter.

6   You could -- it could have been typed in, as long as it was

7   correct and the person could have notarized it.

8            THE COURT:  All right.

9            MR. CALLAWAY:  So, that's not a -- we will pretend

10  that's not a defective affidavit.

11           THE COURT:  All right.

12           MR. CALLAWAY:  Number 69 is the next one, Plaintiff's

13  Exhibit 69.

14           THE COURT:  Now, I need to go to the next volume.

15  One second.

16      (Pause.)

17           MR. CALLAWAY:  I've only got about six more to go,

18  Your Honor.

19           THE COURT:  Okay.  One second, please.  Okay.

20           MR. CALLAWAY:  Number 69 is Number 453 on the

21  spreadsheet.  According to the Plaintiff's the affiant date is

22  -- the defects are the affiant date is blank, different job

23  titles on Page 1 and 2, three blanks on the signature page and

24  payment history not attached.

25           All right, this is an Edith Pickett form.  It does

1   have the specialist versus supervisor issue, as some of the

2   other ones.

3        Our responses are if you look at Page 3 of the

4   affidavit; there's no legal requirement that the affiant has to

5   date their affidavit.  I mean, it could have been completely

6   left off, didn't have to say dated this blank day of blank,

7   2001.  There's not any requirement that that be there, so the

8   fact that it's not filled in is not significant.

9        And then, the fact that it has blanks where they

10  usually will put an appraisal or BPO or something like that, it

11  indicates that they're not doing that, and it maybe would have

12  been better practice to cross it out.  But the fact that the

13  blanks are there indicate that it's not attached, that no

14  valuation is being given, the affidavit is not giving any kind

15  of valuation.  So, I don't think you can use that to say that

16  the affidavit is fraudulent, intended to deceive the Court,

17  fraud on the Court, et cetera.

18            THE COURT:  All right.

19            MR. CALLAWAY:  All right.  Now, we'll add a little

20  bit of excitement, to vary it up a little bit, and go to the

21  next book and look at Plaintiff's Exhibits 84, which are 84A

22  and B.

23            THE COURT:  Okay.  That's actually in this book,

24  right?

25            MR. CALLAWAY:  It's the next book.

1          UNIDENTIFIED SPEAKER:  (inaudible).

2          MR. OLEN:  She's using our set.

3          MR. CALLAWAY:  Oh okay, I'm sorry.

4          THE COURT:  Yes so -- oh, you mean --

5          MR. CALLAWAY:  I'm sorry, I've got my own books,

6  since I forget.

7          THE COURT:  Oh, okay.  That's all right.  And it's

8  fine if -- I'm just glad it isn't the next book, then I don't

9  have to delay you.

10          So all right, 84; and am I looking at both A and B?

11          MR. CALLAWAY:  We're going to look at them both.

12          THE COURT:  Okay.

13          MR. CALLAWAY:  Because Mr. Olen contended that when

14  it came to these fifteen Erin -- I'll call them the Erin Brown

15  affidavits, and where there has been a little updating going

16  on, on Page 1; that either the Wells Fargo people didn't look

17  at it, or they lied about it.

18          Well, that's not correct, as you can tell from this

19  84A and B.

20          Let's look at 84B first, and 84B -- and maybe we need

21  to stipulate to this in the record.  84B came from McCalla

22  Raymer.

23          THE COURT:  One second.  I'm not --

24          MR. CALLAWAY:  You can see the MR000865.

25          THE COURT:  I'm just getting -- hold on, wait one

1  second.  I've got A, and now I've got to find where B starts.

2         Well, I don't know that I have a -- oh wait, there it

3  is.  All right, I've got it.

4         MR. CALLAWAY:  All right.

5         THE COURT:  Tell me, because I missed what you've

6  started to say.

7         MR. CALLAWAY:  84B is the affidavit of Rhonda Jordan

8  as sent from McCalla Raymer to Erin Brown.

9         Now, will you all stipulate, Steve that that's what

10 that is?  You're the ones using the exhibit.

11        MR. OLEN:  There's no doubt that the document was

12 produced.  I can't remember whether Wells Fargo produced it

13 from McCalla Raymer's file or whether McCalla Raymer produced

14 it to us directly.

15        MR. CALLAWAY:  This has an "MR" on there and we never

16 used "MR".

17        MR. OLEN:  Okay.  I'm not going to argue with that.

18        THE COURT:  Okay.

19        MR. OLEN:  I'm not going to stipulate to the rest of

20 that, because I don't know the answer to that.

21        THE COURT:  So, you're saying though that if it says

22 "MR" it came from McCalla Raymer?

23        MR. CALLAWAY:  Yes, ma'am.

24        MR. OLEN:  It's a McCalla Raymer document.

25        THE COURT:  Okay, okay.

1        MR. OLEN:  I have no problem with that part of it,

2   Your Honor.

3        THE COURT:  All right.

4        MR. OLEN:  I just can't remember who gave it to me.

5        THE COURT:  Okay.

6        MR. OLEN:  Whether McCalla Raymer directly or via

7   Wells Fargo.

8        THE COURT:  I see, all right.

9        MR. CALLAWAY:  All right.  You'll notice this -- it

10  has some fax notations down at the bottom.  You can see the

11  bottom right has Page 2.

12        THE COURT:  Right.

13        MR. CALLAWAY:  And then the next page after that has

14  Page 3.

15        THE COURT:  Right, and a date.

16        MR. CALLAWAY:  And you see the certificate of service

17  is not filled in, and there are only three people shown on the

18  certificate of service.

19        And this affidavit is dated August 25, 2004; and if

20  you look at Page 1 of 84B.

21        THE COURT:  All right.

22        MR. CALLAWAY:  Paragraph 3; the second sentence says,

23  "Debtor has not paid certain contractual installments and other

24  charges totaling to-wit July 2004 to August 2004 monthly

25  installments, and so forth.

1          In other words, it goes through August of 2004.

2          THE COURT:  Right.

3          MR. CALLAWAY:  Which are consistent with the

4   affidavit date of August 25, 2004.

5          THE COURT:  Right.

6          MR. CALLAWAY:  If you go to what was filed for the

7   Court, which is Exhibit 84A.

8          THE COURT:  All right.

9          MR. CALLAWAY:  It's different.  Page 1 of the

10  affidavit as filed now goes -- Paragraph 3 now goes through

11  September of 2004, rather than just August, which is

12  inconsistent with the affidavit date of August 25th; it's

13  inconsistent with it coming from McCalla Raymer, going through

14  August.

15         And you'll notice also on Page 2 of the affidavit,

16  you'll notice -- let me back up.  You'll notice there's no

17  longer any fax notation on the page, on Page 1 as filed.

18         THE COURT:  Right.

19         MR. CALLAWAY:  If you look at Page 2 as filed, you'll

20  see it still had the fax notation on it.

21         THE COURT:  Uh-huh.

22         MR. CALLAWAY:  So, Page 1 is -- is different.

23         THE COURT:  Yes.

24         MR. CALLAWAY:  And Ms. Brown denied changing it, but

25  I don't see any other explanation.  The issue is then:  McCalla

1   Raymer didn't know about this.  John Schlotter was quizzed

2   about it extensively and he had no explanation because he did

3   not know what had happened; in fact, he did not know that it

4   had happened.

5          And certainly, it didn't get as far upstream as Wells

6   Fargo, and Ms. Brown testified that she never had

7   communications with Wells Fargo.  She dealt always with the

8   McCalla firm.

9          But those are some outliers.  I mean those fifteen --

10  and I don't think you can even treat them as the same, because

11  it's clearly something different going on there.  It's not

12  related to internal Wells Fargo procedures.

13         Hold on a second, Your Honor.

14         Your Honor, if you would look at Exhibit 89,

15  Plaintiff's Exhibit 89.

16         THE COURT:  Okay.

17         MR. CALLAWAY:  Now, I'm going to skip that one.

18  Let's go to Number 96, Your Honor, in the Plaintiff's.

19         THE COURT:  Right.

20         MR. CALLAWAY:  This is Number 296 on the spreadsheet.

21         MR. OLEN:  I'm sorry, what was the number again?  I

22  apologize.

23         MR. CALLAWAY:  The exhibit number is --

24         MR. OLEN:  That's all I need.

25         MR. CALLAWAY:  -- Exhibit Number 96, and the

1   spreadsheet number is 296.

2          MR. OLEN:  Got it.  Thank you.

3          MR. CALLAWAY:  The Debtor is Keith Bass.  And the

4   alleged defect there, according to the spreadsheet, according

5   to the Plaintiffs, is that the first page of affidavit is

6   missing.

7          And in fact, if you flip through, you'll see that

8   that's correct.

9          THE COURT:  Right.

10         MR. CALLAWAY:  There's only Page 2 of the affidavit

11  of John Schlotter.

12         Ms. Brown testified that she sometimes had a problem

13  scanning things, her scanner would not operate correctly, and

14  sometimes she got a phone call from the Court, from the court

15  deputy saying you need to re-submit the affidavit.

16         Let's look and see what happened.

17         THE COURT:  All right.

18         MR. CALLAWAY:  Just, I need you to look -- and I'll

19  need to go back to the Defendant's exhibits -- Defendant's

20  Exhibit 91.

21         THE COURT:  Let me get to the right book here and

22  I'll see.

23      (Pause.)

24         MR. CALLAWAY:  I'm drowning in exhibits.

25         THE COURT:  I'm sorry.  Just one second.  Okay, I see

1  that.

2        MR. CALLAWAY:  All right.  That's the docket sheet

3  for this, for the Bass.  Defendant's Exhibit 91 is the docket

4  sheet for the Bass case.

5        THE COURT:  Okay.

6        MR. CALLAWAY:  And Event Number 18 is the Motion for

7  Relief from Stay.  It's an affidavit, and that's the defective

8  affidavit with the page missing.

9        THE COURT:  Okay.

10        MR. CALLAWAY:  And then, if you'll look at the entry

11  for March 22, 2007, there's no event number, but look at the

12  minute entry by Ms. Brooks.

13        It says, "Minute entry 3/21/07.  Motion for Relief

14  from Stay filed by Wells Fargo Bank, NA; motion conditionally

15  denied; Brown to submit order and affidavit."  In other words,

16  Ms. Brooks or somebody picked up that the affidavit was

17  defective, so she had to submit the affidavit.

18        And then if the Court would look down to Event Number

19  25, dated March 28th, 2005, Ms. Brown actually does file the

20  correct affidavit and that is Defendant's Exhibit 92, which is

21  right behind Number 91.  So --

22        MR. OLEN:  The affidavit is at 91, the correct

23  affidavit, right.  You said 92, but it was Exhibit 91.

24        MR. CALLAWAY:  I think the --

25        THE COURT:  Actually, yes.  He said 92.

1          MR. CALLAWAY:  I think the correct affidavit if 91,

2     according to my blowup, let me see.

3          THE COURT:  No, wait.  Don't confuse me.  So, the

4     correct affidavit -- oh, the docket sheet is 91.

5          MR. CALLAWAY:  Okay.

6          THE COURT:  The affidavit is 92.  That's the deal.

7          MR. CALLAWAY:  In terms of the Defendant's exhibits.

8          MR. OLEN:  In our book, maybe we messed it up; we

9     have the docket sheet as 92 and the corrected affidavit as

10    91.

11         THE COURT:  I've got them reversed.

12         MR. OLEN:  All right.

13         THE COURT:  Okay.

14         MR. OLEN:  I'm sorry.

15         THE COURT:  That's all right.

16         MR. CALLAWAY:  I think that when I sent them to you

17    yesterday, I didn't number them.  I don't know if I numbered

18    them, so maybe you can.

19         MR. OLEN:  Okay.

20         MR. CALLAWAY:  My point there being --

21         MR. OLEN:  We've got numbers on them, actually.

22         MR. CALLAWAY:  Okay.

23         MR. OLEN:  I'm sorry, I apologize.

24         MR. CALLAWAY:  All right.  Obviously, the system

25    worked in that case.  Somebody filed -- accidentally filed an

1    affidavit that was missing a page.  The Court caught it.  The

2    court personnel caught it and said, "Your affidavit is

3    defective, you need to re-submit it."

4            It was not a fraudulent affidavit intended to deceive

5    the Court, it was a mistake that somebody made and it got

6    corrected.  The problem of it -- the problem that had like many

7    of these things was apparent on the face, and it could have

8    been corrected if somebody had raised an issue about it at the

9    time.

10           Let me ask the Court to look at Plaintiff's Exhibit

11   116.

12           THE COURT:  Okay, one second.  I'm going to have to

13   switch books again.

14           THE CLERK:  I've got it here.

15           THE COURT:  Yes, I will.  I'll try not to hit this.

16   Okay.

17           MR. OLEN:  Okay, what number again?

18           MR. CALLAWAY:  Plaintiff's Exhibit 116.

19           MR. OLEN:  Thank you.

20           MR. CALLAWAY:  And it's Number 6 on the spreadsheet.

21           MR. OLEN:  Thank you.

22           MR. CALLAWAY:  This is one that we've already

23   discussed a little bit.  This was the pre-signed affidavit that

24   was disputed.  It's allegedly the pre-signed affidavit that was

25   disputed as to whether it was pre-signed or not.

1          It was identified by the Brice firm as being

2    potentially pre-signed, but Stephanie Gregory -- this is the

3    only one that Stephanie Gregory signed of the, quote, pre-

4    signed affidavits and she denied for fifteen pages of her

5    deposition that she had signed a signature page by itself.

6          So in other words, it's in dispute as to whether this

7    one was pre-signed or whether this one was fraudulent or

8    defective in any kind of way.

9          Two more, Your Honor, Number 118, Plaintiff's Exhibit

10   118.

11              THE COURT:  Okay.

12              MR. CALLAWAY:  It's Number 201 on the spreadsheet.

13              THE COURT:  All right.

14              MR. CALLAWAY:  This is one where the affidavit itself

15   does not have any exhibits.  You know the forms, these

16   affidavits change by firm and change over time.

17              THE COURT:  Okay.

18              MR. CALLAWAY:  So, and Mr. Olen was correct that

19   sometimes you have affidavits which refer to Motions for Relief

20   from Stay on file; but then the problem is you have to go and

21   look:  Was there a Motion for Relief from Stay with the

22   affidavits at the time, or the notes.  You have to go look at

23   each individual one, see when they were filed, but you have to

24   look at the individual cases.

25          And then last but not least, let me ask you to look

1    at Number 119, which is Number 20 on the spreadsheet.

2              THE COURT:  All right.

3              MR. CALLAWAY:  The alleged defect there is that the

4    notary date is in a different handwriting.  I'm not sure what

5    they mean, whether they mean the handwriting is different from

6    the notary.  Certainly, I would not be able to tell whether

7    that's different -- a different handwriting.  I think you'd

8    have to have some kind of handwriting expert to say whether it

9    was the same, or you'd have to have the person testify on each

10   individual one.

11             And my main point being there's no requirement that

12   the notary has to handwrite the date anyway.  That's not an

13   alleged defect with the affidavits.

14             THE COURT:  All right.

15             MR. CALLAWAY:  Just a brief, brief closing point, a

16   couple of brief closing points.

17             THE COURT:  Wait one second.  I'm going to move these

18   so I have more room.

19        (Pause.)

20             THE COURT:  Okay, now go ahead.

21             MR. CALLAWAY:  Just a couple of brief closing points.

22   One is that none of the evidence discussed by Mr. Olen or me

23   shows any particular pattern or practice, any practice or any

24   instruction that are by Wells Fargo with regard to doing these

25   affidavits.  As I said, for better or worse, they let the

1    outside lawyers handle it.  It may have been to their detriment

2    in this case.

3         We'll talk later about the legal requirements, but

4    there weren't any kind of specific guidelines.  There were not

5    any specific procedures.  As you can see it was done in a

6    variety of different ways, depending upon the law firm, and the

7    pattern changed over time.

8         We'll discuss later the Plaintiff's allegation that

9    there was some broad overall culture of willful neglect or

10   willful flouting of the law, but that does not constitute a

11   sufficient practice according to the mandates of the U.S.

12   Supreme Court.

13        And the other final point that I want to make is just

14   to address something that Mr. Olen kept saying over and over in

15   his evidentiary presentation.  He kept saying that Wells Fargo

16   says that the Court has no kind of remedy, or the Court can't

17   do anything, we're above the law, you know, but the problem is

18   so pervasive, so terrible that the Court can't handle it and

19   the Court can't do anything about it.

20        And we've said over and over again in this case, that

21   that's not the issue here today.  We've said this is -- the way

22   to handle this case property is as a sanctions matter in an

23   individual case.  It's not a class action.  But that's not --

24   and we're not saying that Wells Fargo is above the law, that

25   Wells Fargo -- we're not saying that Wells Fargo has done

1    everything perfectly right, and I don't think that we're here

2    to say that.  Nobody would say that things could not have done

3    better.

4         But the issue before the Court today is:  Is this

5    appropriate for class certification?  Has the Plaintiff met the

6    burden of proving the commonality and so forth that will be

7    discussed later, so that it should be certified?

8         This is -- and we submit it's not.  This is not the

9    right way to go.  The Plaintiff is trying to lead you down the

10   path to an incorrect result.

11        Thank you, Your Honor.

12        THE COURT:  All right.  All right, and with that and

13   the documents that have been received; do you rest your case,

14   Mr. Callaway?

15        MR. CALLAWAY:  Yes, Your Honor.

16        THE COURT:  All right.

17        Any rebuttal evidence, first of all?

18        MR. OLEN:  One comment.

19        THE COURT:  All right.

20        MR. OLEN:  We made clear but it bears repeating that

21   Plaintiff's Exhibit 140 is certainly not the be all, end all,

22   and I said repeatedly that the Plaintiffs are not saying that

23   every problem listed, every issue listed on Plaintiff's Exhibit

24   40 means that problem by itself necessarily shows that there is

25   a fraud on the Court committed with that affidavit.  We said

1   that again and again and again.

2          And in the discovery response, they asked us what we

3   contended was wrong with each affidavit, and we felt compelled

4   to respond to the request, but we've said it again and again

5   here, we even say it on the exhibit description that it doesn't

6   include whatever we learned in depositions.

7          And so -- and I know that I said several times that

8   you've got just that as objective evidence to show what the

9   widespread practice is -- practice was.  The only -- I've got

10  three real short comments about their recitation of the

11  affidavits:

12          One; Erin Brown, who just got chunked under the bus

13  here, was a McCalla Raymer lawyer at the time of her

14  deposition.  She worked for McCalla Raymer, so.

15          And we are excited that Mr. Callaway has found the

16  first page to Schlotter's affidavit at Exhibit 92, because now

17  I can add one more to where he falsely testified to the Court

18  on all of the things I've already recited.

19          And the last thing is, at least if you want to knit

20  pick at our chart; don't go to one where there are other

21  defects that we've talked about at length and ignore them and

22  say:  Well, Ms. Pickett; she ought not have said time after

23  time after time, that there was an attachment.

24          Well, that's not the point.  It's not what

25  Ms. Pickett did there.  The point is, and I know Wells Fargo

1  understands it.  It's that their affiants, time after time

2  after time after time, 177 out of 180 times; it's not that many

3  -- they don't do it on every one -- says there's something

4  attached that's not.

5          And you know, the concept that you take our chart

6  where we say:  Here's everything we can objectively tell you is

7  not right about the affidavit; and then throw it up there as

8  the ideal straw man and knock it down by saying:  Well you

9  know, they say the signature is different.

10         We're just pointing out the things we found, and

11  we're not saying that each item listed on that chart, in and of

12  itself, constitutes fraud on the Court, and we obviously

13  haven't made that clear yet to Wells Fargo.  And we've made

14  clear that it's the overall evidence that includes the

15  testimony and all of these exhibits, collectively.

16         Thank you.

17         THE COURT:  All right.  Well, you've finished within

18  the hour and a half you said you would, and then Mr. Olen did

19  the rebuttal in that period too.  So, I guess as I told you,

20  we're going to be done by five.  We're going to take at least

21  one ten minute break; so what does that leave us?  We've got

22  about two hours and fifteen minutes, something like that.

23         So, my proposal would be, I would assume, and I can't

24  think of any better way, is I give each side basically half of

25  that time.

1        MR. CALLAWAY:  Your Honor, you know we've got two

2 other parties here, interested parties, and so I want to give

3 them some time, but I would be glad to -- they can have some of

4 my time, I guess.

5        THE COURT:  Okay.

6        MR. CALLAWAY:  We can get it that way.

7        THE COURT:  So, I would say -- I guess we've got a

8 little more than two hours and fifteen minutes, but we've got

9 about two-twenty, so I'd give the Plaintiff an hour and ten

10 minutes and you've got like an hour and ten minutes.

11        MR. CALLAWAY:  That's fine.

12        THE COURT:  Okay, does that work?

13        MR. CALLAWAY:  Yes.

14        THE COURT:  All right.

15        MR. CALLAWAY:  I don't think the legal argument can

16 possibly be as long as the factual.

17        THE COURT:  And that means you've got to save time

18 for rebuttal, too.

19        MR. CALLAWAY:  Yes, ma'am.

20        THE COURT:  Okay, all right.  So, I'll just sort of

21 keep track here.

22        MR. CALLAWAY:  And I'll try to keep track, as well,

23 Your Honor.

24        THE COURT:  Okay.  Okay, I've got my notes too, and

25 at some point I'm going to be asking questions of both sides.

1    Okay.

2           MR. NICHOLAS:  And you know, Your Honor, I'm happy if

3    you want to ask questions because then I know I'm answering

4    something that you care about.

5           THE COURT:  Well, I know that, and -- but I'll at

6    least let you start.  I just have -- I have questions that both

7    of you kind of alluded to in the various things that you've

8    talked about already.

9           So, go ahead and start.

10          MR. NICHOLAS:  Let me make about four or five

11   comments, some factual, but tying in legal about what

12   Mr. Callaway said.  I agree we're not here on the merits; but

13   what that means is, also, we're not here saying there are no

14   factual disputes.

15          Just because somebody on their side says, "I always

16   read the affidavit," it doesn't make it so.  I think we've made

17   that point with the recitation of Mr. Olen, talking about terms

18   of time.  I mean there are still credibility issues the Court

19   has to make.  There are still factual findings that may be

20   disputed that the Court has to make, but that doesn't mean you

21   can't certify the class.

22          The question is:  Are there common issues that

23   Your Honor can determine for everyone, and do those common

24   issues predominate over individualized issues?

25          THE COURT:  And tell me, and so tell me what the --

1  this is one of the big points to me, obviously.  What are the

2  common issues and how are you -- I think I have it.  In fact, I

3  have marked various things in the pleading.  Are you sticking

4  with the definition of the class that you gave in your last

5  brief?  All individuals who have filed a Chapter 13 or Chapter

6  7 in the Southern District of Alabama, which the Defendant

7  filed or caused to be filed an improper false affidavit or

8  declaration, and it goes on, in support of a motion, et cetera,

9  from '96 through December 31st, 2000?

10       MR. NICHOLAS:  I'm sticking with the definition, to

11  answer your last question first.

12       THE COURT:  Okay.

13       MR. NICHOLAS:  But I will acknowledge, Judge, and

14  will get -- as I get into it, there are different ways you can

15  come at it.

16       THE COURT:  Okay.

17       MR. NICHOLAS:  I mean if you wanted to say, for

18  instance, you know, there are -- what are there, 150 John

19  Schlotter affidavits?

20       And Mr. Callaway says, "Well, it's an issue of fact

21  of whether he had authority or not."

22       It is, maybe.  It's a common issue of fact.  You only

23  have to decide it once.  But I would submit that that's not the

24  only question.  The question really is did he lie?  Did he

25  intentionally misrepresent his status to the Court?

1          Again, that's a common issue, and then you decide

2   that for 150 potential class members, all in one fell stroke,

3   which is what they say <u>Wal-Mart v. Dukes</u> requires.

4          THE COURT:  Right.

5          MR. NICHOLAS:  There are other common issues like

6   that, and I'm going to get to them if you'll let me defer --

7          THE COURT:  Okay, don't worry, keep going.

8          MR. NICHOLAS:  -- until I talk about <u>Dukes</u>.

9          THE COURT:  Okay.

10         MR. NICHOLAS:  But there are.  But my point is,

11  simply because, and again I'm going to jump off of what

12  Mr. Olen said.  You know, we're not saying because the date is

13  in a different color ink, that that makes the affidavit a

14  fraudulent fraud on the Court.  I'm not saying that.

15         THE COURT:  Okay.

16         MR. NICHOLAS:  But even if Your Honor has to look at

17  an affidavit to decide whether they are in the class or not,

18  that's not they type of individualized inquiry that overwhelms

19  the class action.  No class action.

20         Does it have some individualized inquiry as to

21  whether the person potentially is in the class or not;

22  oftentimes there is no dispute about that, but sometimes there

23  is.  And if there is, Your Honor can do it.

24         The other thing that Mr. Callaway said about this

25  that I thought was wrong is he wants to imply that the only

1  thing we try is Kelly Brannan's case.  That's not true.  No

2  class action is like that.

3          THE COURT:  Right.

4          MR. NICHOLAS:  The question is:  Is her case typical?

5  And we cite to Appleyard v. Wallace, which is one of the

6  leading adversary cases on that point that says, you know, is

7  it -- does it arrive out of the same nucleus of legal issues?

8          The other one that I would cite to, Your Honor, that

9  I didn't cite in the brief, it's Andrews v. AT&T, which is

10 another Eleventh Circuit case, 1986.  It's 95 F3d, 1014, a 1996

11 Eleventh Circuit case involving 1-(900) numbers.

12         And the court said the plaintiff didn't have to call

13 this 1-(900) number.  The fact pattern can be different, but as

14 long as the theory is the same, it's still typical and you can

15 certify a class.

16         So, the concept that we just try Kelly Brannan's case

17 in a class action is wrong.

18         THE COURT:  Right.

19         MR. NICHOLAS:  We're not -- we're not so restricted.

20         THE COURT:  Right.

21         MR. NICHOLAS:  You know, the same thing about common

22 issues about, you know, Erin Brown.  If in fact Your Honor has

23 to have a factual determination of whether Erin Brown changed

24 the affidavit or whether Wells Fargo changed the first page,

25 having already signed it or somebody else; I'm not sure

1   matters, because Erin Brown of course was the attorney for

2   Wells Fargo.  And if the attorney is changing affidavits after

3   they are signed, I still submit that's fraud on the Court, that

4   they are liable for.

5          But even if you had to do that, again, that's not the

6   kind of individualized inquiry that would overwhelm common

7   ones.  Or the fact again, I don't think it matters whether

8   Your Honor told somebody to file an affidavit to support your

9   order and they file it later, and it's fraudulent, whether that

10  matters and requires an individualized inquiry to suggest that

11  it's okay to lie to the Court if it comes later.  You know, I

12  don't think that's the kind of individualized inquiry that

13  matters.

14          THE COURT:  Well --

15          MR. NICHOLAS:  So --

16          THE COURT:  And I'm beyond that question, at least,

17  because I think -- I do rely on those, which is why they have

18  to be in before the order is signed.

19          MR. NICHOLAS:  Well, right.

20          THE COURT:  Because I want proof, and I think this is

21  -- this was the whole point of our local rule.  We want proof

22  that there is ownership of the note.  You know, it's the

23  financial facts, and that they are in fact the proper party.

24          MR. NICHOLAS:  And on that vein, let me just take a

25  second.  I know we've briefed this, we briefed it in the Tate

1  case.  I don't know that we've had occasion to brief it here

2  and I know Your Honor sort of treats them the same.

3  But they raise in their brief that oh, we're going to

4  have these individualized inquiries on res judicata and waiver,

5  and whether it matters, whether anybody relied, and all of

6  that.

7  THE COURT:  Right.

8  MR. NICHOLAS:  And what that does is they are saying

9  that we have claimed something that we haven't claimed.

10  Because we have claimed that the practice that we talked about

11  here today constitutes fraud on the Court at that level that

12  the Court talked about in Hazel-Atlas and the cases that come

13  out of Hazel-Atlas.

14  THE COURT:  Right.

15  MR. NICHOLAS:  You know, and we cited them in brief,

16  United States v. Beggerly, the Pumphrey case out of the Ninth

17  Circuit, and the Navarro v. Brown case out of the Fifth

18  Circuit.

19  Sometimes when you look at the cases and this

20  sometimes happens; the term fraud on the Court gets thrown

21  around a little bit.  And sometimes it's even thrown around in

22  the context of a 60(b)(3) motion, which is where somebody lies

23  on the stand, and they come in and they say:  We want to get a

24  new trial, or we want to have the judgment vacated because they

25  lied on the stand.

1        That's not what we're talking about.

2        THE COURT:  Well, and that's one of the things that I

3  want to explore.  Is it really fraud on the Court?  And that's

4  what you're going to tell me, I think, is it isn't.

5        If you go back to the rule, it says it's about abuse

6  of process or to enforce local rules, which seems to me -- I

7  mean that's what 105 says.

8        MR. NICHOLAS:  Yes, ma'am.

9        THE COURT:  Is that, that I have the authority to

10  enforce local rules, I'm paraphrasing, but -- or for abuse of

11  process.

12        MR. NICHOLAS:  Well, and we go beyond that, because I

13  think you have inherent authority, as well.

14        THE COURT:  Right, I do have that.

15        MR. NICHOLAS:  Yes.

16        THE COURT:  I agree with that.

17        MR. NICHOLAS:  And so, what we concentrate more on is

18  not because, well, I don't have any fraud on the, quote, 105

19  cases, per se.

20        THE COURT:  No, there aren't any that I can --

21        MR. NICHOLAS:  But there aren't any.  But what we do

22  have is a lot of courts that have said, and let me cite you to

23  another one just because I think it's useful language.

24        The Ninth Circuit, just a couple of weeks ago, in a

25  case called United States v. Stonehill, and I apologize,

1  Mr. Callaway doesn't know about this case, I just found it last

2  night.  All I have is a Westlaw cite.

3           THE COURT:  Okay.

4           MR. NICHOLAS:  It's 2011 --

5           THE COURT:  What's the name of the case again?

6           MR. NICHOLAS:  It's United States v. Stonehill.

7           THE COURT:  Okay.

8           MR. NICHOLAS:  It's 2011 Westlaw 4470644.

9           THE COURT:  4470644?

10          MR. NICHOLAS:  Yes, and I'm looking at Page 27 of the

11 Westlaw printout.

12          THE COURT:  All right.

13          MR. NICHOLAS:  And I was going to read it, but I

14 don't want to take the time.  But basically, it said, you know,

15 we talk about fraud on the Court and we say that there is a

16 distinction between fraud or perjury and fraud on the Court,

17 and the Court uses this line which I really like.

18          He said:  Most attempts to state it seem to be a

19 merely compilations of words that do not clarify the

20 distinction between the two.

21          And then it says:  The most important thing to

22 distinguish is a reminder that there is a distinction between

23 the two.

24          And then it says:  What Hazel-Atlas talks about is

25 stuff that undermines the legal process, and that there is a

1    far more injury than to the single litigant when that happens.

2         Now, you take that concept and you look at the <u>Gore</u>

3    case out of the Eleventh Circuit, and it says:  If you don't

4    reach the level of fraud on the Court, then you look at res

5    judicata, then you look at whether it mattered, then you look

6    at diligence.

7         But Judge, if we don't reach the level of fraud on

8    the Court, that's the only thing we've alleged here.  If we

9    don't get there with the Court, if we don't convince the Court

10   that that's what's going on here, we lose.

11        THE COURT:  That was going to be a question that I

12   had, and I -- well, you're going to get to it, ultimately.  I

13   want to talk about how you deal with the damage issue then.

14   You're not alleging damage, per se, to any particular

15   Defendant, or are you?  Or is the damage that just -- they had

16   that file -- well, is the damage to the Court or the damage to

17   the Defendant?

18        MR. NICHOLAS:  I think it's both.

19        THE COURT:  Or to the Plaintiffs, I mean?

20        MR. NICHOLAS:  Well, I think it's both.  Even what --

21   I think it's both.

22        THE COURT:  Okay.  And tell me --

23        MR. NICHOLAS:  And then the question becomes, and I

24   agree it is a -- it may be a question that we have to debate,

25   but a question of remedy which I would propose to the Court, is

1  a common question that Your Honor doesn't have to decide right

2  now.  But certainly, the question of remedy can be -- there's

3  no individualized inquiry, or at least not an individualized

4  inquiry that's going to be difficult for the Court, you know,

5  we're not claiming mental anguish.

6          THE COURT:  No.

7          MR. NICHOLAS:  We're not claiming those types of

8  things.  The Court could do a lot of things, and at the right

9  time.  I think we talk about those.  I'm not sure this is it.

10 Your Honor could theoretically vacate all of the orders.  Now,

11 I'm --

12         THE COURT:  And I saw that that was one of the

13 things, the nullity of the orders, right.

14         MR. NICHOLAS:  Your Honor could say --

15         THE COURT:  Or you could -- yes.

16         MR. NICHOLAS:  -- either as a remedy or as a

17 sanction, "Well you know, I gave you an attorney's fee for

18 filing this motion."

19         And we have proposed this that, "I gave you an

20 attorney's fee.  In effect you cheated and when you filed this

21 motion, and so I'm going to take away the attorney's fee and

22 I'm going to take it away from you and I'm going to give it

23 back to the Debtor."

24         Now, are we saying that that's a pure compensatory

25 damage?  I don't think we really are.

1          THE COURT:  And some parties, at least as the

2    Defendant alleges, didn't pay the fee.

3          MR. NICHOLAS:  Right.  But I'm saying I'm not sure

4    it's a pure compensatory type damage.

5          THE COURT:  And that's what you're saying though.

6          MR. NICHOLAS:  But I'm saying that I think that is a

7    remedy that is logical that the Court could employ, that both

8    compensates the Debtor for having to endure the motion and a

9    fraudulent affidavit, and at the same time, vindicates the

10   Court.

11         But again, I don't think we -- I don't want to take a

12   whole lot of time talking about remedy.

13         THE COURT:  No, but I wanted -- well, I guess I'm

14   struggling with the issue which Mr. Callaway raised somewhat.

15   He says:  Well, this is really just a sanctions motion.

16         And I have looked and I know you guys have looked

17   too; I haven't seen a class action that deals with the fraud --

18   with this kind of fraud.  One, I haven't seen a case that

19   really deals with this kind of fraud on a broad basis, but I

20   haven't seen a class action, so is he right?  Is this one where

21   I just say:  Okay, all of this evidence goes; you can do it in

22   the Brannan's case.

23         There are zillions of affidavits and you should just

24   sanction -- sanction them in this case, or is it a class

25   action?

1          MR. NICHOLAS:  And you --

2          THE COURT:  And is  there a difference, or is it a

3    problem>

4          MR. NICHOLAS:  There is a difference.

5          THE COURT:  That's what -- I'm going right to my

6    biggest issue.

7          MR. NICHOLAS:  Yes, ma'am.

8          THE COURT:  If you --

9          MR. NICHOLAS:  And I have it in my stack here.

10         THE COURT:  Okay.  I knew you were going to get

11   there.

12         MR. NICHOLAS:  No, no.  But I'll be happy to deal

13   with it now.

14         THE COURT:  All right.

15         MR. NICHOLAS:  I think that's -- I think that

16   question is the superiority prong of a class action.

17         THE COURT:  Okay.

18         MR. NICHOLAS:   Because normally, I stand before the

19   Court in a class action case and I say, and this is what the

20   cases say, that the Court should consider the alternatives to

21   certification.

22         So, normally I say:  Well, the alternatives to

23   certification are either they get away with it, because nobody

24   else knows about it.  And Ms. Brannan is the only one who

25   brings it up, and that's not right.

1          Or you're going to have hundreds of individualized

2   lawsuits and it's much more efficient to deal with them all in

3   one case.  That's normally what I would argue.

4          I acknowledge, Your Honor, in this case there is a

5   third alternative, because under the Universal case --

6          THE COURT:  Right.

7          MR. NICHOLAS:  -- it says Your Honor can bring all,

8   and in the Evervast (phonetic) case, I think, I know I've cited

9   to it.

10          THE COURT:  Right.

11          MR. NICHOLAS:  But Your Honor can bring everyone

12   before you, and because Your Honor has limited this to the

13   Southern District, I believe again, within your inherent power,

14   you could say:  I'm going to deal with all of these, not just

15   Ms. Brannan, but sua esponte, you have the right.

16          If there's fraud in the Court, the cases say you can

17   sua esponte raise the issue of whether the order should be

18   vacated, whether there should be a sanction, or anything else.

19   Your Honor has that right.

20          What we believe, if I can finish my point.

21          THE COURT:  Go for it.

22          MR. NICHOLAS:  What we believe though is that affects

23   all of these Debtors in their cases, and that due process is

24   better served by using the mechanism of Rule 23, because it has

25   built into it, not only in the rule, but through a lot of case

1  law, that for due process protections that afford all of these

2  absent members, and that they ought to have notice, they ought

3  to have the opportunity to opt out, because maybe -- maybe an

4  individual member could come in and show that in their case,

5  you granted the motion, they foreclosed, and it did something

6  else and they have some additional damage.

7          I'm not suggesting that that is true.

8          THE COURT:  Okay.

9          MR. NICHOLAS:  But I'm suggesting that due process

10  will allow that to happen if Your Honor certifies it as a

11  class.

12          Now, is there an alternative?  Yes.  I think that is

13  an alternative.

14          THE COURT:  Okay.

15          MR. NICHOLAS:  And also, the question is:  If

16  Your Honor, you know, is offended by the conduct and you want

17  to issue a sanction, you know; is it just the Court that's

18  entitled to that remedy, or does the class --

19          THE COURT:  Yes, and that --

20          MR. NICHOLAS:  -- have a right to come forward and

21  say:  I was injured as well, and I'm entitled to something

22  there.

23          And I think that -- I think the class is entitled to

24  at least make that argument to the Court.  And without a class

25  being certified, I don't think the class can make that argument

1  to the Court.  And so, that's why we think that's the more

2  efficient way to do it.

3  　　　　THE COURT:  Okay.  It just seemed to me I had to ask

4  that question, because in the Rivera, I think it is, case from

5  New Jersey, the judge basically just said, you know, that this

6  was a bad affidavit, but you did it a bunch of times and I'm

7  just going to sock you with a sanction and be done with it.

8  　　　　MR. NICHOLAS:  Well, and let me remind Your Honor,

9  and I think you may recall this; if you remember back in the

10  early proof of claim fee cases.

11  　　　　THE COURT:  Right.

12  　　　　MR. NICHOLAS:  The Tate case out of North Carolina.

13  　　　　THE COURT:  Right.

14  　　　　MR. NICHOLAS:  Well, there were classes brought

15  before that judge.

16  　　　　THE COURT:  Right.

17  　　　　MR. NICHOLAS:  Judge Whitley?

18  　　　　MR. OLEN:  Whitley.

19  　　　　MR. NICHOLAS:  Whitley, I believe.

20  　　　　THE COURT:  Whitley.

21  　　　　MR. NICHOLAS:  Whitley or something.

22  　　　　THE COURT:  Yes, that's right.

23  　　　　MR. NICHOLAS:  I just remember his name.

24  　　　　THE COURT:  It's Whitley.

25  　　　　MR. NICHOLAS:  Where you know, there, instead of

1 | certifying the class, the Court sat en banc and just dealt with

2 | it, okay?

3 | THE COURT: Yes.

4 | MR. NICHOLAS: Okay.

5 | MR. OLEN: In that district.

6 | MR. NICHOLAS: In that district.

7 | THE COURT: Right.

8 | MR. NICHOLAS: And so, again, we were trying to do it

9 | nationwide and Your Honor, you know, agreed with us there. But

10 | there are alternatives, but we still think the class action is

11 | the superior way to go.

12 | THE COURT: Okay, okay.

13 | MR. NICHOLAS: While we're talking about economic

14 | damage though, it kind of segues into standing.

15 | THE COURT: Right.

16 | MR. NICHOLAS: Because Mr. Callaway and Wells Fargo

17 | have raised Ms. Brannan's standing. Let me make a couple of

18 | points there.

19 | THE COURT: They did, right. And that's good, I was

20 | going to ask about that, okay.

21 | MR. NICHOLAS: One, in his factual recitation he said

22 | -- I may have heard him wrong -- that Ms. Brannan didn't pay

23 | any of the mortgage payments. I think factually that's wrong.

24 | THE COURT: She didn't pay them after --

25 | MR. CALLAWAY: After. She testified after the --

1          THE COURT:  That's what he said.

2          MR. CALLAWAY:  From 2003, forward.

3          THE COURT:  After the --

4          MR. NICHOLAS:  I think that's wrong, as well.

5          THE COURT:  Okay.

6          MR. NICHOLAS:  And Your Honor can look at the

7   testimony.  I'm not sure I marked it, because I'm not sure that

8   that's what I understood him to say.  But if you look at Pages

9   38 through 40 of her deposition, what she says is they had a,

10  basically, a joint bank account.  They're still married at the

11  time.

12         Mr. Brannan may have been the one who wrote the

13  checks, but it was out of joint funds, you know, marital funds,

14  and so I think certainly that's an injury to her.

15         But secondly, and maybe more importantly, your order

16  -- Your Honor ordered her to pay the attorney's fees in the

17  conditional denial order.  As you heard Mr. Callaway talk

18  about, they hobbled that, and so the arrearage including the

19  attorney's fee was added to her payments required under her

20  Chapter 13, which continued to be paid until they got

21  dismissed.

22         But beyond that, she was the subject to a fraudulent

23  order, and the cases talk about that in and of itself is an

24  injury.  Again, a fairly recent case out of Maryland, Davis v.

25  Home Depot, 2010 WL 1245755, District Court of Maryland says:

1          "It is equally true that the use of a forged document

2    in a lawsuit prejudices both the opposing party and the

3    judicial system itself.  Both parties are injured."

4          If we're talking about Article 3 Constitutional

5    standing; there's no requirement of an economic injury anyway.

6    And we point that out in our briefs.

7          I would add to that another United States Supreme

8    Court case, Data Processing Service v. Camp, which is 397 US

9    150.  It talked about standing ant says you don't have to have

10   an economic injury; all you have to have is a legally protected

11   right.  And I don't think it's a far stretch to say that a

12   litigant has a legally protected right not to have bogus and

13   false documents filed in their case.

14         But the Supreme Court says that legal right can be

15   one of property, one arising out of contract, one protected

16   against tortuous invasion, or one founded on a status conferred

17   by privilege.  I mean it's any right that is offended gives you

18   Article 3 standing.

19         And what the Supreme Court said in the Class v. Cohen

20   case is that -- which is cited in our brief -- is that Article

21   3 standing goes to -- is this, that the right kind of person

22   who can bring this issue before the court.

23         Well, if it's not the injured litigant where there's

24   a false document filed in the courts, who else can bring that

25   before the Court as an injured litigant?  You know, she doesn't

1  have to prove it cost her money to complain that a false

2  affidavit was filed in her case; and so, she certainly has the

3  Article 3 standing to stand before the Court.

4        Now let me -- I've got to see how much time I have.

5        THE COURT:  You've got -- you've only got --

6        MR. NICHOLAS:  I'm good.

7        THE COURT:  Yes, you've got time.

8        MR. NICHOLAS:  Let me talk about Wal-Mart,

9  Your Honor, and go to the --

10       THE COURT:  Right.

11       MR. NICHOLAS:  -- whole commonality issue.  The

12  Defendant wants you to believe that Wal-Mart, you know, really

13  changes the landscape of class actions, and I submit it

14  doesn't.  The only thing extraordinary about the Wal-Mart case

15  is that the case got certified to begin with.  And maybe that

16  changes the law in the Ninth Circuit, but it doesn't change the

17  law where we've been practicing.  It certainly doesn't change

18  the way Your Honor has viewed class actions in the past.

19       If you look at the facts of Wal-mart, the plaintiffs

20  there acknowledge that there was no policy of discrimination at

21  the top level.  What they really -- the theory of the case was

22  that Wal-Mart allowed promotion and pay issues to be made at a

23  local level, and that because they allowed that to be made at

24  the local level, that fostered the possibility of

25  discrimination --

1          THE COURT:  Right.

2          MR. NICHOLAS:  -- or climate of discrimination.  Not

3     that they did anything at the top to cause it, but that just by

4     allowing it to be de-centralized, in all of these 3500 or more

5     Wal-Mart stores, that that created discrimination.

6          And they said, "Well, what evidence do you have of

7     that?"

8          And what the Supreme Court said, well, the only

9     evidence they had of that was this statistical evidence.

10         THE COURT:  Uh-huh.

11         MR. NICHOLAS:  But when you probed the statistician,

12    the statistician agreed that really, this culture of

13    discrimination, it might have happened anywhere from point zero

14    or half of one percent to 95 percent of the time.

15         And what the Supreme Court said, "Well, that's no

16    evidence at all.  I mean, that doesn't mean anything."

17         And so, they said there's no evidence that you've

18    brought us of any kind of general policy -- any kind of general

19    policy that has been affected across the board.

20         THE COURT:  Well --

21         MR. NICHOLAS:  The court acknowledged --

22         THE COURT:  Okay.

23         MR. NICHOLAS:  -- that one of the ways you can prove

24    commonality in a discrimination case was by showing pattern and

25    practice evidence, by showing that the policy existed not as a

1  written policy.  You know, we don't have to have what

2  Mr. Callaway says, that the default manual says you do it this

3  way.  But you can show it by showing a general course and

4  custom that that's the way it's done.

5          And if you look at Footnote 7 of the <u>Wal-Mart</u>

6  opinion, it talks -- in a discrimination case it says in a

7  pattern and practice case, the plaintiff tries to establish by

8  a preponderance of the evidence that discrimination was the

9  company's standard operating procedure, the regular rather than

10 the unusual practice.  If he succeeds, that showing will

11 support a rebuttable inference that all class members were

12 victim of the discriminatory practice.

13         Now, that's not a principle of discrimination law,

14 that's a principle of evidence.  The same thing applies here,

15 and what I think Mr. Olen has shown you today is that there is

16 a common evidence of a pattern of practice of not verifying the

17 affidavits, not reading the affidavits, certainly saying things

18 in the affidavits that are not verified and demonstrably not

19 true.

20         So, we believe that evidence when Your Honor looks at

21 it, creates the same kind of rebuttable inference.  Now, maybe

22 in an individual case, they could come in and rebut the

23 inference.  But when you read the testimony, Your Honor, you're

24 going to be struck by the fact that they say:  We can't tell

25 you when we did it and when we didn't do it.

1          Now, again, we think the evidence is overwhelming
2    that it was certainly all of the time or most of the time.
3          THE COURT:  And my guess is Mr. Callaway is going to
4    tell me that no, this isn't a pattern and practice.  What is
5    was, was they in essence decentralized too, and gave it all to
6    their law firms, and it was all -- it was varied and they're
7    exactly like Wal-Mart.
8          So, what's your, you know, answer to that?
9          MR. NICHOLAS:  I think -- well, one, I think when
10   Your Honor reads the depositions you won't reach to that
11   conclusion.
12         THE COURT:  Okay.
13         MR. NICHOLAS:  Secondly, we're talking about a single
14   office at Wells Fargo.  We're talking about a handful of
15   managers and supervisors at Wells Fargo.  We're not talking
16   about 3500 -- I mean these law firms weren't drafted and just
17   signed by the law firm and nobody was involved.  It is
18   centralized at Wells Fargo.
19         THE COURT:  Okay, I see your point.
20         MR. NICHOLAS:  The other thing that's interesting in
21   the Wal-Mart case is the court said:  Well, one of the other
22   ways you can show this general policy is through anecdotal
23   evidence, through specific examples.
24         But they criticized the plaintiffs there, because I
25   think they had 40 examples, so it ended up being one out of

1  | every 1250 cases.

2  | THE COURT:  Right.

3  | MR. NICHOLAS:  Or something like that.

4  | THE COURT:  Right.

5  | MR. NICHOLAS:  And they compared that to another case

6  | I'm on --

7  | THE COURT:  One out of eight.  I remember reading the

8  | whole thing.

9  | MR. NICHOLAS:  One out of eight, yes, ma'am.

10 | THE COURT:  I just -- I've read it again this morning

11 | to be -- okay, all right.

12 | MR. NICHOLAS:  I'm at Page 17 of my Westlaw printout.

13 | THE COURT:  Is that where it is?  Yes, me too.  I see

14 | it there.

15 | MR. NICHOLAS:  We're a lot more than one out of

16 | eight, you know, in this case.  Now again, you know, you look

17 | at the chart and you look at the groups of things.  We're a lot

18 | more than that.

19 | And so, the question is, I think what Wal-Mart says

20 | is for there to be common questions there has to be significant

21 | proof that there is this policy, and I think we've done that.

22 | So, looking at the common questions; we've put some

23 | in our brief and let me, if Your Honor doesn't mind, I'll give

24 | you a few more, okay?

25 | THE COURT:  All right.

1          MR. NICHOLAS:  Is there significant proof that there

2    was a policy?  Did the affiants fail to read the affidavits, or

3    did they rely on others to come to them and say, "This is

4    right; sign it."

5          And I think that the evidence of that you've heard

6    today is that that existed.

7          Did they fail to verify that they were in fact

8    authenticating the documents they said were attached and

9    actually incorporating it into the affidavit?  Did they do

10   that, or not, on a systematic basis?

11         Did they change the affidavit after it was signed?

12   And the "they" there would include their lawyers.  If their

13   lawyers did that, I think that's the same thing.

14         Did they used pre-signed signature pages?

15         And then the overriding -- well, I guess another one:

16   Did they misrepresent who they were, and in reference to

17   Mr. Schlotter?

18         And then the overriding common issue is once you

19   answer those questions is do some or all of these rise to the

20   level of fraud on the Court, because that's the overriding

21   common question.  Your Honor, I guess, could say all of this is

22   bad, but it doesn't rise to the level of fraud on the Court,

23   but Your Honor can do that across the board.  It's not going to

24   vary whether it's Ms. Brannan or whether it's Mr. Smith, if

25   it's the same fact pattern.

1          If Your Honor thinks about the other cases that

2   you've certified, they've presented these same types of common

3   questions, you know, either common legal issues or common

4   factual issues that were addressable across the board, and Wal-

5   Mart doesn't really change that.

6          If I can cite you to two cases, two Circuit Court

7   cases, and there have only been I think three Circuit Court

8   cases that have been decided since Wal-Mart.  The Third Circuit

9   in Behrend, it's B-E-H-R-E-N-D v. Comcast, 2011 Westlaw,

10  3678805, August 23rd of this year.

11         And what the court said there in Footnote 12 is the

12  defendant brought forth Wal-Mart to try to disqualify the

13  statistician expert of plaintiffs.  It's an antitrust case.

14         Well, and let me before I go to that, let me point

15  out:  Wal-Mart is a discrimination case and discrimination

16  cases are different.

17         THE COURT:  I know they are different, right.

18         MR. NICHOLAS:  Okay?

19         THE COURT:  Right.

20         MR. NICHOLAS:  What the Third Circuit said though in

21  August was the factual and legal underpinnings of Wal-Mart

22  which involved a massive discrimination class action in

23  different sections of Rule 23 are clearly distinct from those

24  of this case.  Wal-Mart therefore neither guides nor governs

25  the dispute before us.

1          That doesn't sound like the Third Circuit reads it

2   as some great sea change in the law.  It neither governs nor

3   guides -- it neither guides nor governs the dispute before

4   us.

5          Secondly, in the Pex case, Zurn Pex Plumbing,

6   products liability litigation, 644 F3d 604, the Eighth Circuit,

7   July 6th, 2011, talked about Wal-Mart and again said this

8   massive, you know, Your Honor this was a million and five,

9   you know, individualized pay and promotion decisions in Wal-

10  Mart.

11         THE COURT:  And they only have a million employees,

12  so they were obviously pulling in people from a long period of

13  time.

14         MR. NICHOLAS:  What the Eighth Circuit in talking

15  about Wal-Mart, said the court concluded that the plaintiffs

16  had not presented any significant proof that Wal-Mart had a

17  general policy of discrimination which might have satisfied

18  Rule 23(a)(2)'s commonality requirement.

19         Here, in contrast the evidence of a universal defect

20  raises a critical question common to all members of the class

21  as certified by the district court.

22         So again, the question is:  Is there significant

23  proof of a generalized common issue?  And the court there had

24  no difficulty finding that there was one, in doing so.

25         Now, let me touch on one other thing and that's this,

1   the concept of whose burden is it, because it kind of

2   interplays here.  We acknowledge it's our burden to show you

3   that we can meet the requirements of Rule 23.  We don't run

4   from that at all.

5           But it's somewhat unusual in that you've got affiants

6   who have made sworn statements to this Court saying I don't

7   know if it's right or not, you know.  And it's unusual for the

8   plaintiff suing a defendant to try to establish a defendant

9   course of conduct.  You know, normally it's the person

10  offering the evidence that says, you know:  I don't remember

11  what I did here on this occasion, but I know every time, this

12  is how I do it, and therefore, I must have done it that way in

13  this case.  If you have that kind of testimony, again, the Rule

14  of Evidence is you can presume it continued to be done that

15  way.

16          Whereas here, we don't really have that, but there

17  are cases where the plaintiff is trying to prove an affirmative

18  course of conduct on the defendant.

19          THE COURT:  Uh-huh.

20          MR. NICHOLAS:  And that if we prove that course of

21  conduct exists, then the presumption exists that it continued.

22          Now, that doesn't mean that Mr. Callaway and Wells

23  Fargo are deprived of their defense.  I mean they can come in

24  here and try to say:  In the John Smith case it didn't happen

25  that way.

1          And I think they can do that, even if Your Honor

2     certifies the class, because if you look at the evidence,

3     there's not going to be a lot of that because all of the

4     evidence is:  We don't know.  But if they can come in here and

5     show that, they can show that.

6          But again, that's not the kind of individualized

7     inquiry that's going to overwhelm these common questions that

8     the Court can answer of whether they systematically failed to

9     verify, they systematically failed to read, and does that

10    constitute fraud on the Court?

11         THE COURT:  Because you are assuming that their

12    defenses of res judicata or waiver, whatever, don't matter or

13    are not applicable?

14         MR. NICHOLAS:  Because if we don't prove -- because

15    if your answer to the last question I posed, Your Honor --

16         THE COURT:  Uh-huh.

17         MR. NICHOLAS:  If you say:  This doesn't reach to the

18    level where it attacks the integrity of the judicial system --

19         THE COURT:  Then the rest of it --

20         MR. NICHOLAS:  -- then we lose.

21         THE COURT:  Right.  So, you're agreeing that those

22    defenses don't matter because if we get to that, you lose?

23         MR. NICHOLAS:  We lose.

24         THE COURT:  Okay.

25         MR. NICHOLAS:  Yes, ma'am.

1          THE COURT:  All right.

2          MR. NICHOLAS:  And so, whether or not it mattered to

3    Your Honor when you signed the order; whether or not

4    Ms. Robertson saw the affidavit or didn't see the affidavit

5    doesn't matter; whether it would have changed the result, it

6    doesn't matter.  I don't want to get so deep into the merits

7    that we start arguing whether it does matter or not, but I

8    don't know whether Your Honor has had the occasion to read

9    Judge Sawyer's opinion and what --

10         THE COURT:  I've read -- actually, no, I haven't.

11   I've only read what you've given me, and I need to --

12         MR. NICHOLAS:  Well --

13         THE COURT:  I need to do that, but I haven't had it.

14         MR. NICHOLAS:  We cite Judge Sawyer's opinion in

15   Woodruff for a different reason.

16         THE COURT:  Oh, okay.

17         MR. NICHOLAS:  And on the 105 issue and power.

18         THE COURT:  Right.

19         MR. NICHOLAS:  But Judge Sawyer points out the five

20   reasons that he came up -- and he came up with them, it wasn't

21   something that we argued to him, as to why this process is

22   important to the court and why submitting affidavits to the

23   court is an important process.

24         And he concludes that if we can prove what we alleged

25   in Woodruff, that it does -- it does constitute fraud on the

1  Court.

2        Now again, that's a merits inquiry at the end of the

3  day.

4        THE COURT:  Right.

5        MR. NICHOLAS:  But it's a common inquiry at the end

6  of the day.  We're not going to be saying, you know, that it's

7  sometimes yes and sometimes no.  It's a common inquiry across

8  the board that is critical to the resolution of the case.

9        THE COURT:  Okay.

10        MR. NICHOLAS:  And again, yes, if we don't get to

11  that level, then I would agree, then we're into 60(b)(3),

12  perjury, and you have to show it matters, and we're not trying

13  to show it matters.

14        THE COURT:  Okay.

15        MR. NICHOLAS:  Because we're not saying it's

16  60(b)(3), we're saying it's up here.

17        THE COURT:  That was my assumption in the beginning,

18  but I wanted to -- and you have clarified that as well.  Thank

19  you.

20        MR. NICHOLAS:  I guess -- if I can have just a second

21  to regroup, Your Honor.

22        THE COURT:  That was my question.

23        MR. NICHOLAS:  I've kind of bounced around in my

24  outline, but let me just talk about I guess to make sure we've

25  touched on, and I know Your Honor's very familiar with just the

1  requirements of Rule 23.

2          THE COURT:  Okay.

3          MR. NICHOLAS:  And to make sure I've covered them

4  all.

5          THE COURT:  That's good.

6          MR. NICHOLAS:  Numerosity and ascertained ability;

7  certainly, we have numerosity if Your Honor defines the class

8  the way we've proposed it.

9          THE COURT:  Right.

10         MR. NICHOLAS:  I believe that when Your Honor reads

11 the testimony and is able to -- that Your Honor will come to

12 the same conclusion that we get, and that is that there was a

13 massive undertaking by Wells Fargo, a massive failure I should

14 say, to pay attention and to actually swear to and testify to

15 the things that they said they were testifying in the

16 affidavit, and that that justifies the class as we've defined

17 it.

18         Now, definitions of a class sometimes involve some

19 give and take with the Court.  And I'm not asking for the Court

20 to define my class, I'm not going there.  But I would

21 acknowledge that there are groups of people that clearly are

22 identifiable or ascertainable like, I'll just use the one

23 example, the John Schlotter affidavit.  I mean we know who they

24 are, we know what they are.

25         Now, I think the John Schlotter fact pattern is just

1   one fact pattern under the broader umbrella.  But if Your Honor

2   disagrees, that is another alternative.

3           THE COURT:  Okay.

4           MR. NICHOLAS:  And I just point that out to the

5   Court.

6           THE COURT:  Okay.

7           MR. NICHOLAS:  We've talked about typicality.  Let me

8   -- and we've talked about predominance.

9           THE COURT:  We have.

10          MR. NICHOLAS:  And superiority.  Well, I guess I

11  should talk for a minute about (b)(2).

12          Now, the Wal-Mart case was certified under (b)(2) and

13  the Court had little difficulty.  In fact, I think it was a

14  unanimous decision to reverse certification under (b)(2),

15  because what the Court said was we're not going to allow a

16  (b)(2) certification where you have to have any individualized

17  inquiry on damages.

18          THE COURT:  Uh-huh.

19          MR. NICHOLAS:  And maybe that is a little bit of a

20  change in the law, but we've come to Your Honor before with

21  (b)(2) saying incidental damages that flow directly are still

22  okay.  The Supreme Court didn't answer that question.  They

23  cited to the Murray v. Citgo case -- not the Murray v. Citgo,

24  it's Murray v. Auslander and I can't remember the plaintiff.

25  The Citgo case was the Fifth Circuit.  The Murray v. Auslander

1   case is the Eleventh Circuit case.

2           That say if they flow incidentally, it's okay.  And

3   the majority kind of refused to say whether that's the law or

4   not, but they certainly didn't say it wasn't the law.  What

5   they reversed was the Ninth Circuit view, the Ninth and the --

6   I believe it was the Third said you look to whether sort of the

7   mental impressions of the plaintiff and what they're really

8   after.  And if they're really after money, then it's (b)(3),

9   and if they're not really after money, it's (b)(2).

10          Well, that's not the law any more.  But they sort of

11  site with approval the Citgo analysis, which is -- well, but I

12  don't want to say with approval.  They don't disapprove the

13  analysis to say if it's automatic, then you can certify under

14  (b)(2).

15          Well here, I think it would be automatic.

16          THE COURT:  And that's what I was going to ask if the

17  automatic would be -- it would be the, what, the --

18          MR. NICHOLAS:  Again, a proposed remedy that we have

19  suggested is a disgorgement of a fee.

20          THE COURT:  Okay.

21          MR. NICHOLAS:  And that that returns to the

22  Plaintiff.  Now, if it's on their account, then it goes to

23  their account.  If their account is not there any more, then

24  there is nothing to account for.

25          THE COURT:  Okay.

1          MR. NICHOLAS:  But that's --

2          THE COURT:  And that is -- that goes back, if I am

3    consistent with what I have done in the past and don't think

4    Wal-Mart changed anything on that, in that regard, then that --

5    that obviously would be something that I thought was right

6    before.

7          MR. NICHOLAS:  And it has to -- what Wal-Mart says

8    and what the law even under Murray v. Auslander, which is the

9    Eleventh Circuit case, that has to flow from declaratory or

10   injunctive relief.

11         And Your Honor could declare if this conduct that

12   we've put forward here is in fact fraud on the Court, and could

13   declare lots of things about whether you want to take any

14   action, any additional action against Wells Fargo, whether you

15   want to take any action in each individual case in the terms of

16   any kind of vacating the order or not.

17         But again, all of that would then -- if you vacated

18   the order including the attorney's fee part, then all of that

19   would automatically flow.  There is no allegation here:  Well,

20   we're going to put people on the stand and say, oh I was

21   mentally anguished or I get this or I get that, which is the

22   kind of individualized inquiry that the Supreme Court said

23   that you can't do under (b)(2).  But we are not trying to do

24   that and we never have tried to do that in any of these

25   cases.

1          THE COURT:  Okay.

2          MR. NICHOLAS:  Mr. Callaway raises the 105 issue in

3    his briefs.  I have addressed it.  I know Your Honor has dealt

4    with it.  I would again invite the Court to read Judge

5    Stilson's opinion in the Holman case and Judge Sawyer's opinion

6    in Woodruff, where -- which are later in time, where they both

7    say:  We agree with Judge Mahoney, but oh by the way, it

8    doesn't matter, because we've got inherent authority anyway.

9          And so, whether or not you can put this within the

10   rubric of 105 or whether you want to leave it outside of 105,

11   it really doesn't make any difference.  And the Rojas case in

12   the Fifth Circuit does that.

13         His arguments about this has to be contempt; I point

14   this out in the brief, but if Your Honor looks at those cases,

15   they go from the Pertuso line of cases that say you can't use

16   105.  Well, so if you, you know, you knock out the underpinning

17   of those, of those cases, and it's a clear split of authority

18   anyway.  In the Eleventh Circuit, the Hardy case says you can

19   use 105 for contempt, even if you are limited to contempt,

20   which we don't think you are.

21         So, there's no Eleventh Circuit case there.  The

22   Ninth Circuit case is based on a different view of 105 than

23   what the court has, and so we don't think any of that matters.

24         I'm going to save some time for rebuttal, Judge.  I'm

25   glad to answer --

1        THE COURT:  Okay.  No, that gives you like 20 -- a

2   little less than 25 minutes.  You've answered most of my

3   questions.  I think I want to hear -- I may have a couple more

4   after I hear what Mr. Callaway says, and I'll ask him on

5   rebuttal.  But I think you've hit the points that I needed

6   right now.

7        MR. NICHOLAS:  Thank you, Judge.

8        THE COURT:  Thank you.

9        MR. CALLAWAY:  Your Honor, would this be a decent

10  time for a break?

11       THE COURT:  We can break.

12       MR. CALLAWAY:  So, I can sort of caucus with my

13  group?

14       THE COURT:  Sure.  We can break.

15       MR. CALLAWAY:  To see -- I need to split up my time,

16  Your Honor.

17       THE COURT:  No problem, no problem.  And like I said,

18  you've got -- I'm going to keep it short.  It will be ten

19  after, so a little less than a ten minute break.

20       MR. CALLAWAY:  Okay.

21       THE COURT:  But we'll be back.  Okay.

22    **(Recess from 3:03 p.m. to 3:13 p.m.)**

23       THE CLERK:  Please rise.

24       THE COURT:  All right.  You may be seated.

25       All right Mr. Callaway, how are you going to divide

1  things?  Have you decided?

2      MR. CALLAWAY:  Well, help me keep track of my time,

3  please.

4      THE CLERK:  I will.

5      MR. CALLAWAY:  I'm going to try to go quickly.

6      THE COURT:  Okay.

7      MR. CALLAWAY:  And then Ms. Morgan will go, and then

8  we'll let our co-Defendants' Counsel go.  I'll give them as

9  much time as they want.

10      How much time do we have?  We have until --

11      THE COURT:  You've got an hour and ten minutes.

12      MR. CALLAWAY:  Until about 4:20 or so?

13      THE COURT:  That should be about 4:20.

14      MR. CALLAWAY:  Okay.

15      THE COURT:  That would be about right because you've

16  got like 25 minutes of -- yes, that's about right.

17      MR. CALLAWAY:  Well, I'm not going to be -- I want to

18  let them have plenty of time, so I will not be --

19      THE COURT:  All right.

20      MR. CALLAWAY:  -- overly, overly long.

21      THE COURT:  All right.

22      MR. CALLAWAY:  The Plaintiffs here are asking you to

23  certify a class that is unlike any other than anybody can find.

24  You know, they are asking you to go where no man has gone

25  before.

1          THE COURT:  I know, or a woman.

2          MR. CALLAWAY:  And I know that the Court is

3   intellectually bold and willing to sometimes go out a little

4   bit beyond, but this is a bridge too far.  This is not like the

5   proof of claim cases that you certified.  You'll remember in

6   those cases we had exactly the same thing done, exactly the

7   same charge.  There was no question about reliance because it

8   was not disclosed to the Court and to the Debtors, exactly the

9   same thing happened to them.

10         You may remember, at least in my case, the Wells

11  Fargo case, that we did a printout of everybody.

12         THE COURT:  Right.

13         MR. CALLAWAY:  And so, the class was readily

14  identifiable, and exactly the same thing happened.  I can't

15  even remember whether we opposed the class action in that case,

16  because that would be a typical -- and would not have been on

17  the commonality and stuff, because that's a typical class

18  action.

19         THE COURT:  I think we had a hearing.  I think we had

20  a hearing on that.

21         MR. CALLAWAY:  But I think it was more on what is our

22  cause of action and so forth.

23         THE COURT:  That may have, yes.

24         MR. CALLAWAY:  -- rather than --

25         THE COURT:  That's probably -- I think, yes, it did

1 | go more to that.

2 |         Well, what about the fact that they said a

3 | commonality is that the pattern and practice of, I'll call it

4 | right now, reckless disregard of the affidavit process, or the

5 | truth of the matters in the affidavit, or something like that?

6 | What about that?

7 |         MR. CALLAWAY: That just shows -- that doesn't show a

8 | particular pattern or a particular practice. It just -- they

9 | are just alleging essentially, in essence, an attitude or -- it

10 | would be, for example, if you -- using the automobile analogy.

11 | If they said: Okay, you had a bunch of different kinds of

12 | defective cars that General Motors made, and some had bad

13 | brakes and that some had bad headlights, some had a bad

14 | steering wheel, and some of these -- maybe some of these were

15 | defective, were arguably defective, you know.

16 |         But General Motors had this whole attitude of just

17 | totally disregarding safety and totally, totally not paying

18 | attention to the product, and therefore, we could certify a

19 | class based upon that.

20 |         THE COURT: But if you could pick out which cars had

21 | bad brakes and bad steering, could you certify a class even

22 | though it was two or three different issues, but maybe --

23 |         MR. CALLAWAY: Well, that's the --

24 |         THE COURT: -- you could certify the class for all of

25 | those that had the three defects?

1      MR. CALLAWAY:  Well, Mr. Nicholas seemed to be sort

2  of implying that well, maybe we don't meet the requirements of

3  a full class, because we have so many different kinds of

4  alleged things and different -- he seemed to be retreating

5  back, well maybe if you had -- you could do a subclass or do a

6  class with the John Schlotter affidavits, and then make a

7  decision up or down on that.

8      THE COURT:  That's why I'm saying, can you have --

9  because I think that there are cases that have subclasses.  So,

10  could you do a class that said there are three things that are

11  fraudulent, and the class is everybody that had those three

12  things?

13      MR. CALLAWAY:  Well, setting aside other issues.

14      THE COURT:  Yes.

15      MR. CALLAWAY:  I do think you can defeat the

16  typicality and commonality problems.

17      THE COURT:  Okay.

18      MR. CALLAWAY:  I think you can address it by doing

19  that.

20      THE COURT:  Okay.

21      MR. CALLAWAY:  By doing it that way.

22      THE COURT:  Okay.

23      MR. CALLAWAY:  You know, and that, for example how

24  does Ms. Brannan's case with a pre-signed affidavit, now how is

25  that related to a John Schlotter affidavit issue?  They're not

1    related.  And a decision in her case doesn't mean an up or

2    down, it doesn't resolve any issues in the John Schlotter

3    affidavit situation.

4            So, I think that that --

5            THE COURT:  Okay.

6            MR. CALLAWAY:  And I think, I'm not admitting or

7    stipulating to a class in that situation, at all.

8            THE COURT:  I understand.

9            MR. CALLAWAY:  Because we think that there are all

10   kinds of other problems.  But I'm saying that that is --

11           THE COURT:  I got you.  I'm just --

12           MR. CALLAWAY:  -- that is a different mechanism.

13           THE COURT:  Okay, all right.

14           MR. CALLAWAY:  Let me go -- let me go -- I'll be glad

15   to answer any questions, but I'll just hit the highlights of my

16   brief.

17           The class has morphed, as everybody admits, and this

18   morphing even today, there are asking you to certify a class

19   which is not the same as they even had in their definition.

20   It's only in the last reply brief that we finally got -- you

21   got the response that --

22           THE COURT:  Right.

23           MR. CALLAWAY:  Well, it's actually everybody that

24   they filed an -- that Wells Fargo filed an affidavit in, for

25   some period of time.  How that period of time was arrived at is

1  not --

2          THE COURT:  If they were improper or fraudulent.

3          MR. CALLAWAY:  But that, you see that -- my point

4  there is that class is not -- I'll jump ahead, that class is

5  not identifiable.  I mean, you have to have some means by

6  objective definitive means of identifying your classes.  So, it

7  makes no sense to say it's a class of people with improper or

8  fraudulent or false affidavits, because that begs the whole

9  question, and the Court has to look at each individual one of

10 maybe disputes as I've pointed out as to whether a particular

11 affidavit was false or not.  So, that class clearly on its face

12 won't work.

13         Their response has been to say:  Oh well, we're

14 changing our mind, it will be everybody because there's such a

15 pattern and practice.

16         But then you have the -- so maybe that -- you'd make

17 it -- you can ascertain that class, because you now -- you

18 could figure out who had affidavits filed in that class.  But

19 then you'd have the commonality problem, because even the

20 Plaintiffs admitted it in their argument:  Well yeah, maybe

21 the Defendant could come in and show well, this one was good,

22 or this one was bad.  But if you don't have commonality of

23 the whole class, then it shouldn't be certified as a class

24 action.

25         And as we've gone over and over again, the problems

1    alleged are so different, and a different fact situation for

2    every one.  And we do not -- do not concede, and this is going

3    to be addressed by Ms. Morgan and Ms. Szukala to some extent.

4    We do not concede that essentially all of the defenses fly out

5    the window.

6          You know, the Plaintiffs say:  We're suing for fraud

7    on the Court, therefore it doesn't make a difference whether

8    anybody ever saw it, anybody ever did anything with it, whether

9    it's obvious on its face, or whether there were any damages

10   suffered, you know.  They are essentially saying all defenses

11   are eviscerated if you prove fraud on the Court.  And they will

12   be discussing that that's not correct.  I mean, you do have to

13   prove other elements.

14          The Wal-Mart case, and most commentators do agree

15   that the Wal-Mart case changed the landscape in terms of class

16   actions.  And the big thing that I take away from that is that

17   it's not the questions that are common, that have to be common

18   to the class, but the answers that you can -- the answers that

19   are going to be common, and the answer has to resolve an issue

20   essentially class-wide so that the answer in the individual

21   named Plaintiff's case would resolve it for everybody.

22          And as we keep pointing out, the classes, as the

23   Plaintiffs want us to define it, that's not the case.  And it

24   doesn't make -- a question as to whether there was a fraud on

25   the Court in Ms. Brannan's case does not mean it for everybody

1  else who has ever had an affidavit filed in their case over a

2  period of twelve years.

3        You can always come up with common questions.  A

4  common theoretical question like the Plaintiffs questions are

5  essentially are in the abstract.  Did Wells Fargo have a

6  practice of filing improper affidavits?  But that doesn't

7  answer as to the particular Plaintiff in the case.

8        THE COURT:  And let me just -- so, are you saying

9  that there is, and maybe you can't answer this, that there is

10  no class that you could certify in this kind of situation,

11  fraud on the Court, for affidavits, or that this class is just

12  too broad?

13        MR. CALLAWAY:  We're saying that we think, because of

14  the individualized issues, that it shouldn't be certified at

15  all, because they have individualized issues of, for example,

16  was the affidavit improper?  Was it relied upon?  Did it

17  improperly influence the decision?  Is it res judicata?  Did

18  the Plaintiff suffer any consequential damages?

19        THE COURT:  But to the extent, if I were to -- let's

20  just take -- let's just take the one and I think it's only like

21  eight affidavits, but let's just say pre-signed affidavits.  We

22  know there are eight.  So, would --

23        MR. CALLAWAY:  Well actually, there are seven.

24        THE COURT:  There are seven, okay.

25        MR. CALLAWAY:  But if -- well, one is in dispute at

1 least.

2         THE COURT: Okay, that's right. That's right.

3         MR. CALLAWAY: The lady testified that she denied

4 it.

5         THE COURT: Yes. Let's take that group. Could that

6 be a class?

7         MR. CALLAWAY: I think that that could be a class for

8 -- some parts of it, not for the issue of -- well, maybe for an

9 issue of was that an improper affidavit. I'm just being honest

10 with the Court.

11         But then you would still have to look individually.

12 I think that the class would be --

13         THE COURT: Because that's what I'm getting to,

14 then.

15         MR. CALLAWAY: -- would be overwhelmed by the --

16         THE COURT: Can it be a class?

17         MR. CALLAWAY: Well, let me --

18         THE COURT: And then if so, then are you saying that

19 just because there are defenses --

20         MR. CALLAWAY: Let me take that back, Your Honor.

21         THE COURT: -- that it could never be a class?

22         MR. CALLAWAY: Let me take that back, Your Honor. I

23 don't think it could ever be a class. I think that will be a

24 closer issue than what they have, but because of the things

25 that we talked about when I went through almost all of those

1  pre-signed affidavits, that they were -- in some cases the

2  parties had -- the Defendant -- excuse me, the Debtor had

3  already agreed to it before the affidavit was even filed.

4          Certainly, in most of those cases the parties had

5  already agreed to what the relief was before the -- before the

6  affidavit was filed.  There wasn't any kind of reliance.

7          And I know you're saying the Court wants affidavits

8  in order to prove up ownership and to prove it up and so forth,

9  but -- and that was proved up, you know, in those cases.

10         THE COURT:  It was.

11         MR. CALLAWAY:  The only thing that was improper was

12  just the execution of the actual affidavits.

13         THE COURT:  And let me ask this though:  But what

14  about the injury to the Court or the court system?

15         MR. CALLAWAY:  That's the sanction.

16         THE COURT:  You don't need -- do the -- the defenses

17  don't apply to that, do they?

18         MR. CALLAWAY:  I'm going to let them talk about

19  that.

20         THE COURT:  Okay, all right.  All right.

21         MR. CALLAWAY:  The fraud on the Court issue.

22         THE COURT:  Okay.

23         MR. CALLAWAY:  I'm trying to stay away from that.

24         THE COURT:  Then, all right.

25         MR. CALLAWAY:  But that's --

1          THE COURT:  And I hear you.

2          MR. CALLAWAY:  That's what we kept coming back to.

3    This isn't a class action.  It's a sanction thing.  What is a

4    trial -- what is the advantage?  You know, one of the things

5    under (b)(3) that you're supposed to look at is the advantages

6    of a -- I'm setting aside commonality, which we don't think we

7    have.

8          What are the efficiencies and advantages of having it

9    be a class action?  Well, how is a trial of this going to be

10   any better than a trial on the sanctions?  Because you've

11   already heard as I mentioned before, the Plaintiffs' attorneys

12   say, "Oh, we're going to have -- it's going to be more, and

13   bigger evidence.  We're going to have every file.  We're going

14   to try them all."

15         Well, what's the purpose of having a class action if

16   you're doing that?

17         THE COURT:  Well, I guess their response would be

18   superiority among, you know, among other things.

19         MR. CALLAWAY:  How is it superior?

20         THE COURT:  Because it's more efficient than having

21   them come in here -- I can tell you from my perspective it will

22   be more efficient than having them come in here, one case after

23   the other, as doing it --

24         MR. CALLAWAY:  But in --

25         THE COURT:  -- when it's basically, potentially -- I

1  know this is the argument or the discussion that we're having

2  today, whether it's the same question or not but are some of

3  the same questions or not.

4      MR. CALLAWAY:  But how would -- I don't see how the

5  evidence would be shortened up by having it as a class action

6  rather than a sanction.  It's going to be the same -- the same

7  kind of thing.

8      THE COURT:  That might be the case.  That may well be

9  the case.

10      MR. CALLAWAY:  And you have to give notice to

11  everybody, to see if they want to be a party to or not.

12      THE COURT:  Right, right.

13      MR. CALLAWAY:  In a (b)(2) injunctive relief, you

14  don't have to give -- you would not have to give notice, and

15  then the people might be stuck with an adverse result.  We

16  would submit it's not a (b)(2) class, but they might be stuck

17  with an adverse result without ever getting their day in

18  court.

19      The Defendant in any case is going to be able to

20  challenge each individual affidavit -- each individual

21  affidavit, each individual case in a class action -- in any

22  kind of hearing.  It's not due process for us that we're

23  accused of fraud on the Court, but we can't put on evidence as

24  to the individual -- individual matters.

25      So, from my perspective, I don't see what the

1 advantage of a class action is, is to the Court or to the

2 parties either, except if they want to try to use the class

3 action and then leverage into other class actions in other

4 districts. I mean that's the underlying --

5         THE COURT: Oh, I --

6         MR. CALLAWAY: -- the underlying reality.

7         THE COURT: I understand. Well, I understand that

8 that is certainly a bonus if that happened. I guess everybody

9 realizes -- I know all of you here do -- that in, you know, I

10 usually at least try to be consistent to the extent there is

11 anything to be consistent with in my other rulings. I try to

12 be what I call boring.

13         And by just doing that, that means I address some of

14 those issues about what sort of defenses and things you had. I

15 think in my earlier proof of claim cases, and I said, you know,

16 whether the Defendant -- whether the Debtor paid the fee,

17 whether their case got -- all of that; in the end, it really

18 didn't matter, I didn't think, to the fact that they were --

19 that they were charged it, and it was undisclosed.

20         So, I guess -- I guess I'm sort of -- and now I'm

21 hitting the damages again, and --

22         MR. CALLAWAY: There though, the damages directly

23 arose from the claim.

24         THE COURT: Uh-huh.

25         MR. CALLAWAY: You know, the claim was you shouldn't

1   have charged me this -- I think it was $150 or $125 proof of

2   claim fee.

3          THE COURT:  It was, yes, all over.

4          MR. CALLAWAY:  You know, here, there's not any

5   consequential damages that anybody is claiming.  Nobody is

6   claiming that if the affidavit had been perfect, that they

7   would have saved the attorney's fee.  The attorney's fee would

8   have been the same in any case.

9          And for the most part, they're not contending any

10  actual error in any particular affidavit, other than with the

11  manner that it was executed.  In other words, rightly or

12  wrongly, as they point out in deposition, the Wells Fargo

13  people were concerned with making the numbers, making sure that

14  the numbers were right, and of course, that's what the Court

15  and the parties are the most concerned with either, so there's

16  not --

17         THE COURT:  Actually, I hear you say that but as I

18  was alluding to it, my big concern beyond the numbers, which

19  the numbers are important, I agree with you, but my concern has

20  always been I want somebody who is -- with whom the buck stops

21  if later it turns out somebody says:  They didn't even own this

22  property. There was a problem you know.  Somewhere along the

23  line I want to say:  I have them on record as saying that this

24  was all true.  So, it went beyond that for me.

25         But, and I guess that goes back to my issue of what

1   about the harm to the system that just came from -- that's the

2   reason we had the rule, and that's the reason I require an

3   affidavit, not just that fact summary, because I wanted

4   somebody under oath attesting to those issues.

5           MR. CALLAWAY:  Your Honor, let me remind you, this is

6   not a hearing on the merits.

7           THE COURT:  I understand that.

8           MR. CALLAWAY:  I mean, this is --

9           THE COURT:  No, I got you.

10          MR. CALLAWAY:  No, the question is:  Should this be a

11  class certification?

12          THE COURT:  Yes, yes.

13          MR. CALLAWAY:  And I keep saying the Plaintiff --

14  we're not saying that the Court doesn't have a remedy.  We're

15  just saying that the Plaintiffs are steering you towards the

16  wrong remedy.

17          THE COURT:  No, and what I'm trying to get to with

18  you is:  Does it matter, you say maybe there will be defenses,

19  they don't have damages.  That still doesn't -- that still

20  doesn't deal with the fact that the Court may have been

21  damaged, which as a general -- which isn't going to require

22  proof.  And I guess, to me, I mean the proof is just that I

23  thought that I was getting totally, you know, correct

24  affidavits.

25          They say I wasn't.  You say I was, or that it was

1   true, even if it wasn't --

2           MR. CALLAWAY:  Yes.

3           THE COURT:  -- wasn't done exactly right each time.

4           MR. CALLAWAY:  And so my response is:  That's what

5   the Court ought to -- this is not a class certification

6   matter.

7           THE COURT:  Right.

8           MR. CALLAWAY:  It's not a -- it's appropriate for

9   sanctions by the Court, if that's what you determine that the

10  property remedy is.  It's not a matter for a certified class.

11          THE COURT:  Would you say that as sanctions -- what

12  if I decided I'm going to let them file 800, you know, 800 or

13  whatever, I don't know how many there are, what is it?  It's

14  600 and something now?

15          MR. CALLAWAY:  It's 641.

16          THE COURT:  Whatever.

17          MR. CALLAWAY:  Yes.

18          THE COURT:  And I'm going to consolidate all of the

19  cases, because you know, they have the same theme if not a

20  commonality.  Doesn't that get us to the same place?  I don't

21  know.

22          MR. CALLAWAY:  Well, we contend the proper thing

23  would have been -- would be a Motion for Sanctions in the

24  Brannan case, where you could bring in all of the matters in

25  the other cases.  I don't know if you'd have to proceed until

1   we consolidate all of the cases and so forth.

2           I think truthfully, that's the correct way it should

3   have been done.

4           THE COURT:  And just bring in the evidence as to --

5           MR. CALLAWAY:  And then the Court can say:  Okay, I'm

6   setting this for a three day hearing and Plaintiffs, you have a

7   day and a half and Defendant, you have a day and a half, and

8   then I'm going to decide what the sanction is going to be, if

9   I'm going to -- whether I'm going to impose any sanctions, then

10  I'm going to do -- do what the sanction is.

11          THE COURT:  And the difference is that a sanction

12  probably goes to the federal coffers, which I'm not totally

13  thrilled with.  Whereas, a class action potentially, the money

14  goes to the Debtors, right?

15          MR. CALLAWAY:  That's a possibility.

16          THE COURT:  Okay.

17          MR. CALLAWAY:  I don't know about the sanction money.

18  I don't know how --

19          THE COURT:  I don't know.  I know -- I don't know

20  either.  I don't know if I could -- and that's, I guess, a

21  different issue and not one we have to face today, certainly,

22  where the sanctions have to go, or can go.

23          MR. CALLAWAY:  Could I --

24          THE COURT:  Okay, yes.

25          MR. CALLAWAY:  I'm way off the track and I don't have

1    any particular order in my argument at this point.

2         THE COURT:  Go back, and I'm going to shut up now so

3    you can --

4         MR. CALLAWAY:  Let me hit a couple of more points --

5         THE COURT:  Okay.

6         MR. CALLAWAY:  -- before I turn it over to the other

7    folks.

8         THE COURT:  Okay.

9         MR. CALLAWAY:  One is that the Plaintiffs have

10   mentioned Rule 23(b)(2), which is the injunctive relief.

11        THE COURT:  Right.

12        MR. CALLAWAY:  They're not seeking any improper

13   injunctive relief.  I just wanted to point that out.  There's

14   no danger of additional pre-signed affidavits being filed and

15   so forth.  There haven't been any since 2003.

16        The Court can't -- it's not proper under 23(b)(2) and

17   we've cited some cases to this effect, to just do a general

18   declaration, you know, essentially a general declaration of

19   liability or a general declaration out in the air that:  Oh, I

20   find that Wells Fargo has engaged in some improper practice.

21        In terms of the disgorgement of fees, that is

22   actually a money damages thing.  Even you term it as injunctive

23   relief.  It's really money damages, so you have to fall under

24   Rule 23(b)(2).  You can't disguise it by saying:  Well, I'm

25   enjoining -- I'm ordering you to pay money.  That's a money

1    damages thing.

2            THE COURT:  Didn't I in those proof of claim cases

3    enjoin prospectively each of the Defendants from ever claiming

4    fees that were undisclosed?

5            MR. CALLAWAY:  I truthfully can't remember.  I know

6    we had -- I'm pretty sure that it was a (b)(3) class, because I

7    remember we did a class notice.

8            THE COURT:  We did.

9            MR. CALLAWAY:  I remember working on the class

10   notice.

11           THE COURT:  We did.

12           MR. CALLAWAY:  And --

13           THE COURT:  So, maybe not.  I was thinking I did.

14           MR. CALLAWAY:  And there wasn't nobody, without a

15   doubt, everybody got -- that I remember, that everybody wanted

16   their $125.

17           THE COURT:  And it was consensual, in fact, yes, all

18   right, in most of them; so, all right.

19           MR. CALLAWAY:  But it was made -- it was made as a

20   refund.

21           THE COURT:  I'll shut up, thank you.

22           MR. CALLAWAY:  Ironically, a side note on that case

23   that is completely off the topic.  Only a few -- a small

24   amount of the money in that case had actually been paid by the

25   Debtor, so there was only a small amount paid to the Debtors.

1    And of course, the firm that had done the -- had gotten all of

2    the fees kept all their fees.  So, Wells Fargo was out the

3    money and --

4              THE COURT:  No, I didn't know that.  All right.

5              MR. CALLAWAY:  -- and they ended up paying a big

6    attorney's fee, as well.

7              I'm going to turn over my time to Ms. Morgan next.

8              THE COURT:  Okay, all right.

9              MR. CALLAWAY:  And then to Ms. Szukala.

10             THE COURT:  All right.  So, I'm keeping track here.

11   You've had about 20, about minutes, roughly.  So, you've got 50

12   minutes left, all right.

13             Ms. Morgan?

14             MS. MORGAN:  Good morning, Judge, or good afternoon,

15   Judge.

16             THE COURT:  You're going to talk about damages?

17             MS. MORGAN:  I can.

18             THE COURT:  Okay.  Well no, that's what I thought you

19   were going to talk about.  So, when you get to that, we'll talk

20   some more about damages.

21             MS. MORGAN:  I have a few.  I'll be very brief.

22             THE COURT:  No, just go for it.

23             MS. MORGAN:  But I do have a few things to talk

24   about.

25             THE COURT:  Okay.

1          MS. MORGAN:  One thing that hasn't been raised yet,

2    and was raised in the briefs, and so I won't talk about it very

3    long is the fact that this is a civil contempt action, which

4    has to be brought by motion and not via an adversary

5    proceeding.

6          Like I said, this has been briefed.  The opposite

7    views have been briefed to this Court.  But I did want to bring

8    this Court's attention -- this Court has said in other cases

9    that interpretation of the Bankruptcy Code must begin with its

10   plain language.  And that particular quote was from In Re:

11   Puffinburger, which is 281 Bankruptcy 379.

12         THE COURT:  Right.

13         MS. MORGAN:  And Plaintiff's argument is directly

14   contrary to the plain language of Rule 9014 and 9020.  But

15   another thing that I wanted to bring up, and this Court I think

16   you hit the nail on the head earlier, that you said that there

17   are no class action cases --

18         THE COURT:  No.

19         MS. MORGAN:  -- like this one.

20         THE COURT:  No, I've looked.  I know you have all

21   looked, too, but I understand that.

22         MS. MORGAN:  And I think that one of the reasons,

23   Plaintiffs in their brief have argued that this whole motion

24   versus adversary proceeding is a matter of form over substance.

25   And I would agree that generally, things that are brought by

1   motion and then brought by adversary proceeding; a lot of times

2   they are very similar.

3          But the reason that this is a matter of substance

4   over form in this case is because they are not just trying to

5   bring a civil contempt motion in Ms. Brannan's case.  They are

6   trying to bring a class action, which is why they had to bring

7   it via adversary proceeding, and that's simply not appropriate

8   under the rules.

9          THE COURT:  And I think their view is -- well, in

10  fact, Mr. Nicholas said it, they are not -- this isn't civil

11  contempt, this is fraud on the Court or fraud on the system, if

12  you will, under 105.

13         MS. MORGAN:  And Judge, my response to that would

14  just be that once again their argument keeps changing and it

15  keeps morphing to their benefit.  And if you look, I believe we

16  cited their direct testimony in our brief, where they

17  specifically defined this as a civil contempt proceeding.

18         THE COURT:  All right.

19         MS. MORGAN:  Now, I did want to touch very briefly

20  on the issue of standing.  That's also been briefed

21  extensively.

22         Plaintiff's unequivocal testimony in her deposition

23  is that she was not damaged by the affidavit filed in her case.

24  She did not even remember it.  I do not remember if she ever

25  saw it.  She admits that there was nothing factually wrong with

1    the affidavit.  And I think that's an important point to make,

2    that there was nothing factually wrong.

3            And I believe you asked Mr. Callaway about the damage

4    to the Court, and you asked about class certification being

5    appropriate regarding the damages, and I think that's exactly

6    the point.  Why is there even a Plaintiff if this is a case

7    simply about -- not simply, it's not a simple issue -- but

8    about fraud on the Court, and that is why this should be a

9    sanctions issue and not a class issue, because they cannot show

10   that the Plaintiffs were damaged, any of the Plaintiffs, not

11   just Ms. Brannan.

12           And finally, the last thing I wanted to briefly touch

13   on is the elements of fraud on the Court.  And I brought a case

14   today, and I have a copy

15           Now, did you want to show it or --

16           MR. CALLAWAY:  I'll get it.  Thank you.

17           MS. MORGAN:  And I have one for the Court, as well.

18           THE COURT:  All right.

19           MS. MORGAN:  And this is an Eleventh Circuit case

20   from 2009, In Re: Behrend Stores.  And in that case the

21   Eleventh Circuit held that fraud on the Court must involve an

22   unconscionable plan or scheme which is designed to improperly

23   influence the Court in its decision.

24           It has been found only in those instances where the

25   fraud vitiates the Court's ability to reach an impartial

1  disposition of the case before it.

2  　　　　And Mr. Olen said that in some of these affidavits it

3  was crystal clear what happened on the face of the affidavit

4  itself.  And that's the point.  If there was a date missing or

5  Ms. Cochran signed it Teresa Cochran as opposed to Teresa Diaz-

6  Cochran; did that vitiate the Court's ability to reach an

7  impartial disposition of the case before it, or was it simply a

8  clerical error?

9  　　　　And that ties into what Mr. Callaway was saying, that

10  there will be all of these individualized inquiries of every

11  single affidavit, of every single affiant, to even prove the

12  elements, the specific elements of fraud on the Court.

13  　　　　And finally, I also think that the language that

14  fraud vitiates the Court's ability to reach an impartial

15  disposition of the case before it.  I think that requires that

16  there had to have been a change in the result.  If they hadn't

17  forgotten to put the date in the affidavit, would that have

18  changed this Court's result?  Mr. Callaway talked about in some

19  of these cases the relief was granted even before the affidavit

20  was filed.

21  　　　　THE COURT:  Let me ask you this, and maybe this

22  doesn't exactly -- well, let me just ask it.

23  　　　　If, with what you're saying, if parties are

24  recklessly disregarding notary rules or recklessly disregarding

25  rules of the Court in some other way or something; you're

1    saying it's no harm, no foul, right?

2          MS. MORGAN:  No, Judge.  I'm saying there would need

3    to be individualized inquiries to see if there was even harm.

4          THE COURT:  Okay.

5          MS. MORGAN:  I mean --

6          THE COURT:  But if --

7          MS. MORGAN:  Is there fraud on the Court --

8          THE COURT:  Let's just say in Ms. Brannan's case,

9    everything stated was true but it was a pre-signed affidavit.

10   Do you think that that is something that a Court should be able

11   to award damages or sanctions for?

12         MS. MORGAN:  And I believe that that's what

13   Mr. Callaway was saying, is that this -- the Court could award

14   sanctions.

15         THE COURT:  Okay.

16         MS. MORGAN:  But --

17         THE COURT:  So, you make a distinction between

18   sanctions and damages?

19         MS. MORGAN:  Right.  And that goes back to the issue

20   of the standing issue is -- the case law is very clear that the

21   class representative has to have standing.  And that's the

22   point, class-wide relief is not even appropriate in this

23   action.

24         THE COURT:  Okay, all right.

25         MS. MORGAN:  And I think I'm going to let Danielle

1  pick up on the elements of fraud on the Court.

2          THE COURT:  All right.  And --

3          MS. SZUKALA:  I'm the first name, so no one has to

4  bother with the last name.

5          THE COURT:  No, I want you to say it again.  It's

6  such a (inaudible).  I'm going to say it wrong too.  I'm as bad

7  as --

8          MS. SZUKALA:  Your Honor, it's Danielle Szukala.

9          THE COURT:  Szukala.

10          MS. SZUKALA:  And I have to --

11          THE COURT:  But there are several letters there, it's

12  S-F?

13          MS. SZUKALA:  S-Z.

14          THE COURT:  S-Z?

15          MS. SZUKALA:  Uh-huh.

16          THE COURT:  That's it.  I knew there was another

17  letter there.

18          MS. SZUKALA:  And I have to give Mr. Olen credit,

19  he might be one of the few people who usually gets it right,

20  so.

21          THE COURT:  Well, I appreciate you saying it again,

22  because at some point I want to get it right, and I'll keep

23  trying.  Thank you.

24          MS. SZUKALA:  And Your Honor, it's a somewhat odd

25  position that I'm in.  I'm here, I represent JP Morgan Chase

1    Bank in the Taylor matter before you, and at your okay, we

2    filed briefs in this case.

3         THE COURT:  I have read them.

4         MS. SZUKALA:  But we are not really talking about

5    the evidence, we're not part of the evidence in this case, and

6    the evidence from our own case isn't also being considered

7    here.

8         But, and exactly what our positions will be in our

9    own, you know, case may vary.  However, I did want to have the

10   opportunity to speak to I think what is a really important

11   issue in this case, and it goes to the other cases, because

12   it's the underlying cause of action, and that is such an

13   important consideration at class certification.

14        You know, an understanding of what the cause of

15   action is; what are the elements of that cause of action; and

16   what are the potential defenses to that.  And then, with all of

17   that evidence, what does your trial look like?  You know, and

18   are you resolving things with common evidence or is it a trial

19   that lasts a year or two years, because you have so many

20   witnesses?

21        So, you know, first, their cause of action that they

22   have alleged is fraud on the Court.  Fraud on the Court, I

23   mean, the very first word there, it's fraud.  Fraud is rare in

24   a class certification context because of the nature of fraud,

25   because of the elements of fraud.

1    Fraud on the Court; it's not something less than

2 fraud.  It's something more than.  It's a bigger deal than your

3 typical fraud.

4    And another important component of this is it's not

5 fraud between the parties.  And you know, I would just urge

6 you, Your Honor, to look closely at the -- we have cited a lot

7 of fraud on the Court cases.  Plaintiffs have cited a lot of

8 them.  There's a lot of, you know, parentheticals; but really

9 looking at these cases and what's happening with fraud on the

10 Court and when does it come about.

11    And so, the one thing that's clear is it's not just

12 fraud between the parties, meaning if someone gets up on the

13 stand and lies or someone submits a false document, that is not

14 fraud on the Court.  It has to involve an officer of the court,

15 otherwise it's just fraud and her parties.

16    And the Eleventh Circuit it recognizes this in Gore,

17 and it does -- my apologies.  It recognizes it in Gore, and I

18 think I have that one, specifically.  I'll come back to it.

19    THE COURT:  All right.

20    MS. SZUKALA:  And then in the Seventh Circuit, in a

21 recent opinion, In Re: Golf, 652 F3d 806, at 809 provides and

22 holds that stating a fraud on the Court has to include

23 circumstances where a lawyer is involved.  They submit a

24 fraudulent submission for a party, with knowledge that the

25 documents are forged or perjured.  That's one of the things

1    that the Seventh Circuit talks about.

2            So, we're not just talking about an attorney

3    submitted the affidavit.  The attorney has to be part of the

4    fraud.  They have to have intent and knowledge of the fraud.

5    They have to be participating in this process.  That's what

6    makes it fraud on the Court.

7            So, in the class cert context, what matters?  The

8    common evidence that needs to be there to show not only that

9    all of these affidavits are false -- and just as a side note

10   here, a lot of what's been talked about today is this pattern

11   and practice, but the pattern and practice doesn't equal fraud

12   on the Court.  They are trying -- what pattern and practice

13   would do is they are trying to say this is the common evidence

14   that proves an element of the claim.  And at least from what

15   I'm hearing, it's the common evidence to show bad affidavits

16   exist in these cases.

17           I think from the testimony today, at least what I

18   heard, you'd still have to look at each affidavit, and Wells

19   Fargo would still have the opportunity to defend each

20   affidavit, to put people on the stand, to say you know, what

21   was the process for creating this affidavit; for the person who

22   signed it, did you confirm the information in it?

23           You know, and again, I don't know all of the

24   evidence, but it seems that they should have this opportunity

25   to defend with respect to each of these affidavits.

1          So, the pattern and practice idea seems to be going

2    to whether the affidavit itself is bad.  But there's other

3    things that have to be considered.  Was an officer of the Court

4    involved, with knowledge and intent, and part of that fraud?

5          And that's something, you know, that the evidence in

6    the Wells Fargo case will have to be looked at, but could

7    certainly vary with any given case as to -- I've heard some

8    testimony to that -- or some discussion, I'm sorry, today about

9    this idea of the Wells Fargo people -- someone else would

10   confirm the information and then someone else signs that, and

11   then it's submitted.

12          That doesn't mean an officer of the court is

13   involved.  For all you know, the attorney is just -- they've

14   gotten the affidavit back from their client and they have no

15   idea that someone else confirmed the information and someone

16   else signed it.  That's a case by case analysis.

17          So, I think that, you know, when you're thinking

18   about the evidence needed on this issue of, well, frankly both

19   the fraudulent affidavit as well as the involvement of the

20   officer of the court is going to be reviews of the affidavits,

21   depositions or testimony of attorneys, testimony of Wells Fargo

22   people, and then there's other elements of fraud on the Court

23   that I also think lead to other individualized issues.

24          Oh, I did want to talk a little bit about what I

25   think is Plaintiff's argument, because I think what I

1  understand them to be is that you can have a fraud on the

2  Court, even if an officer is not involved, because in Gore, I

3  think they're focusing on the quote, you know, that there's a

4  fraud which does or attempts to defile the Court itself, or as

5  a fraud perpetrated by officers of the court, as if it's two

6  different things.

7         THE COURT:  Right.

8         MS. SZUKALA:  But defiling the Courts; whenever cases

9  are talking about fraud on the Court, they seem to be talking

10 about bribery of a judge, tampering with the jury, you know,

11 things that are of an extremely high level.  We're not talking

12 about evidence, because over and over and over again in fraud

13 on the Court cases, they address issues like evidence, and when

14 you're talking about perjury or submission of evidence, if only

15 the party is involved, it's not fraud -- it's fraud, inter

16 parties.  If an officer of the court is involved, i.e. the

17 attorney, it's fraud on the Court.

18        So, the Seventh Circuit in this recent decision came

19 out in July of this year.  I just wanted to read a part of what

20 the court was saying, because they were talking about, you

21 know, what kind of fraud rises to the level of fraud on the

22 Court, quote:

23        "The answer is the kind of fraud that ordinarily

24 couldn't be discovered despite diligent inquiry within a year

25 and in some cases within many years, cases in which there are

1   no grounds for suspicion and the fraud comes to light,

2   serendipitously.  Examples are bribery of a judge or exertion

3   of undue influence on him, jury tampering, and fraudulent

4   submissions by a lawyer for one of the parties in a judicial

5   proceeding such as tendering documents he knows to be forged or

6   testimony he knows to be perjured."

7         The court goes on, "One might not think that a lawyer

8   being complicit in a fraud would make it harder to detect the

9   fraud within a year of final judgment, but whereas perjury by

10   witnesses is the known danger and lawyers for the adverse party

11   have ways of countering it through discovery, other

12   investigatory means and cross-examination --"

13         I'm sorry.

14         "-- of countering other investigatory means and

15   cross-examination, perjury and other outright fabrications by

16   lawyers are less common and more difficult to ferret out.

17   Lawyers are not witnesses and therefore are not subject to

18   cross-examination.  That is the practical reason why a

19   lawyer's perjury is deemed fraud on the Court, but simple

20   perjury by a witness, perjury not suborned by a lawyer in the

21   case is not."

22         And they cite Hazel-Atlas class, which is a case

23   heavily relied on by Plaintiffs.

24         THE COURT:  Right.

25         MS. SZUKALA:  I think that this is an important, you

1  know, statement about -- I think it goes to the heart of this

2  case too, that we're talking about an affidavit submitted by a

3  witness that counsel looks at.  We know that sometimes counsel

4  have already -- counsel for, bankruptcy counsel, I mean, have

5  already worked out what's going to be happening with this

6  motion before that affidavit is even put together.

7       But the Debtor is represented by counsel and they do

8  see the affidavit, and if there was something of concern to

9  where they said:  Wait a minute.  We cannot proceed and go

10  forward with this Motion for Relief.  There's something of an

11  issue here.

12       They can depose that witness.  They can say:  Wait a

13  minute, I have a concern about this evidence.  I mean that

14  happens all the time in courtrooms, and that's not fraud on the

15  Court situations.

16       THE COURT:  Let me ask you, then you're not -- so, if

17  -- say if -- let's assume that these affidavits have problems.

18  What can I do?  So, are you -- what are you saying?  There's a

19  sanctions motion then, if it's not fraud on the Court; are you

20  saying there's nothing I can do?

21       MS. SZUKALA:  I --

22       THE COURT:  Or can I sanction?

23       MS. SZUKALA:  I have to be careful here in the sense

24  that I haven't done a lot of research and looking into the

25  sanctions part of it.

1          THE COURT:  Okay.

2          MS. SZUKALA:  Focusing more on the class

3   certification, but --

4          THE COURT:  You're not saying there's no remedy?

5          MS. SZUKALA:  I'm not saying that there's no remedy.

6   I do think that when the remedy needs to be presented, when

7   the issue may need to be presented to the Court may be a

8   factor.

9          THE COURT:  Okay, all right.

10         MS. SZUKALA:  So, and as to this idea of officer

11  involvement, obviously the Gore court does recognize it.  They

12  say, quote:  "Fraud, inter parties, without more should not be

13  fraud on the Court," end quote.

14         So, another element of the case I wanted to talk

15  about was this idea of the fraud must prevent the judicial

16  machinery from performing.  So, the idea is that it affects the

17  process.  So, one of the things that could be fraud on the

18  Court is where the attorney creates false evidence and it's --

19  or even better, there was a case, I think it is the case that

20  perhaps Plaintiffs, one of them that they quoted, but I

21  remember in the facts of that case, there were two videos and

22  one was basically going to be bad for one party in the case,

23  and they only produced the other video.  And the attorney is

24  part of all of this.

25         And so, that is something that affects the judicial

1  machinery, and the court talked about it, does the outcome --

2  do they have to change the outcome of the case? You don't have

3  to prove that, but you have to prove something was impacted in

4  the proceeding.

5           And here, we can see something was impacted. The

6  party was prevented from presenting evidence. So, unlike here

7  where you're looking at was there -- I mean I guess they'll

8  have to look case by case as to whether that rises to that

9  level in any of these affidavit cases, but at its core it

10  doesn't seem like it.

11           I mean, no one was presented from -- prevented from

12  presenting evidence. The Debtor at any point can say: I've

13  made payments, and this isn't right, because I know I've made

14  these payments and I know that I'm only two payments behind.

15           THE COURT: How about the impact that I only signed

16  the order because I've got an affidavit?

17           MS. SZUKALA: Can I ask? Do you look at the

18  affidavit?

19           THE COURT: Yes.

20           MS. SZUKALA: Okay. So, you look at the affidavit.

21  So, when there were mistakes --

22           THE COURT: No, we do. We look at the affidavit. In

23  fact, you will find lawyers around here, we're always going,

24  "There's no notary seal visible."

25           MS. SZUKALA: And --

1      THE COURT:  "There's a page missing."  Yes, we look

2  at the affidavits.

3      MS. SZUKALA:  And so, what -- and can I ask then:

4  What -- when you see the affidavit and say it's got, you know,

5  a date issue or you notice something, what happens then?

6      THE COURT:  I just -- I don't know that I looked at

7  them so carefully that I looked at the dates.  But we look to

8  make sure the, you know, that things are attached that they say

9  are going to be attached.  We do do all of that.  And I don't

10  sign an order until all of that is there.

11      I assume the lawyers are going into -- and actually,

12  Judge Shulman goes farther than I do at times.  He looks at the

13  chain of title more closely than I do.

14      MS. SZUKALA:  And I think, remembering back to

15  something you talked about earlier today, you were talking

16  about --

17      THE COURT:  So, I'm just saying yes.  Is that an

18  impact?

19      MS. SZUKALA:  Fair concerns about you know, standing.

20  For example, note and mortgage.  But if you were looking at it

21  and there was no mortgage attached, that would be a red flag,

22  you know, because you're saying -- you're not looking at

23  absolutely everything, but you're looking for it.  So, there's

24  the note and the mortgage and it shows you, presumably is

25  showing you whether that party has a right to proceed with the

1   motion that they're going on.

2          THE COURT:  But it may -- but to me, it's important

3   that somebody says:  This is the note and mortgage for this

4   case and it's, you know, by swearing to it, they're telling me

5   it's true and correct.

6          MS. SZUKALA:  And at least as far as I understand

7   things, Plaintiffs aren't saying and in fact there's note and

8   mortgages attached that aren't --

9          THE COURT:  No, no, no.

10          MS. SZUKALA:  -- true and correct.

11          THE COURT:  I'm not -- no, I don't think that -- they

12   haven't said that.

13          MS. SZUKALA:  Right.

14          THE COURT:  But I'm just saying is that enough of an

15   impact?

16          MS. SZUKALA:  So, let's just -- I don't -- well,

17   let's just say this:  If you decide, well, if it was redone,

18   would it be the same?  It would be the same thing?

19          THE COURT:  Well, in fact we did make them, you know,

20   we have the one we went by, which -- where the page was

21   missing, whatever.  We do make them redo it.  We do make them

22   resubmit affidavits where we make them shade the notary or

23   something like that, or they don't put in the payoff amount or

24   they don't, you know, something yes, I mean we do make them

25   review them.

1          MS. SZUKALA:  So there -- I mean, so the process is

2     in essence working?  I mean you don't have -- you don't always

3     have --

4          THE COURT:  But what about the fact that I may have

5     relied on some that were not properly done?

6          MS. SZUKALA:  Well, I think that that goes to -- but

7     if you relied on it, and ultimate -- so, I think it goes to

8     harm.  So, how do you define harm?

9          THE COURT:  Yes, that's what I say.

10         MS. SZUKALA:  And if ultimately, the note and the

11    mortgage and the standing and the -- how much a borrower owns

12    is all there.  Is there harm to the system, especially when the

13    other side's attorney, the Debtor's attorney has all of these

14    documents, is reviewing all of this evidence and certainly will

15    bring to the Court -- I have no doubt that these Debtor's

16    counsel are going to show up in this court and say, and I know

17    it happened.  They don't have standing to bring this motion.

18         THE COURT:  They didn't --

19         MS. SZUKALA:  My Debtor is not five payments behind,

20    they are three.  They are going to make sure that this court

21    process works right in terms of what has to be resolved here;

22    this Motion for Relief and making sure that this Debtor does

23    not pay for more than they should and that everything is

24    exactly what it is.

25         THE COURT:  Okay, all right.

1          MS. SZUKALA:  So, a few points on this, the harm

2    issue.  I don't know if it will answer your question, but I

3    just wanted to -- or if it will further answer the question,

4    but I just wanted to get to a few things, is that I think that

5    Plaintiffs will argue that impact doesn't matter and impact

6    does matter.  There has to be some effect.

7          I mean, there's cases, I know that there was one

8    cited in the Chase brief.  There was a completely false like

9    substantively false -- I believe it was an affidavit.  And the

10   Court said there's no fraud on the court, because this document

11   was withdrawn before anything happened.  So, no matter how

12   terrible the document is, if nobody is, you know, basing any

13   decision on this, then that is not going to be fraud on the

14   court.

15         And so, what they argue at 23 of their reply is:

16   Because the affidavits are sworn, they are a nullity and in

17   turn, all of the rulings based on the purported affidavits are

18   tainted with the same fraud.  But I think this goes back to

19   Your Honor, I mean, one, we do -- and Wells Fargo has the right

20   to go case by case to see what the impact really was, where the

21   affidavit came into the mix.

22         And I understand what you're saying is that I want an

23   affidavit filed, but there are circumstances, for all we know,

24   there can be circumstances where a problem was noticed with the

25   affidavit and it was fixed.

1      And I think what's also important in terms of harm

2  and impact, is that the counsel has an opportunity to raise

3  the issue of whether it be standing or an issue with the

4  payments.

5      THE COURT:  All right.

6      MS. SZUKALA:  So, just in terms of impact and impact

7  mattering, one of the cases, Davenport Recycling, is an

8  Eleventh Circuit case.  Let's see it's Davenport Recycling

9  Association v. CIR, 220 F3d 1255.

10      And in that case -- well actually, it just goes to

11  what has been previously said, that maybe it was quoted before

12  and my apologies, but that fraud on the court is narrowly

13  construed.  It has been found only in those instances where the

14  fraud vitiates the Court's ability to reach an impartial

15  disposition of the case before it.

16      Fraud on the court must involve an unconscionable

17  plan or scheme which is designed to improperly influence the

18  Court in its decision, preventing the opposing party from fully

19  and fairly presenting its case.

20      So, this gets to the point I'm saying is you have to

21  have intent.  You need an officer of the court, so you need

22  their intent.  And they are trying to improperly influence your

23  decision to go in the wrong direction, and the other side was

24  unable to present their case.

25      THE COURT:  Uh-huh.

1          MS. SZUKALA:  I don't think that that's what's

2    happening here, but more importantly for a class cert, you're

3    going to have to look on a case by case basis to see if that's

4    what happened at any given instance.

5          So, the last thing I wanted was to address at least a

6    couple of their cases on this point at Plaintiff's reply brief.

7    At 21, they cite Browning v. Navarro, and they have a

8    parenthetical that says -- or that suggests something in

9    opposite, I think, to what the Court's saying.  I don't think

10   the Court held, quote, "that it was not required to examine

11   the effect of the conduct," which is what their parenthetical

12   said.

13         In Browning, they cite Hazel-Atlas class, which the

14   1944 case, the U.S. Supreme Court case that plaintiffs rely on

15   a lot.

16         THE COURT:  Right.

17         MS. SZUKALA:  And it said, quote:  "Although Hazel-

18   Atlas presents facts more akin to the elements of common law

19   fraud, i.e. misrepresentation and reliance than we have before

20   us, it involves an additional element that is alleged here, the

21   involvement of the parties' attorneys.

22         "Indeed, Hazel-Atlas might be read to suggest that

23   once the determination is made, that officers of the court

24   have corruptly abused the judicial process, the Court is not

25   required to examine the effect that such conduct might have

1  had on the ultimate judgment, but rather the court may rely on

2  such conduct alone to set aside the judgment."

3       The Supreme Court, however, noting that the attorneys

4  had urged the falsified article upon the court, had prevailed

5  -- and had prevailed, held that they are, quote, "in no

6  position to now dispute its effectiveness."

7       So, the Browning court was looking at Hazel, and what

8  Hazel -- what the Hazel court decided was there's a falsified

9  article and the party that prevailed is the one that submitted

10 the falsified article.  They didn't say you don't look at

11 impact.  They just said that -- so, they made that comment in

12 that case.

13      But then we apply it to this case.  You submit this

14 affidavit, but it doesn't make a difference, because the

15 parties -- the Debtor's attorney was clearly fine with the

16 information presented, and didn't raise anything to make it an

17 issue.  And they certainly weren't prevented from doing so,

18 which is defraud on the court, circumstance.

19      So, I believe that what the Browning court is

20 saying is that impact does -- it's not that it doesn't matter,

21 it was just assumed in Hazel-Atlas.  But if there are facts in

22 other cases that show -- certainly if it shows there's no

23 impact, or there's not an impact of the kind expected for fraud

24 on the court; then there isn't going to be a fraud on the

25 court.

1          So, in this context again, that's a case by case

2     review in each instance.

3          THE COURT:  Just so you know, there's like ten

4     minutes.

5          MS. SZUKALA:  Then I will stop.

6          THE COURT:  Okay.

7          MS. SZUKALA:  So that --

8          THE COURT:  I just wanted to make sure that if we had

9     one other argument --

10          MS. SZUKALA:  Other than to make this last point, one

11     last point.  They talk about diligence and whether there has to

12     be due diligence to ferret out the problem.  I do think that

13     when you look at the cases, there are a lot of cases that talk

14     specifically about diligence, but there might be a difference

15     between how much efforts you have to go through to figure out

16     the fraud and maybe it doesn't go that far.

17          But certainly knowledge.  If you have actual

18     knowledge of everything about these affidavits, you're the

19     Debtor's attorney, and you don't raise something about it; I

20     don't know that you can come back later and say:  Oops,

21     there's a fraud on the court, even thought I had knowledge

22     of every problem I'm talking about today, back when it

23     happened.

24          I don't -- and the line due diligence with knowledge

25     due diligence with knowledge, they are two different things,

1  whether you knew or should have known, and whether you actually

2  know is two different things.  And I do think that there's a

3  right for Wells Fargo to figure out in each and every

4  circumstance, what the Debtor and the Debtor's attorney knew

5  with regard to the evidence being submitted.

6          That could affect whether there's a fraud on the

7  court.

8          THE COURT:  All right.

9          MS. SZUKALA:  Thank you, Your Honor.

10          THE COURT:  All right.  And who else is going to

11  speak?

12          Mr. Bumgarner?

13          MR. BUMGARNER:  Good afternoon, Judge.

14          THE COURT:  Good afternoon.

15          MR. BUMGARNER:  I hope you're doing well.

16          THE COURT:  Oh, yes.

17          MR. BUMGARNER:  I'm one of the attorneys who

18  represents Citimortgage in the Katherine Tate case,

19  Your Honor.  And like Danielle, we have not been involved in

20  the discovery in this case.  We've been to all of the

21  depositions and we don't have the benefit of all of the

22  evidence.  We submit, certainly, that the evidence in our case

23  is going to be substantially different from the evidence

24  presented to the Court today.

25          MR. OLEN:  Well wait a minute, we're not here to talk

1    about your case.

2         Now, that's not fair, Your Honor.

3         THE COURT:  I don't think he's going to --

4         MR. OLEN:  That's not what --

5         MR. BUMGARNER:  I'm not.

6         THE COURT:  I don't think --

7         MR. OLEN:  That's not what this --

8         THE COURT:  I don't think he --

9         Are you going to talk about the evidence?

10        MR. BUMGARNER:  No.

11        MR. OLEN:  I don't think he even gets to tell you

12   what, anything about the evidence in his case.  That's not what

13   he got a right to come here for.  That's not right.

14        THE COURT:  I think you get to make -- you can talk

15   about legal issues which is what Ms. Szukala did, as well.

16        MR. BUMGARNER:  Right.  I don't need to talk about

17   evidence in our case.

18        THE COURT:  And actually, I was wrong about the

19   time.  I forgot.  I think you've got like fifteen minutes

20   left, if you've got -- I don't know how, but just so you're

21   aware of it.

22        MR. OLEN:  Okay.

23        THE COURT:  All right.

24        MR. BUMGARNER:  Thank you, Your Honor.  And I'm only

25   going to take a couple of minutes, and I didn't mean to suggest

1    that I was talking about any of this in my case.

2            THE COURT:  Okay.

3            MR. BUMGARNER:  There's twenty that were involved in

4    discovery in this case.

5            THE COURT:  Okay.

6            MR. BUMGARNER:  And we have filed an amicus brief

7    just as the interested party, Your Honor, and I will just

8    respectfully direct the Court to the arguments raised in that

9    particular brief.

10           THE COURT:  And I read it.

11           MR. BUMGARNER:  Thank you, Your Honor.  I believe

12   most of the issues that I want to talk with the Court about

13   have already been addressed.  I'll just raise two issues that I

14   would like to address with the Court.

15           THE COURT:  All right.

16           MR. BUMGARNER:  First of all, is the issue concerning

17   the remedy that will be available to the class representative

18   here and perhaps the class as a whole?

19           As I understand it, Your Honor, the primary remedy or

20   one of the prime remedies that the Plaintiffs are seeking in

21   this particular case, is to vindicate fraud on the court.  And

22   particularly, the improper, false affidavits that were

23   submitted to the Court in connection with Motions for Relief of

24   Stay and the like.

25           THE COURT:  All right.

1          MR. BUMGARNER:  Now, the cases, as I understand them,

2  Your Honor, clearly state that to the extent that the damages

3  are not designed to compensate the individual, in this

4  case Ms. Brannan for any actual loss, then the sanction is more

5  of a punitive sanction and nature.

6          And there is a distinction between a civil sanction

7  and one that's designed to basically compensate -- not

8  compensate, Your Honor, but to prevent some further conduct --

9          THE COURT:  Coercive versus criminal?

10         MR. BUMGARNER:  Yes, Your Honor, to prevent someone

11  from violating the sanctity of the Court.

12         THE COURT:  Right.

13         MR. BUMGARNER:  Or to punish someone as to the past

14  conduct for violating the sanctity of the Court.

15         THE COURT:  We used that a lot and whether you can go

16  forward and in domestic relations court.

17         MR. BUMGARNER:  Okay.

18         THE COURT:  I wonder if it's criminal or civil

19  contempt.

20         MR. BUMGARNER:  So --

21         THE COURT:  I'm well aware of that, but I hope -- I

22  guess you weren't going to tell me are you, that I can't --

23  that I cannot sanction in my court without it being criminal

24  content.

25         MR. BUMGARNER:  Your Honor, I'm not telling you that

1    form.

2              THE COURT:  Okay, okay.

3              MR. BUMGARNER:  What I am saying is that there is a

4    distinction when you look at actual or civil contempt.

5              THE COURT:  Right.

6              MR. BUMGARNER:  Versus Peanut type contempt.  Now,

7    what that distinction is, that if you're looking at a contempt

8    award that is designed to remedy a fraud perpetrated upon the

9    court.  A remedy that's designed to address conduct that

10   violated a court order that didn't cause actual harm; then

11   you're looking at a punitive sanction award, which I understand

12   they were seeking here to remedy or to pick -- basically to

13   address the fraudulent conduct that violated the sanctity of

14   the Court.

15             Well, what that gives rise to and certain due

16   process safeguards that Wells Fargo and any other Defendant is

17   entitled to, when they're facing a punitive or a contempt

18   award.

19             Those due process safeguards require that Wells Fargo

20   or any other mortgage company be provided the opportunity in

21   each individual situation where the alleged contempt occurred,

22   the contempt that violated the sanctity of the Court to be able

23   to present evidence, testimony and the like on each alleged

24   contemptuous act or conduct.  That would require individualized

25   analysis, Your Honor.  That's one of my points.

1          The second point is --

2          THE COURT:  And I did rule on this somewhat, if not

3    totally, I think in one of the -- in Mr. Tauzey's case; isn't

4    that -- is that the one that you're in?

5          MR. BUMGARNER:  I'm in <u>Katherine Tate's</u>, yes,

6    Your Honor.

7          THE COURT:  Okay.  Because I think that went up -- I

8    think that went out -- I think I've ruled on that.  I've

9    certainly talked about that whole issue as to whether this is

10   criminal contempt or punitive, so.

11         MR. OLEN:  You decided that issue.  They moved for

12   leave to appeal and they got it.

13         THE COURT:  Yes.

14         MR. OLEN:  They sent it back.

15         THE COURT:  Yes.  So, but just -- I'm probably

16   going to be consistent so you may want to move on to your next

17   issue.

18         MR. BUMGARNER:  Okay.

19         THE COURT:  Because I'm probably not going to change

20   my mind on that, but --

21         MR. BUMGARNER:  The second issue has to do with the

22   other remedies that we're seeking as far as disgorgement.

23   Disgorgement is any actual damages that may have been suffered

24   by any class member.

25         THE COURT:  And that one -- yes.

1          MR. BUMGARNER:  Yes, Your Honor.

2          THE COURT:  Talk to me about that, okay?

3          MR. BUMGARNER:  Okay.

4          THE COURT:  Okay.

5          MR. BUMGARNER:  Well, their position is that

6   disgorgement would be incidental.

7          THE COURT:  Right.

8          MR. BUMGARNER:  And therefore, it would be

9   appropriate under class-certification, under 23(b)(2) or

10  (b)(3).

11         It seems to me that the disgorgement is not

12  incidental but it's directly related to the claim contemptuous

13  conduct; and therefore, there are a number of cases out there,

14  including In Re: Willburn From the Fifth Circuit in 2010, which

15  held that a class could not be certified under Rule 23(b)(2) or

16  (b3) where disgorgement would depend on fast, a fact-specific

17  inquiry for each class member.  Okay.

18         And also, Your Honor, we would cite you to the Aho v.

19  Americredit Financial Services case, which is a July of 2011

20  Southern District of California case that talks about --

21         THE COURT:  Go ahead.

22         MR. BUMGARNER:  -- restitutionary relief and how that

23  would not be appropriate under Rule 23(b)(2) or 23(b)(3).

24         THE COURT:  And so, if -- basically, fees for Relief

25  of Stay are pretty much standard in this court.  There's a

1    certain filing fee that's charged and there is an attorney's

2    fee and it's usually $500.

3           MR. CALLAWAY:  That's paid.

4           THE COURT:  So, if that's the case and it's a pretty

5    standard fee and it's pretty easily discernible in every case,

6    and the Debtor either paid it or it's in their mortgage now, or

7    whatever the arguments may be about who would be able to get it

8    back?

9           THE COURT:  Where, I guess if -- I'm not sure, so how

10   would -- it's directly related to the contemptuous conduct by

11   the fact that there was -- I guess I'm not totally following

12   you.

13          I have ruled in earlier cases that the fee what was

14   paid was incidental to the fact that the creditors should be

15   enjoined from any further charging of fees without disclosure.

16          So, let's say in this case I said - let's assume I

17   have found in the Plaintiff's favor and said you will never

18   file affidavits that have not been properly, you know, done

19   under the law, and by the way, since earlier one weren't

20   anybody who got charged a fee, it comes back.

21          You say that's no incidental.  I guess I don't

22   understand the difference between incidental and directly

23   related to contemptuous conduct, because it seems to me even

24   incidental damages are going to be directly related to

25   contemptuous conduct, so I'm uncertain.

1          Are you staying there can never be damages in a

2   (b)(2)?  Or that you're making a distinction here?

3          MR. BUMGARNER:  Your Honor, I'm not saying that there

4   here would never be damages in (b)(2).  My6 distinction --

5          THE COURT:  Well, if it's directly related to

6   contemptuous conduct, isn't that always going to be, at least

7   in what I post here and in those prior cases, proof of claim

8   cases; isn't that always the case?

9          MR. BUMGARNER:  Well Your Honor, I think if it's

10  directly related, all I'm trying to say, and as I understand

11  the cases that they articulate is that if they are directly

12  related, they impose upon the court, an analysis of the

13  individual case situation, to determine whether or not what

14  those -- what that award is, and indeed, whether or not

15  attorney's fees were paid in that individual matter, and that

16  is going to require an individual -- an individualized analysis

17  for each particular debtor.

18          As I understand this particular Plaintiff,

19  Ms. Brannan, from listening to the testimony and the evidence

20  presented to the Court -- that she didn't pay any attorney's

21  fees, and that would require an individualized analysis that

22  would vitiate or cut against any type of Rule 23(b)(2) or

23  23(b)(3) certification.

24          THE COURT:  Okay, all right.  I think I understand --

25  okay.  And -- well, we'll leave it at that, okay.  I understand

1   your issue, I think.

2          MR. BUMGARNER:  Thank you, Your Honor.

3          THE COURT:  All right.

4          All right, and we actually finished a little early.

5   If Mr. Callaway has something that he wants to add, he's still

6   got a few minutes.  I'm going to let him do that, because we've

7   got the time.

8          MR. CALLAWAY:  The first thing is that I -- there are

9   things that I forgot to say the first time that I was --

10         THE COURT:  That's fine.

11         MR. CALLAWAY:  I got off of my --

12         THE COURT:  Between the four of you, you have saved

13  yourself some time.

14         MR. CALLAWAY:  I got off of my little outline.  But I

15  just --

16         THE COURT:  I did that to you, I'm sorry.

17         MR. CALLAWAY:  On the commonality issue, going back

18  to the commonality issue, there is not -- now that the

19  Plaintiffs are defining their class as being everybody who has

20  had an affidavit filed over a period of twelve years or so;

21  there's not any evidence to support that everybody had a false

22  affidavit, you know, that we had anecdotal -- anecdotal

23  evidence that was discounted, of the kind that was discounted

24  in the Wal-Mart, that:

25         Yes, certain people who were deposed said they

1  couldn't tell, you know, they were not able to -- sometimes

2  they had the exhibits with them, sometimes they didn't have

3  exhibits with them.  They can't tell now in retrospect which

4  ones that did or did not, it's difficult to tell.  But that

5  doesn't meet the burden of proof as showing that all the class

6  members have all bad affidavits.

7       We had no kind of evidence that the Plaintiffs had

8  pulled up all affidavits.  Nobody said that they actually

9  pulled up all of the affidavits and looked at them to see if

10  they were bad or not.  There's no kind of statistical evidence

11  that would perhaps jump that gap.

12       And as I've said before, it's not enough just to say

13  that:  Oh, the defendant had sloppy practices or you know, had

14  a bad attitude, or intended to flout the law.  You need to show

15  the actual practice, how that was carried out, and we didn't

16  have any commonality of that.

17       And then a couple of other comments; really, the

18  bottom line that I come to after listening to all of the

19  evidence here is that the Court is saying -- the Court is sort

20  of saying, you know, that I may be the damaged one because I'm

21  relying upon the affidavits.  That's what I hear you saying.

22  And you may be the only one who is actually relying on them,

23  because --

24       THE COURT:  Well, I'm just saying it's certainly --

25  there may be other damage too, but I'm saying what about me,

1   you know?

2          MR. CALLAWAY:  Right.

3          THE COURT:  But it seems like everybody is saying:

4   Well, in the end with the defenses and all, you don't really

5   matter.

6          And I'm saying:  What about that?  Is that right?

7   So, that's what I'm trying to explore.

8          MR. CALLAWAY:  And nobody is saying that.

9          THE COURT:  I know you aren't.

10         MR. CALLAWAY:  But it --

11         THE COURT:  I know you really aren't.

12         MR. CALLAWAY:  And in this case, but for example in

13  the Brannan's specific case which was the only one we've

14  deposed the Plaintiffs for; Ms. Brannan never saw it.  Her

15  lawyer never even saw the affidavit, you know.  And it doesn't

16  appear that they were relying upon it in negotiating a

17  standard.

18         And she was unable to tell us -- the fee may have

19  been assessed against her.  I looked back at her deposition

20  testimony and she was just operating on a cash basis and didn't

21  have access to the checking account and so forth.  She told me

22  in the deposition that she didn't know that she had paid that,

23  the fee.

24         So, you have all kinds of individualized questions

25  and I understand you're saying:  What about me?

1          That, in my mind, points to the fact that this is not

2     a class action.  This is really a sanction thing where the

3     Court is saying:  Yeah, you've got too many different -- too

4     many different factors here with the individual Plaintiffs, you

5     know, too many different things happened too many different

6     ways; they may not have been relied upon.  They may not have

7     even seen it, and so forth.

8          But look at:  Here I am, the Court; and I'm relying

9     on -- I'm counting on to be correct and this is an appropriate

10    sanction case.  And you're never going to have a Defendant ever

11    again, are you, in that there ought to be some kind of

12    sanctions actions or a sanctions hearing against it.

13          THE COURT:  I'm -- I hear you.

14          MR. CALLAWAY:  But I'm just saying that that's the

15    appropriate legal mechanism that this case should be following,

16    and it avoids all of the problems of the commonality and all of

17    the being able to define the class, all of these different

18    things that we're raising.

19          THE COURT:  Well, that's why I was asking you the

20    questions that I was asking you, because I wanted to figure out

21    whether you thought that if one didn't work, was there the

22    possibility that the other, or why not, you know.  That's

23    exactly -- let me just say this:  I know that the Defendants

24    have said:  Well, maybe there's no damage if she didn't pay

25    it.  But I -- did their case get dismissed?  They never --

1               MR. CALLAWAY:  It was dismissed.

2               THE COURT:  Yes.  So, what about -- I'm assuming, and

3 they lost their house is my recollection, as well.

4               MR. CALLAWAY:  No, she gave it in a deed in lieu of

5 foreclosure --

6               THE COURT:  She did?

7               MR. CALLAWAY:  -- years and years later.

8               THE COURT:  Okay, okay.  So, she did do a deed in

9 lieu.  I was going to say otherwise, if she had a deficiency

10 judgment, that would be part of that.

11              MR. CALLAWAY:  And the deed in lieu which was one of

12 our exhibits --

13              THE COURT:  But she did a deed in lieu, you said.

14 That's right, you said that.

15              MR. CALLAWAY:  -- specifically said that they are

16 releasing liability.

17              THE COURT:  So, she didn't have that damage, okay,

18 all right.

19              MR. CALLAWAY:  She is releasing liability.

20              THE COURT:  She is, yes.

21              MR. CALLAWAY:  So, she doesn't have the possibility

22 that it's going to be assessed against her at some later

23 date.

24              THE COURT:  I forgot about the deed in lieu, okay,

25 that answers that too.  Thank you.

1        MR. CALLAWAY:  But I just -- I think everything

2   points against class action and toward a different revenue,

3   which would be the sanctions which we have already said was the

4   appropriate mechanism.

5        THE COURT:  Okay.

6        MR. CALLAWAY:  I'm not agreeing to sanctions, but

7   we're saying if that was the procedural mechanism.

8        THE COURT:  I hear you.  All right, okay.

9        Mr. Nicholas.

10        And this doesn't mean that you get until 5:00 now.

11        MR. NICHOLAS:  Yes, ma'am.

12        THE COURT:  You kept 25 minutes.

13        MR. NICHOLAS:  Yes, ma'am.

14        THE COURT:  So, I'm going to hold you to that.

15   Okay.

16        MR. NICHOLAS:  And you may have to stop me.

17        THE COURT:  All right.

18        MR. NICHOLAS:  I'd like to start with impact.

19        THE COURT:  Okay.

20        MR. NICHOLAS:  Because I think -- well first, let me

21   say again, Mr. Olen said it two or three times, we're not

22   talking about some mis-dates or something like that on the face

23   of the affidavit.

24        But let's hypothetically look back at say, the 65 or

25   so affidavits that Ms. Massey filed before the Court, and she

1  adds a paragraph that says:  You know, I have personal

2  knowledge of none of this, but somebody put it in a stack

3  and I've signed it and notarized it, and filed that affidavit

4  before the Court.  What would have been the impact of that?

5          Or I think it's -- there's so many that I forget the

6  names, Mr. Olen took all of the depositions.  If they added the

7  paragraph that said:  I have personal knowledge of none of

8  this, but one of my underling employees brought me this

9  affidavit and tells me it's true, and they sign and notarize

10 that.

11         Or if Mr. Schlotter had said -- well, let me back up.

12 If any of these people say:  The note and the mortgage and any

13 other document attached to this affidavit, I don't know if it's

14 the right one or not, but I'm going to let somebody else attach

15 it and file that with the Court.

16         Or Mr. Schlotter says:  I don't work for these

17 people, I have no idea how the books and records are kept, but

18 I can look on the computer and I'm a lawyer, and he signs that

19 affidavit, and says that truthfully in the affidavit.

20         If you want to test impact, that's the way you have

21 to test impact, not whether the numbers were right, because the

22 point is, it's not an affidavit at all, effectively.  And

23 that's how you test impact.

24         And the definition of fraud of the court, and

25 Ms. Szukala is right, there are two prongs of it.  One is a

1   system that attempts to defile the court or make a mockery of

2   the system.  I think that's what that is, when they're

3   pretending, because this Court gives them the accommodation to

4   file affidavits, as opposed to bringing a witness and

5   testifying.

6           THE COURT:  That's the point.  I mean that is the

7   point of us letting them do affidavits.

8           MR. NICHOLAS:  Yes, ma'am.  You do them a favor, and

9   because that takes too long to do a proper affidavit, they have

10  a Robo signer, who sits there and signs all day, or it's too

11  much trouble to actually look and see if the attachments that

12  they were incorporating are actually there; so, they

13  misrepresent that.

14          If they had told the truth, I suspect that Lacey

15  Robertson might have looked at that affidavit that says:  You

16  know, I don't have any idea whether this is actually an

17  affidavit or not, because some lawyer had a signature page that

18  they stapled to it and sent it to the Court.  That might have

19  raised somebody's inquiry if they had been truthful.

20          So, for them to now come in here and say:  Oh, no

21  impact, no impact on the Court, no impact on the Debtor, no

22  impact on the lawyer, because as the cases Ms. Szukala talked

23  about, it's hard to uncover Robo signing.  It's hard to uncover

24  the fact that these people aren't doing what they're supposed

25  to do.  We wouldn't have uncovered it, but for the fact that

1    they went so far as to use pre-signed affidavits, pre-signed

2    signature pages.  That's the very point.

3            Secondly, that's prong one, mockery of the Court or

4    a process that attempts -- it doesn't even have to be

5    successful, attempts to defile the judicial integrity of the

6    Court.

7            The other is the use of their lawyers.  The lawyers

8    are knee deep in all of this.  They're the ones attaching the

9    post-dated attachments.

10           In Ms. Brown's case, they're the one I guess,

11   Mr. Callaway is now saying that's changing the affidavit.

12   They're the ones in Mr. Schlotter's case, everybody knows who

13   he is.  You know, they know he's the head of their department,

14   the lawyers that are working for him.  They're the ones

15   promoting his affidavit as being an affidavit of Wells Fargo,

16   when it's really not.  So, we meet both prongs of that test of

17   fraud on the Court.

18           But more importantly, I'm making -- that's a merits

19   argument, Judge.  All of that is a merits argument.  More

20   importantly, that's a common merits argument that we get to

21   make on behalf of this entire class.  Does that rise to the

22   level of fraud on the Court?  And that's the common question,

23   the overriding common question that we get to make on behalf of

24   everybody.

25           Now, a couple of other comments on the same vein; I

1    agree the _Behrend's_ case is a fine case, but a conscionable

2    plan or scheme which is designed to improperly influence the

3    Court in its decision.  The only reason the affidavit is filed

4    is to influence the Court in its decision.

5            And again, if they were truthful about what it was,

6    and in Ms. Brannan's case, that it's not an affidavit at all,

7    then that would have changed the outcome of her case.  Not

8    that the numbers are different, but the fact that they weren't

9    going through the very accommodation that this Court allows

10   them to make.

11           Now again, to the extent of impact, we cite to these

12   cases and I know Your Honor will look at them, but the _Browning_

13   case.  The _Browning_ case, it was a situation where the state

14   court judge was corrupt.  But what the court said there was:

15   Irrespective of whether such corruption can be said to have

16   directly affected the jury in its consideration in the merits

17   of the case, its existence is grounds for setting aside the

18   entire judgment, including the jury verdict.

19           You don't have to show the corruption led to -- or

20   would have led to a different result.  It's the corruption in

21   and of itself you can vacate.

22           The Ninth Circuit in _Pumphrey_, and we've cited

23   Your Honor to this case.

24           THE COURT:  Uh-huh.

25           MR. NICHOLAS:  Moreover, even assuming that Sparks

1  was not diligent in uncovering the fraud, the district court

2  was still empowered to set aside the verdict as the Court

3  itself was a victim of the fraud, citing to Hazel-Atlas.

4       Your Honor's -- and I don't have time, I won't read

5  it, but Your Honor recalls you said that in Tate. No court

6  could be prevented from determining whether it's a victim of

7  fraud on the court, because a debtor's lawyer may have been

8  asleep at the switch. All of it matters.

9       And that segues me, I guess, into remedy, Judge.

10      THE CLERK: Ten minutes.

11      MR. NICHOLAS: One remedy would be for Your Honor to

12 simply say, not simply, but to say: If we've proven it, all

13 of these orders, conditional denials or grants for that

14 matter, are infected with fraud on the court. They are all

15 vacated.

16      Now, what would that mean? That would mean --

17      THE COURT: You've got me.

18      MR. NICHOLAS: Well, that would mean the imposition

19 of the fee, right?

20      THE COURT: Yes, the fee.

21      MR. NICHOLAS: Would go away.

22      THE COURT: Right.

23      MR. NICHOLAS: Now, maybe in Ms. Brannan's case it

24 doesn't matter because she has now been released. Your Honor

25 has ruled in the proof of claim fee cases that posting that on

1    their account is a damage, they've been injured.

2           Now, the fact that she is later released, I agree,

3    maybe she doesn't get the money, but she certainly has standing

4    to complain.  But that makes the fee go away.  Now --

5           THE COURT:  Unless it's also incidental to the

6    other --

7           MR. NICHOLAS:  And it's automatic.

8           THE COURT:  Yes.

9           MR. NICHOLAS:  It's automatic.

10          THE COURT:  Yes.

11          MR. NICHOLAS:  You don't have to look at anything

12   else, it's done.

13          THE COURT:  Okay.

14          MR. NICHOLAS:  And under Allison, which was the name

15   I couldn't remember, Allison v. Citgo, which is discussed by

16   the Supreme Court in Wal-Mart v. Dukes, that's the test.  Is it

17   automatic?  Is it incidental?

18          Now, you know in fairness to, you know, Your Honor

19   has to think through, I guess, there may have been some grants

20   under those bad affidavits, and that might create some issues

21   that then occur, but those are damage type issues that flow

22   from that rule.  I mean, we may have to clean up some stuff if

23   Your Honor were to do that, but that's a remedy that simply --

24   that certainly the Court has to vacate not judgments, but

25   orders, because it's not a final judgment, based on the fraud

1    on the court, and that's easy and across the board.

2         And as far as (b)(2), Your Honor, it did do that in

3    the proof of claim fees.  I think the first two, I know you

4    certified under (b)(2), under the same basis though.

5         THE COURT:  Well, yes.

6         MR. NICHOLAS:  You looked at the account, you could

7    see what was assessed, it goes away, and that's incidental and

8    I think that's consistent with Allison and Murray v. Auslander

9    and the Supreme Court in Dukes.

10        Again, the idea of superiority and how you should

11   proceed, and that whole line of inquiry, I think you talked to

12   Mr. Callaway, and frankly with everybody.  We don't think it's

13   appropriate for what I said when I was here the first time, to

14   simply look at Ms. Brannan's case, and for Your Honor to be

15   whatever level of irritation, aggravation or anger over their

16   conduct.  I'm not going to try to argue the merits of it.

17        And say:  I'm going to sanction you a lot or a

18   little, based on that.  Now, certainly you could do that and

19   limit yourself to that.

20        And then it may be a lot of other people come and

21   say:  Me too, you know, me too.  We want relief from these

22   orders.  And then you've got all of these people.

23        But the better way to do it is to deal with it in

24   each of these cases where it's present.  And again, the most

25   efficient way to do that is by certification.  If Your Honor

1  was going to do it the other way, then again, the cases that we

2  cite to on Page 12 and 13 of our reply brief say you have the

3  authority to bring everybody here.

4          And so, whether you do it by bringing everyone here

5  and we still have to go through all the notice process and

6  everything else; we think it's much more efficient to do it on

7  a class-wide basis.

8          THE COURT:  And it -- let me just be sure I'm clear

9  before we're done here, too.  Mr. Callaway says that you're

10 basically saying in your definition of the class right now,

11 that it's every case in which Wells Fargo filed an affidavit,

12 from '96 to 2008, is presumptively fraudulent.  Is that what I

13 hear him saying?

14         MR. NICHOLAS:  Yes, ma'am.

15         THE COURT:  Okay.  And that's what -- so, that's what

16 you're saying.  Every one?

17         MR. NICHOLAS:  Yes, ma'am.

18         THE COURT:  Not just -- not just picking out types,

19 but everyone, okay, all right.

20         MR. NICHOLAS:  Because when you -- when you read the

21 testimony, even though they protest at times and say:  Oh, we

22 had the attachments and oh, we read them.

23         THE COURT:  Got you.

24         MR. NICHOLAS:  That's when if you look at the

25 evidence in the chart, you say:  I don't believe it.

1          THE COURT:  Okay.

2          MR. NICHOLAS:  I just don't believe it.  And it's not

3    that somebody mis-dated something or, you know, that we're

4    saying that makes it fraudulent.  It's when you read the

5    testimony it contradicts their own protestations that they in

6    fact read the stuff.

7          THE COURT:  Okay.

8          MR. NICHOLAS:  I had one more point and I lost it,

9    Judge.

10          THE COURT:  I'm sorry, and it's my fault.

11          MR. NICHOLAS:  If you give me just one second.

12          No, I don't remember.  I do know this, that because

13    we've done this in the past, even if Your Honor certifies it

14    under (b)(2), the rule allows for -- the rule allows for

15    notice and opt out.

16          THE COURT:  Right.  Oh, yes.

17          MR. NICHOLAS:  We have always requested that and we

18    would again, because we think that that's the most fair.

19          THE COURT:  Right.

20          MR. NICHOLAS:  Because if somebody is in fact

21    different, then they can exercise that right.

22          THE COURT:  Right.  I do remember that we did that.

23          MR. NICHOLAS:  Can I have just a second?

24          THE COURT:  Sure.

25          (Pause.)

1      MR. NICHOLAS:  Well, that was the point that I

2 forgot.  The fact that -- I mean that on one of the ways I

3 guess I would say thank God nobody has done this before,

4 because as a lawyer, you know, I'm offended.  If what we say is

5 true, and obviously I think it is, you know, this doesn't

6 happen every day.  And I think we're all glad that it doesn't

7 happen every day.

8      And the fact that we have brought it as a class

9 doesn't mean -- I mean nobody brought a proof of claim fee

10 class before the proof of -- before that first class.  We

11 didn't do it first.  They did it in North Carolina first.

12      THE COURT:  Right.

13      MR. NICHOLAS:  But nobody did that because they

14 didn't know the conduct was there.  Nobody did a lot of

15 things, until somebody finds out the conduct is there.

16      Now, you know, this type of conduct apparently, it

17 has existed recently in some other settings and it has been

18 dealt with in different ways.  But that doesn't mean because it

19 doesn't -- hasn't been uncovered and hasn't been brought to the

20 attention of anybody, that this is the inappropriate vehicle to

21 do it.

22      And we're, you know, we're glad that this -- that

23 there aren't a lot of these out there, at least until the ones

24 that we've brought.

25      Thank you, Judge.

1          THE COURT:  All right.

2          Obviously, it's under advisement.  I hope you didn't

3  think I was going to rule today.  I have a lot to read and look

4  at.  I can't tell you how soon it will be done.  It will be

5  done as soon as I can have it done.

6          I thank you, you know, good lawyers make it easy, or

7  I won't say easy this time, but easier, and you've given me

8  everything I could possibly want and need.  Your arguments have

9  been well done.

10          Thank you very much.  You'll hear as soon as I can

11  get it done.

12          Thank you.

13          MR. CALLAWAY:  Your Honor, I'm going to take this

14  deposition notebook and put the exhibits behind it, as you had

15  requested.

16          THE COURT:  Oh, that's right.

17          MR. CALLAWAY:  So, I'm taking it with me.

18          THE COURT:  Okay.

19          MR. CALLAWAY:  But I'll --

20          THE COURT:  And then return it to me and you'll make

21  copies for Mr. Olen, so he has them too?

22          MR. CALLAWAY:  He's got the depositions.

23          I don't know if you would want a copy with the

24  exhibits?

25          MR. OLEN:  Please.

1          MR. CALLAWAY:  Okay.

2          THE COURT:  He probably wants to know just what I

3    have, so yes.

4          MR. NICHOLAS:  Just --

5          THE COURT:  Okay, Mr. Nicholas?

6          MR. NICHOLAS:  Just so, we talked about this in the

7    pretrial conference, but just in case Your Honor gives us any

8    different direction, Mr. Callaway may have some --

9          THE COURT:  I forgot.

10         MR. NICHOLAS:  But all of these --

11         THE COURT:  I probably forgot.

12         MR. NICHOLAS:  All of these binders against the wall

13   are the universe of affidavits --

14         THE COURT:  Right, right.

15         MR. NICHOLAS:  -- that are part of the chart; and we

16   agreed, I think, that we would have them here, give them to

17   Your Honor on a disc, and then bring them.  I'm happy to leave

18   them, if Your Honor wants them all.

19         If Your Honor wants some of them at some later date,

20   it's whatever Your Honor wants to do.

21         THE COURT:  I'll tell you what.  Will you leave now

22   until I figure out how I am going to do my own?  I'm probably

23   going to just want the disc and I will tell you to come and

24   pick it up, unless --

25         Or do we need to keep an original -- I don't know

1  what the district court will accept from us.  They will

2  probably want -- do they still want paper over there?  If I --

3  because I'm assuming somebody is going to appeal this, so.

4          THE CLERK:  Yes, ma'am, because I always give them

5  what I have, which is paper exhibits.

6          THE COURT:  We have never given them everything on a

7  disc, which would be -- it would make sense, of course.  But

8  leave the --

9          MR. NICHOLAS:  I'm happy to leave them here,

10  Your Honor, I just didn't want to --

11          THE COURT:  Leave it here and I will let both sides

12  know if at some point that changes, so you're both aware of

13  what's happening, but we'll keep it for now.

14          MR. NICHOLAS:  I just didn't want to burden the

15  Court --

16          THE COURT:  Okay.

17          MR. NICHOLAS:  -- if you didn't want to be burdened,

18  Your Honor.

19          THE COURT:  No, I appreciate that and we are going to

20  take them out of the courtroom.

21          THE CLERK:  Yes, ma'am.

22          THE COURT:  And we're going to put them in chambers,

23  because I don't want them out here without us.

24          THE CLERK:  I'll go get the dolly.

25          THE COURT:  Okay, good.  It doesn't have to be at

1  this moment, but certainly by tomorrow, because you'll lock

2  this up, right?

3          THE CLERK:  Yes, ma'am.

4          THE COURT:  Okay, all right.

5          Thank you.

6                        *   *   *   *   *

7                  (Hearing is Concluded)

# C E R T I F I C A T E

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                  **_1/20/12**
**Sherryl P. Robinson**                      **Date**